*Judge Hellerstein*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

DANIEL EISNER,

                      Plaintiff,

                   v.

WALLEYE TRADING ADVISORS, LLC,

                    Defendant.

------------------------------------------------------------------ x

07 CIV 7837

07 Civ. _____

**COMPLAINT**

SEP 0 5 2007
U.S.D.C. S.D. N.Y.
CASHIERS

       Daniel Eisner ("Eisner"), by his attorneys, McDermott Will & Emery LLP, for his Complaint for a declaratory judgment pursuant to 22 U.S.C. §2201 against Walleye Trading Advisors, LLC ("Walleye"), alleges as follows:

### Nature of the Action

       1.     Eisner is an information technology ("IT") professional who, until August of 2007, worked as the Chief Technologist at Walleye in its New York office. As a condition of employment with Walleye, Eisner was required to execute an employment agreement containing a non-competition covenant ("the Non-Compete") that, on its face, purports to prevent him from working for any financial services firm anywhere in the world for two years following his separation from Walleye; specifically, the Non-Compete goes so far as to state that employment with "*any* business similar to or competitive with" Walleye is prohibited for a two-year period (emphasis added). Moreover, by its very terms, the Non-Compete purports to prohibit Eisner from utilizing his skills – an impermissible basis to preclude an individual from working for a future employer.

       2.     Eisner resigned from Walleye and has been offered and accepted employment with D. E. Shaw & Co., L.P ("D. E. Shaw") in a position that poses no risk whatsoever to

Walleye's protection of its legitimate business interests. Despite being informed that the new position poses no risk to Walleye's confidential information, Walleye has continued to persist in its unreasonable position that Eisner cannot accept employment with D. E. Shaw under the terms of the Non-Complete.

3.     Eisner brings this action to obtain a declaratory judgment that the Non-Compete is unenforceable as a matter of law, or, in the alternative, unenforceable as Walleye is applying it to him. Eisner also requests that this Court enjoin Walleye from attempting to enforce the Non-Compete against him because Walleye's efforts to preclude Eisner from working with D. E. Shaw unreasonably restrain his ability to earn a living, maintain and develop his technical skills, and pursue a career as an IT professional. If Eisner is unable to accept employment in the financial services industry for two years from his separation from Walleye, Eisner's career will be irreparably damaged and he will suffer significant financial losses, warranting injunctive relief to prevent such an outcome.

### Parties

4.     Eisner is an individual who resides at 200 Rector Place, New York, New York 10280.

5.     Walleye is a limited liability corporation with a principal place of business at 294 Grove Lane East #280, Wayzata, Minnesota 55391.

### Jurisdiction and Venue

6.     Pursuant to 28 U.S.C. §1332, this Court has diversity jurisdiction over this matter based upon the complete diversity of the citizenship of the parties and an amount in controversy exceeding $75,000.

7.     Pursuant to 28 U.S.C. § 1391(a)(2), venue properly lies in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## Facts

8.      Eisner is an IT professional who, over the course of his career, has developed considerable expertise and skill in the area of IT for the financial services industry.  The IT industry is a competitive field that requires professionals to keep up to date with ever-changing technological advancements.  Moreover, IT professionals in the financial services industry have the additional burden of keeping abreast of specialized technological developments, industry standards, as well as financial market trends.  In sum, in order to pursue his profession, Eisner must constantly be honing his skills in a fast-paced and constantly evolving field.

9.      Eisner received his Bachelors in Science and his Masters in Science in computer science from the State University of New York, Buffalo in 2001.  While in school, Eisner worked as a systems analyst for a New York based technology firm, where he developed his skills in network systems integration and other areas.

10.      In 2002, Eisner was hired as the Development Project Manager for Securities Industry Automation Corporation ("SIAC"), a subsidiary of the New York Stock Exchange ("NYSE").  SIAC provided technology services for financial institutions and market exchanges, including data network management, data center operations, disaster recovery and network connectivity.  A component of SIAC's work involved setting up co-location infrastructure, which technology allows financial services firms to locate their computers in close physical proximity to the various market exchanges and to execute trades at higher speeds than would otherwise be possible.  This is sometimes referred to as creating a "speed of light" advantage because it permits faster electronic communication between the financial services firms' computers and the exchanges' computer systems.

11.      At SIAC, Eisner was responsible for the research and development of new technologies for the NYSE.  Eisner was involved in developing cutting-edge technologies that,

among other things, facilitated infrastructure connections between the NYSE and financial services firms.

12.    Walleye is a Minnesota-based financial services company that develops an electronic derivative and securities market making system.    In addition to its Minnesota operations, Walleye employs individuals in New York, New York.

13.    In the summer of 2005, Eisner was contacted by a recruiter about a Chief Technologist position with Walleye.  After being solicited by a recruiter, Eisner interviewed with Walleye for the position.  Eisner participated in the interviews – a telephone interview and an in person interview – while physically present in New York, New York.    Following these interviews, Walleye hired Eisner, upon information and belief, because of his expertise in the field of IT systems, particularly IT systems in the financial services industry.

14.    In July 2005, Eisner began working at Walleye in the position of Chief Technologist.  In this position, Eisner worked out of Walleye's New York office and reported to Ori Kushnir, who also worked in the New York office.    Throughout his employment with Walleye, Eisner worked almost exclusively in Walleye's New York offices, traveling to Walleye's Minnesota offices on only a few occasions.

15.    As a condition of employment with Walleye, Eisner was required to execute an employment agreement that contained a non-competition covenant.  The Non-Compete provides in relevant part:

> so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the 'Noncompete Term') for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer; provided, however, that following the termination of Employee other than for 'Cause' as provided in Paragraph 14, the provisions of this Paragraph shall only apply to Employee for as

4

long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term.

(Attached as Exhibit A is a true and complete copy of the Employment Agreement.)

16.     The Employment Agreement provides that it is governed by the laws of the State of Minnesota.  It does not, however, provide that all disputes under the agreement be exclusively resolved in Minnesota courts.

17.     Eisner was hired shortly after Walleye commenced operations in 2005.  Indeed, upon information and belief, Walleye had only been in operation approximately 30 days when Eisner started as its Chief Technologist.  For the duration of his employment, Eisner was Walleye's only full-time systems IT professional.

18.     In his position at Walleye, Eisner was responsible for implementing and maintaining Walleye's systems infrastructure.  Specifically, Eisner used his skills to set up and maintain computer servers running industry-standard versions of the Linux operating system ("Linux Servers") and set up and maintain network connections to stock exchanges using the exchanges' published protocols and requirements for such connections.  In his position at Walleye, Eisner was not involved in developing, modifying, or programming related to Walleye's proprietary trading algorithms, trading decisions or client information and he never had reason to access, and never accessed, Walleye's proprietary information regarding its trading algorithms, trading decisions or clients.  Rather, Eisner's support of Walleye's trading system was related to infrastructure, such as developing methods to send out alerts in the event of a system crash, programming the system's log-on and shut-down systems, and allocating server space to those individuals charged with the development, modification and oversight of Walleye's trading algorithms and software.

19.    While working at Walleye, one of Eisner's primary tasks involved setting up network connections to the stock exchanges. Seeking to develop and maintain "the speed of light" advantage through "lightening quick" trading with the market exchanges (*e.g.*, the NYSE), a number of financial firms have begun to "co-locate" their own computers in close physical proximity to the exchanges' computer systems. Firms that co-locate their computers near or next to the computers of the various exchanges can benefit because those firms' transactions can be processed faster than if the computers were located at the distant offices of those firms. The practice of "co-locating" systems at market exchanges existed prior to Walleye's inception and is not proprietary, nor unique, to Walleye. In fact, in December 2006, the Wall Street Journal published a front-page article about such practices. (Attached as Exhibit B is a true and complete copy of that December 15, 2006 article.)

20.    In his position at Walleye, Eisner was involved in, among other things, co-locating Walleye's computers at various stock exchanges. In performing this task, Eisner did not utilize any proprietary information or special training received at Walleye. Rather, Eisner contacted individuals at various exchanges and informed them that Walleye wished to co-locate one or more of its computers and/or routers at the exchanges. In order to do so, Eisner completed standardized forms utilized by the exchanges and conferred with individuals at the exchanges to arrange for shipment of Walleye's computers and/or routers to the site of the exchanges' computers – a routine process for the exchanges. In setting up the network connections for the co-located computer, Eisner utilized third-party instruction manuals and industry-standard protocols prepared by the exchanges and available to all customers of the exchange. Eisner received no training from Walleye on how to perform these tasks, and Eisner did not utilize any proprietary Walleye manuals or protocols in performing these tasks.

21.    Throughout his employment at Walleye, Eisner did not receive any training in his field of expertise. In fact, as Eisner was the only full-time employee with substantial experience in implementing IT systems at Walleye, there was no one who could provide any substantial training to Eisner in IT systems. With the exception of one part-time employee, Walleye's other technology employees were largely deployed in the development of trading algorithms utilized by Walleye and in the programming of trading systems utilized by Walleye. Unlike these individuals who regularly worked with trading algorithms and software that may have been confidential or proprietary to Walleye, Eisner did not work on Walleye's trading systems, except as related to basic infrastructure issues, such as to assist in a systems crash.

22.    Accordingly, Walleye did not provide any specialized training to Eisner and Eisner's work for Walleye did not involve the use of any confidential information or unique methodologies developed or owned by Walleye.

23.    On or about July 19, 2007, Eisner resigned his position at Walleye. By letter dated August 3, 2007, from Peter Goddard ("Goddard"), Walleye's Chief Executive Officer, Walleye accepted Eisner's resignation. In that letter, Goddard informed Eisner of Walleye's intent to enforce the Non-Compete. Additionally, Goddard requested that Eisner submit an offer letter and job description from his potential future employer. (Attached as Exhibit C is a true and complete copy of the August 3, 2007 letter.)

24.    Prior to receipt of the letter from Goddard, Eisner had been offered and accepted a position in the Systems department at D. E. Shaw, an investment and technology firm with its main office in New York, New York. Like Walleye, D. E. Shaw generally separates the functions of employees, on the one hand, who are engaged in the development of proprietary trading algorithms and proprietary trading software, and employees, on the other hand, who are responsible for the implementation and maintenance of systems infrastructure consisting of

7

industry-standard, commodity hardware and software like Linux Servers, standard network connections and communication protocols, and similar commodity products and services that are available to all financial services firms. The former group of employees generally are referred to as being part of the "Front Office" or sometimes the "Middle Office," but the latter group of employees are part of the Systems department.

25.    The job that Eisner seeks to perform at D. E. Shaw is that of a System Administrator within D. E. Shaw's Systems department. In this position, Eisner would: (i) head up the company's search for new data center co-location space; (ii) find, evaluate and deploy new technologies for the Systems department (such as backup systems, high performance servers and voice-related technologies); and (iii) design and oversee the development of internal software to increase staff productivity (such as tools to improve conference room booking and improved communications software). *None* of these tasks involves the use of Walleye's confidential or proprietary information. Most importantly, *none* of these tasks requires skills that Eisner did not already have in abundance prior to commencement of his employment with Walleye in 2005.

26.    On or about August 10, 2007, James D. Kremer ("Kremer"), initial counsel for Eisner, sent a letter to Walleye, advising Walleye of Eisner's potential position at D. E. Shaw. In his letter, Kremer outlined Eisner's job responsibilities at D. E. Shaw and explained that Eisner's role at D. E. Shaw would not involve the creation, modification or implementation of trading systems or software. Additionally, Kremer further asserted his assessment that the Non-Compete is overbroad and unenforceable both as a matter of law and as Walleye seeks to apply it to Eisner. Further, Kremer articulated that Eisner would suffer financially as a result of the enforcement of the Non-Compete. (Attached as Exhibit D is a true and complete copy of the August 10, 2007 letter.) Eisner and D. E. Shaw have postponed Eisner's previously scheduled

8

August 10, 2007 start date until the dispute with Walleye regarding the Non-Compete is resolved. As of the date of this Complaint, Eisner has not started working for D. E. Shaw.

27.    The financial impact on Eisner should the Non-Compete be enforced to prevent him from working for D. E. Shaw is significant. In the position at D. E. Shaw, Eisner has been offered compensation significantly in excess of his base salary at Walleye. If limited to his Walleye base salary for two years, Eisner will be forced to forgo well over $120,000 in additional compensation, plus $30,000 in deferred compensation. With the potential for additional bonuses and salary increases over the initial two years, Eisner will likely suffer financial losses significantly greater than $150,000.

28.    On or about August 14, 2007, Walleye's counsel, Kevin R. Coan ("Coan"), responded to Kremer's August 10, 2007, letter. In his letter, Coan asserted that Walleye continued to believe that Eisner's employment at D. E. Shaw would violate the Non-Compete. However, Coan did not explain his reasoning as to why Eisner's employment at D. E. Shaw would violate the Non-Compete or why Kremer's analysis of applicable law was inapplicable. Additionally, Coan demanded that Eisner not commence employment at D. E. Shaw and, on behalf of Walleye, expressly threatened legal action if Eisner failed to do so. (Attached as Exhibit E is a true and complete copy of the August 14, 2007 letter to Kremer.)

29.    On August 14, 2007, Coan also mailed a letter to John M. Liftin, Esq. ("Liftin"), D. E. Shaw's General Counsel. In this brief letter, Coan asserted Walleye's position that Eisner's employment with D. E. Shaw would violate his obligations under the Non-Compete, and requested that D. E. Shaw discontinue his employment. Again, Coan provided no explanation as to why Eisner's employment at D. E. Shaw would violate the Non-Compete. (Attached as Exhibit F is a true and complete copy of the August 14, 2007 letter to Liftin.)

30.     Thereafter, counsel for Eisner and D. E. Shaw have had multiple telephone conversations with counsel for Walleye regarding this matter. In those conversations, counsel for Walleye have reiterated Walleye's intent to preclude Eisner from working for D. E. Shaw in any capacity. As a basis for this position, Walleye's counsel have asserted that Eisner's role in co-locating computers at exchanges entitles them to prevent him for working in the financial services industry. Further, counsel for Walleye has asserted that there are no assurances that could be provided by Eisner and D. E. Shaw that would alleviate Walleye's concerns about Eisner's potential employment at D. E. Shaw.

31.     Based on all of the above facts, Eisner concluded that Walleye intends to unreasonably enforce the Non-Compete and that his only means of obtaining appropriate redress is through litigation.

## COUNT I

### Declaratory Judgment

32.     Eisner repeats and realleges each and every allegation contained in paragraphs 1 though 31 above as though fully set forth herein.

33.     There is an actual controversy between Eisner and Walleye regarding whether the Non-Compete is enforceable as a matter of law and/or as applied to attempt to prevent Eisner from working for D. E. Shaw.

34.     The Non-Compete is unenforceable because the terms of the restrictive covenants do not reasonably protect Walleye's legitimate interests. Specifically:

a.      The Non-Compete does not protect Walleye's interest in confidential training methods because Eisner did not receive any such training from Walleye;

b.    The Non-Compete does not protect Walleye's confidential client information because Eisner had no involvement in Walleye's customer relationships and did not access Walleye's customer data; and

c.    The Non-Compete does not protect Walleye's proprietary systems, if any, because Eisner was not involved in the creation or modification of any such proprietary systems.

35.    Additionally, the Non-Compete is unenforceable because it is unreasonable as to geographic and temporal scope.    The Non-Compete's unlimited geographic scope is unreasonable as a matter of law.  The Non-Compete's two-year duration is unreasonable because Walleye does not require that amount of time to disassociate Eisner from Walleye's customers (particularly as Eisner had no involvement with Walleye's customers) and because systems technology changes so rapidly that any proprietary technology (of which there was none that Eisner worked on for Walleye) would be outdated in a much shorter span of time.

36.    Further, Walleye cannot enforce the Non-Compete to prevent Eisner from working at D. E. Shaw because his job duties would not involve the use of any confidential or proprietary Walleye information or methodologies.

37.    For all of these reasons, Eisner seeks a judicial determination that the Non-Compete is unenforceable as a matter of law or, in the alternative, that the Non-Compete cannot be enforced to preclude his employment at D. E. Shaw.

### COUNT II

### Injunctive Relief

38.    Eisner repeats and realleges each and every allegation contained in paragraphs 1 though 37 above as though fully set forth herein.

11

39.     If Walleye is not enjoined from enforcing the Non-Compete, Eisner will suffer damages, including but not limited to the loss of competitive advantage in his field, the loss of continued advancement along his current career path, as well as financial losses, for which Eisner's remedies at law are inadequate.

40.     More specifically, if the Non-Compete is enforced, Eisner will be precluded from working as an IT professional in the financial services market for two years from his separation from Walleye.   If precluded from working in the industry in which he has worked since graduating from college, Eisner will be prevented from continuing to develop the skills necessary to work in his field and from pursuing his chosen career.  A two-year hiatus is not acceptable for IT professionals in the financial services industry because the technology, industry standards and market change and develop rapidly.  If the Non-Compete is enforced and Eisner is forced to "sit on the sidelines" in the face of rapid technological developments in the financial services field, Eisner is likely to find it much more difficult to be employed as an IT professional in the financial services industry because he will not be up to date on these developments.

41.     Further, if the Non-Compete is enforced, Eisner will suffer substantial financial harm.  For the next two years, Eisner will suffer losses of no less than $120,000, but likely well over $150,000.  In the long term, Eisner will need to pursue employment in other industries, which other industries generally do not provide the same level of financial packages to IT professionals as those provided in the financial services industry.

42.     Thus, if the Non-Compete is enforced, Eisner will be irreparably harmed in terms of his ability to pursue his chosen field and to earn the livelihood available to him in his chosen field.

**WHEREFORE,** plaintiff Daniel Eisner prays that judgment be entered in its favor and against defendant Walleye Trading Advisors, LLC as follows:

(a)    declaring that the Non-Compete is unenforceable as a matter of law or, in the alternative, declaring that the Non-Compete cannot be enforced against Eisner with respect to his employment at D. E. Shaw;

(c)    enjoining Walleye from attempting to enforce the Non-Compete (by way of threats, judicial intervention or other means) to prevent Eisner from working for D. E. Shaw as a Systems Analyst; and

(d)    awarding Eisner such other and further relief as this Court may deem just and proper.

Dated:  September 5, 2007
        New York, New York                    MCDERMOTT WILL & EMERY LLP

                                              By _____
                                                  Terri L. Chase (TC-9091)
                                              340 Madison Avenue
                                              New York, NY 10173
                                              (212) 547-5400

                                              *Attorneys for the Plaintiff*
                                              *Daniel Eisner*

NYK 1119304-2.042771.0023

13

# EXHIBIT  A

<u>CONFIDENTIAL EMPLOYMENT, NON-COMPETITION, NON-SOLICITATION,</u>
<u>AND NON-DISCLOSURE AGREEMENT</u>

This Confidential Employment, Noncompetition, Nonsolicitation, and Nondisclosure Agreement ("Agreement") is made this 22nd day of June 2005, by and between Walleye Trading Advisors, LLC, ("Employer"), and Dan Eisner ("Employee").

### BACKGROUND:

1.      Employer desires to engage the services of Employee, and Employee desires to become so employed under the terms and conditions of this Agreement.

2.      Employer is engaged in the highly proprietary and unique business of trading securities in local, national and global markets.

3.      The trade and goodwill of Employer with its clients has been, and will be, established at substantial cost and effort to Employer, and irreparable damage will result to Employer if this goodwill is diverted from Employer or in any way disrupted.

4.      Employer has also expended, and will continue to expend, substantial costs and efforts to teach its employees techniques and methods that are extremely valuable, highly confidential, proprietary, and unique to Employer's industry and that Employer has developed.

5.      Employer intends to employ Employee to assist in developing its business, will provide Employee with access to its highly confidential techniques and methods, and will expose Employee to its clients, research, and techniques.

6.      During the course of Employee's employment, Employee will also be exposed to other confidential and proprietary information, including methodologies, profits, and specialized skills, which are not generally known to the public or to Employer's competitors and, as a result, have substantial value to Employer.

7.      Employer wishes to reasonably protect its confidential and proprietary information and to protect Employer from competition by Employee.

Accordingly, Employer and Employee agree as follows:

### AGREEMENT:

1.      <u>TERM</u>. Employee's employment with Employer shall be "at will," meaning that Employee may terminate his or her relationship with Employer at any time and for any reason, and Employer may terminate Employee's employment at any time and for any reason.

2.      <u>DUTIES AND RESPONSIBILITIES</u>. Employee's duties shall include the application of all of Employee's skills and knowledge as they relate to Employee's position with Employer as a senior developer, with those powers and duties as may be assigned from time to time by Employer.

3.      <u>BEST EFFORTS</u>. Employee agrees to devote all of Employee's time and best efforts to Employer's business in the performance of Employee's duties hereunder, and Employee shall not, without the express written consent of Employer, become associated with or engage in any business, employment or directorship other than for Employer.

4.      <u>COMPENSATION</u>. Employee will receive an annual salary of $120,000, paid pursuant to normal payroll practices. This salary will be reviewed and adjusted from time to time in Employer's discretion.

DSE _Initial_
Dan Eisner, 22 June 2005

5.     **DISCRETIONARY BONUS.**  Employee may be entitled to receive a payment of bonus compensation (the "Discretionary Bonus").  Employee's entitlement to receive a Discretionary Bonus payment shall be determined in the sole and complete discretion of Employer and be contingent upon the Employee being employed by Employer on the day of the Discretionary Bonus's payment.  Payment of all or any portion of a Discretionary Bonus payment shall be made in accordance with the "Terms and Conditions of Discretionary Bonus and Compensation and Identification of Deferred Compensation" attached as Exhibit A hereto.

6.     **DEFERRED COMPENSATION.**  Employee may be entitled to receive a payment of deferred compensation (the "Deferred Compensation").  Employee's entitlement to receive a payment of Deferred Compensation shall be determined in accordance with the terms and conditions of this Agreement, including Exhibit A attached hereto, and the terms and conditions of the Walleye Trading, LLC Non-Qualified Deferred Compensation Plan (the "Plan"), as may be amended from time to time.

7.     **BENEFITS.**  During the term of Employee's employment, Employee will be entitled to participate in Employer's benefit plans, including health and retirement plans, which are available to all similarly situated employees in accordance with the terms and provisions of those plans. Employer retains the right to alter or discontinue these plans at any time.  In addition, Employee will be entitled to four (4) weeks of vacation pursuant to Employer's existing vacation policy, which may also be altered at Employer's discretion.

8.     **NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.**  Employee will not, at any time during employment with Employer or anytime thereafter, directly or indirectly, disclose, furnish or make accessible to any person, firm, corporation, or other entity, or make use of, any Confidential Information of Employer or its affiliates, subsidiaries, or principals. For the purposes of this Agreement, "Confidential Information" means any information that derives independent economic value from not being generally known or readily ascertainable by persons outside Employer. Confidential Information includes, but is not limited to: this Agreement; information protected by Minnesota's Uniform Trade Secret Act; client contact information or information concerning client needs, portfolios or investments; methodologies; training materials of any kind; information related to profits or other financial data; market research and analysis or projections; proprietary trading techniques and skills used or developed by the company; products, securities, equities, option sales and other performance information; information of any kind related to the company's trading or product development practices; computer data files of any kind; lists of instruments, securities or positions held by the company, its clients or affiliates; marketing or advertising materials; plans, processes, and projections; the identities of the company's employees and independent contractors; Employer's computer programs, software and computer applications; company personnel and human resources information; company organizational information; proprietary quantitative trading algorithms; and the plans, objectives or strategies of Employer, its affiliates, subsidiaries, principals, investors or clients.

In addition, Employee recognizes that Employer has received or in the future may receive from third parties their confidential or proprietary information subject to a duty on Employer's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees that Employee owes Employer and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm, or corporation (except as necessary in carrying out Employee's work for Employer consistent with Employer's agreement with such third party) or to use it for the benefit of anyone other than for Employer or such third party without the express written authorization of a duly authorized officer of Employer, whether prior to, or following termination of Employee's employment with the Employer.

9.     **RETURN OF EMPLOYER PROPERTY.**  Employee agrees that, upon demand, and, in any event, after termination of employment with Employer, whether voluntary or involuntary, Employee will promptly return and deliver to Employer (and will not keep in his or her possession or deliver to anyone else) any and all information or property (tangible or intangible) of Employer, its successors, assigns, or third-parties (as set forth above) including and without limitation, any records, data, notes, reports, proposals, lists, correspondence, business plans, other documents or property, tangible trade secrets, Confidential Information, confidential knowledge, data, and all reproductions or electronic versions of any of these items.

10.    **ASSIGNMENT OF INVENTIONS.**

a)    In the course and scope of Employee's employment with Employer, Employee may develop copyrightable material (the "Work"). The parties agree that all Works created by Employee shall constitute "works made for hire" under the Copyright Revision Act of 1976, as amended from time to time, and shall be the exclusive property of Employer. To the extent that a Work, or any portion of a Work, may not properly be considered a work made for hire, Employee agrees to assign and hereby does assign to Employer all of its right, title and interest, including all copyright rights, in and to the Work, or such portion of the Work. Employee agrees to execute such documents as Employer may deem necessary from time to time to perfect Employer's rights hereunder. Should applicable law preclude Employer's exclusive ownership of a Work, Employee hereby grants to Employer an unlimited, exclusive, perpetual and royalty free license to use, reproduce and distribute such Work.

b)    While Employee is employed by Employer, Employee will promptly inform Employer of the full details of his or her inventions, discoveries, improvements, innovations and ideas (collectively, "Inventions") whether or not patentable, copyrightable or otherwise protectable that he/she conceives, completes or reduces to practice (whether jointly or with others) (whether conceived, completed or reduced to practice by Employee while employed by Employer prior to the date hereof or hereafter) and that:

   i)    relate to Employer's present or prospective business, or actual or demonstrably anticipated research and development;

   ii)   result from any work Employee does using any equipment, facilities, materials, trade secrets or personnel of Employer in the course of their service to Employer; or

   iii)  results from or are suggested by any work that Employee may reasonably be expected to do for Employer in the course of his or her employment.

c)    Employee hereby assigns to Employer or Employer's designee, his or her entire right, title and interest in all of the following, that Employee conceives or makes (whether alone or with others) while employed by Employer (whether conceived, completed or reduced to practice by Employee while employed by Employer prior to the date hereof or hereafter):

   i)    all Inventions;

   ii)   all copyrights, trade secrets, trademarks and mask work rights in Inventions; and

   iii)  all patent applications filed and patents granted on any Inventions, including those in foreign countries.

d)    Employee's obligations to disclose and assign Inventions under this Paragraph 10 shall not apply to any invention that: (i) was developed entirely on Employee's own time and effort; (ii) used no equipment, supplies, facility, trade secrets or Confidential Information of Employer or its affiliates in its development; (iii) does not relate to Employer Activities or Employer's actual or anticipated activities or research and development; and (iv) does not result from any work performed by Employee for Employer.

e)    Employee hereby agrees that he/she shall execute any and all such documents, instruments, agreements or certificates and take such other actions as Employer may reasonably request to further secure Employer's rights in and title to any Inventions.

11.    **NON-SOLICITATION OF CLIENTS.** Employee acknowledges that his/her position with Employer will inevitably expose Employee to confidential client information, including client identity and contact information, investing information, and any other information about Employer's clients. In addition, Employee acknowledges that in carrying out his/her duties for Employer, it may become necessary to utilize confidential client information and develop good will with Employer's clients. Accordingly, for a period of two

DSE Initial
Dan Eisner, 22 June 2005

3

(2) years after termination of Employee's employment with Employer, whether voluntary or involuntary, Employee agrees not to solicit or accept business from, or do business with, either as a principal, agent, employee, employer, stockholder, partner, or in any other individual or representative capacity whatsoever, any person or entity with whom Employer has done business or solicited business from during the preceding two (2) years. The term "client" shall specifically include, without any limitation, any investors in any of Employer's funds.

12.    NON-SOLICITATION OF EMPLOYEES. Employee acknowledges that Employer has spent, and will spend, substantial efforts in training and recruiting other employees. Accordingly, Employee agrees that, for a period of two (2) years after termination of Employee's employment with Employer, whether voluntary or involuntary, Employee will not, directly or indirectly: (i) solicit, induce, or attempt to induce any person who then is, or was within two (2) years previously, an employee or independent contractor of Employer or its affiliates, subsidiaries or principals (a "Company Employee"), to become connected in any way with a company, entity, firm, business, activity or enterprise with which Employee is directly or indirectly affiliated; or (ii) hire or attempt to hire any such Company Employee to become connected in any way with a company, entity, firm, business, activity or enterprise with which Employee is directly or indirectly affiliated .

13.    NON-COMPETITION AGREEMENT. Employee acknowledges that Employer will invest a substantial amount of time and resources in training Employee using highly confidential and proprietary training methods, techniques and materials, and that Employer would not otherwise make this training and know-how available to Employee were it not for Employee's strict adherence to all of the terms of this agreement, specifically including Employee's agreement to not use the skills, training, and know-how provided by Employer pursuant to this provision. Employee further acknowledges that Employer's business is of a global nature, involving investments and trading of securities in local, national and global markets, and that the protections contained in this Agreement must also be of a global nature and scope for Employer's reasonable protection.

Accordingly, so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the "Noncompete Term") for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer; provided, however, that following the termination of Employee other than for "Cause" as provided in Paragraph 14, the provisions of this Paragraph shall only apply to Employee for as long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term. Nothing in this paragraph shall prohibit Employee from trading for their own account, but if Employee uses any resources of Employer, any such activity must conform in all respects with Employer's employee manual and other procedures and policies as determined from time to time with respect to trading and investing in public companies.

14.    TERMINATION FOR "CAUSE". For purposes of this Agreement, "Cause" shall mean:

(i)    The diversion or attempted diversion by Employee of business from Employer for Employee's personal gain or benefit;

(ii)    The commission by Employee of an act of dishonesty or moral turpitude involving Employer;

(iii)    A violation of the provisions of this Agreement;

(iv)    Gross negligence or willful misconduct;

(v)    Failing to abide by established internal risk policies by a meaningful margin or by a small margin chronically;

DSE Initial
Dan Elsner, 22 June 2005

4

(vi)    Commission by Employee of a felony or serious misdemeanor offense or pleading guilty or *nolo contendere* to same; or

(vii)    Persistent failure of Employee to effectively perform his or her duties for Employer.

15.    INJUNCTION.  Employee acknowledges that the provisions set forth in this Agreement are reasonable and necessary in order to protect and maintain the legitimate business interests of Employer, and that their enforcement would not prevent Employee from earning a livelihood, especially given that Employee is skilled in other areas and would only be skilled in the areas protected by this Agreement as a result of the training and know-how provided by Employer. In the event Employee breaches the promises contained in this Agreement, Employee recognizes that irreparable injury will result to Employer, that Employer's remedy at law for damages will be inadequate, and that Employer shall be entitled to seek an injunction to restrain the continuing breach by Employee, Employee's partners, agents, servants, or employees, or any other persons or entities acting for or with the Employee as provided by law and/or equity. Employer may further be entitled to damages in connection with the enforcement of this Agreement as provided in the Plan and by law and/or equity, and including the recovery of any profits and revenues obtained by Employee while engaging in violations of this Agreement in addition to the recovery of any Deferred Bonus. These remedies are in addition to any other rights and remedies that Employer may have at law or in equity.

16.    ENFORCEABILITY.  If any provision of this Agreement is, for any reason, adjudged to be void, invalid, or unenforceable by a court of law, the remainder of this Agreement will nonetheless continue and remain in full force and effect. In the event that any provision of this Agreement relating to time periods and/or areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time periods or areas such court deems reasonable and enforceable, said time periods and/or areas of restriction shall be deemed to become and thereafter be the maximum time periods and/or areas which such court deems reasonable and enforceable.

17.    SUCCESSORS AND ASSIGNS.  Except as otherwise provided herein, the benefits and obligations of this Agreement will inure to the successors and assigns of Employer, to any person or entity which purchases all or substantially all of the assets of Employer and to any subsidiary affiliated corporation or operating division of any other previously described entities.

18.    INJUNCTION BOND.  If Employer is required to furnish a bond or other surety as a precondition to the issuance of any injunctive relief, Employee hereby agrees that such bond or surety will be in the amount of the minimum allowable by law.

19.    SURVIVAL.  The terms and conditions of this Agreement will survive the termination of Employee's employment with Employer to the fullest extent necessary for their enforcement and for the protection of Employer, its successors, assigns, and affiliates.

20.    CONSENT TO JURISDICTION, SERVICE OF PROCESS AND VENUE.  Employee, Employer, and its subsidiaries and assigns consent to venue and jurisdiction in the District Court of Hennepin County, State of Minnesota, and in the U.S. District Court for the District of Minnesota and to service of process under Minnesota law in any action commenced to enforce this Agreement.

21.    GOVERNING LAW.  This Agreement will be construed and interpreted in accordance with the laws of the State of Minnesota.

22.    ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement between Employer and Employee with respect to the subject matters herein and supercedes and replaces all prior agreements. Employee represents that there were no inducements or representations leading to the execution of this Agreement, except as contained in this Agreement. This Agreement may not be amended other than by a writing signed by the parties.

23.    VOLUNTARY AND KNOWING ACTION.  Employee acknowledges that Employee has had ample opportunity to review this Agreement and has had the opportunity to consult with an attorney before

DSE Initial

Dan Eisner, 22 June 2005

5

signing it and before accepting employment with Employer, that Employee understands the terms of this Agreement, and that Employee is voluntarily entering into this Agreement and intends to be fully bound by its terms.

24.     NON-WAIVER. The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other portions of this Agreement or any subsequent breach by such other party.

25.     EMPLOYEE REPRESENTATIONS. Employee warrants and represents that there were no inducements or representations leading to the execution of this Agreement, except as contained in this Agreement, and further represents that he/she has not accepted any employment offer with Employer, either verbally or in writing, prior to executing this Agreement. Employee represents that that: (i) the execution, delivery and performance of this Agreement by Employee does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment, decree, employment agreement, noncompete agreement or confidentiality agreement to which Employee is a party or by which he is bound; (ii) upon the execution and delivery of this Agreement by Employer, this Agreement shall be the valid and binding obligation of Employee, enforceable in accordance with its terms; and (iii) Employee will not make use of any confidential information, trade secrets or intellectual property belonging to other parties in connection with the performance of Employee's duties hereunder, and that any such use would be unauthorized beyond the scope of Employee's duties and responsibilities to Employer.

26.     EXECUTION IN COUNTERPARTS.   This Agreement may be executed in any number of counterparts, and by different parties upon different counterparts as the same effect as if the signatures thereto where upon the same instrument.  Each counterpart shall be deemed an original but together shall constitute one in the same instrument.

Dated: 6/23/05

_____
Employee Name: Daniel Eisner

Dated: 6/28/05

WALLEYE TRADING, LLC

By: _____ (Peter Goddard)
Its: CEO

DSE Initial
Dan Eisner, 22 June 2005

6

**Exhibit A**

**Part I.     Terms and Conditions for Payment of Discretionary Bonus Compensation and Identification of Deferred Compensation:**

1.      The "Base Amount" refers to any compensation received by Employee from Employer during the applicable fiscal year in the form of bonuses or salary. Any Discretionary Bonus that does not cause the Base Amount to be exceeded will be paid to the Employee in the form of a single lump sum cash payment on the applicable Bonus Payment Date, subject to withholding tax and other legally required and voluntary deductions in accordance with the Employer's regular payroll practices.

2.      If the Discretionary Bonus does cause the Base Amount to be exceeded, then Fifty percent (50%) of the difference between the Employee's total compensation and the Base Amount (the "Excess Amount") shall be deemed "Deferred Compensation" to the Employee, the payment of which shall be subject to the terms and conditions of the Walleye Trading, LLC Nonqualified Deferred Compensation Plan, as amended.

**Part II.     Base Amount and Bonus Payment Date:**

1.      Employee's "Base Amount" shall be $250,000.

2.      Employee's "Bonus Payment Date" shall be defined as within ten (10) days after the end of the first quarter following Employer's fiscal year end.

# EXHIBIT  B

1 of 1 DOCUMENT

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

## factiva

(Copyright (c) 2006, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

December 15, 2006 Friday

**SECTION:** Pg. A1

**LENGTH:** 2373 words

**HEADLINE:** Fast Lane: Firms Seek Edge Through Speed As Computer Trading Expands --- Tradebot Moves Its Machines Into Exchange Buildings;
Competitors Follow Suit --- 100 Million Shares in a Day

**BYLINE:** By Aaron Lucchetti

**BODY:**

NORTH KANSAS CITY, Mo. -- About four years ago, Dave Cummings moved his trading firm's computers from a storefront in this Kansas City suburb to buildings in New York and New Jersey that house central computers for two big electronic stock exchanges.

The move shaved a precious fraction of a second from the time it takes Mr. Cummings's firm, Tradebot Systems Inc., to buy or sell a stock on computer-based exchanges like Archipelago. It now takes Tradebot about 1/1000 of a second to trade a stock, compared with 20/1000 before the move -- a difference of about the time it takes a computer signal to zip at nearly the speed of light from Kansas City to New York and back.

That may not seem like a big difference, but in Mr. Cummings's obscure corner of the stock-trading universe, speed is critical and fractions of seconds loom large. Tradebot's computers are programmed to detect, among other things, tiny, fleeting differences between bid and offer prices of stocks, then to pounce, buying stocks at one price and almost immediately reselling them for a fraction more. If his firm hadn't moved its computers, says Mr. Cummings, "we'd be out of business."

Dozens of other firms, ranging from Citadel Derivatives Group to a brokerage unit of J.P. Morgan Chase & Co., also employ split-second trading strategies. That has set off an arms race to shave the time it takes for orders to reach the computers of electronic exchanges. In their quest for the choicest locations, at least 40 of Tradebot's competitors have carted their computers to the same buildings, a practice known as co-location.

The kind of trading practiced by Mr. Cummings is a particularly fast form of "algorithmic" or "black-box" trading, in which computer programs decide when to buy and sell securities. Hedge funds such as SAC Capital Advisors, D.E. Shaw & Co. and Renaissance Technologies have been using computers in their investment strategies for years. These days, a variety of new computer strategies rely on lightning-quick trading. For example, computers are being programmed to take news headlines into account when executing trades, and media companies including Dow Jones & Co., publisher of The Wall Street Journal, and Reuters Group have begun releasing news in computer-readable formats that cater to them.

Mr. Cummings's strategy -- which is shorter term than most and is highly reliant on speed -- was made possible by the growth of electronic-trading networks. These trading platforms -- Globex at the Chicago Mercantile Exchange, Ar-

Fast Lane: Firms Seek Edge Through Speed As Computer Trading Expands --- Tradebot Moves Its Machines Into
Exchange Buildings; Competitors Follow Suit --- 100 Million Shares in a Day The Wall Street J

chipelago at NYSE Group, INET at Nasdaq Stock Market and others -- account for more than half of all trading in household-name stocks and financial futures contracts.

Trading mostly Mr. Cummings's own money, privately held Tradebot, which has about 20 employees, makes between $30,000 and $150,000 a day and up to $20 million a year, people familiar with its finances say.

Electronic exchanges use computer systems to match buyers and sellers. They execute orders without involving floor traders known as specialists, who arrange transactions through auctions on the NYSE. For years, these specialists and the Wall Street dealers who traded Nasdaq stocks profited on gaps between bid and offer prices.

The electronic marketplaces bill themselves as a democratizing force -- a way to cut out specialists and dealers. Mr. Cummings realized that these electronic-trading pipelines also provided a new opportunity for profit: If he used fast enough computers and programmed them just right, he could harvest the same kind of trading profits that specialists and dealers long have gathered, albeit on a smaller scale for Mr. Cummings.

In Mr. Cummings's world, the fundamentals of a stock are of little consequence. His firm favors large stocks, such as Microsoft, because it can trade in and out quickly. On one recent afternoon, a computer screen in Tradebot headquarters indicated that the firm accounted for more than 10% of that day's trading in Microsoft. On many days, Tradebot's trading totals account for as much as 5% of all Nasdaq trading, on par with trading levels at such giant firms as Fidelity Investments.

"He's had a huge impact," says Jamie Selway, former chief economist of Archipelago and now head of White Cap Trading, a small New York brokerage firm. By constantly trolling to buy and sell, he says, Mr. Cummings enables others to trade more quickly. "You're probably trading with Dave Cummings, but don't know it," Mr. Selway says.

Mr. Cummings, 37 years old, learned to program as a teenager when he also worked at his father's computer-software store. After earning an engineering degree at Purdue University, he worked for three years at a health-care software company. In the mid-1990s, he moved to the Kansas City Board of Trade, donning a forest-green jacket and taking to the pits with other traders, buying and selling futures contracts tied to stocks and wheat prices.

In 1999, he quit his trading job, settled at a computer in a spare bedroom of his house and set out to develop software to replicate the actions of a floor trader in an arena where floor traders don't exist -- the electronic marketplace. Months later, he rented a small office in a bank building, furnished it with old furniture and a few computers, and launched Tradebot with $25,000 of personal savings.

Harold Bradley of American Century Investments, a Kansas City-based money-management firm, saw Mr. Cummings demonstrate the system while Tradebot was hunting for money to trade. Mr. Cummings told potential investors that he had created a robot to do what floor traders did -- hence, the name Tradebot. His firm would buy and sell based on signals from its computer program, collecting lots of nickels and dimes by being faster than other traders. Mr. Bradley says he declined to invest, figuring it would be difficult to make money on a large scale.

Mr. Cummings raised several hundred thousand dollars from a Chicago trading firm that wanted to use his programs. (Mr. Cummings bought this partner out in 2002.) Tradebot focused on stocks listed on the Nasdaq, which were easier to trade electronically than those at the New York Stock Exchange, where rules, at that time, limited electronic trading.

Tradebot took no long-term views on where stock prices were heading. Instead, it aimed to profit off tiny differences between what investors were willing to pay for heavily traded stocks and what others were willing to sell them for. In 2000, when stock pricing began shifting from increments of 1/16 of a dollar to one cent, many Wall Street trading desks gave up that business, figuring it was no longer profitable enough. That left Tradebot and competitors such as Citadel, Automated Trading Desk and Getco LLC to go after the profits.

Mr. Cummings's programs took into account fluctuations in stocks as well as in financial instruments such as stock-index futures. His computers, for example, would simultaneously try to buy Microsoft stock from investors at, say, $27.69 a share, and to sell it at $27.70, for a penny-per-share profit. Theoretically, human traders could spot the same opportunities, but Mr. Cummings's computers could usually get there first. His firm sometimes traded more than 1,000 times a minute. It ended most days owning no stock, cashing out all its positions.

Tradebot's employees constantly monitored the program trading. Mr. Cummings says he figured that once in a while the strategy wasn't going to work. It was often best, he concluded, to move out of the way when the market was moving sharply in one direction or another. He did not want to be stuck holding big blocks of stocks when their values

Fast Lane: Firms Seek Edge Through Speed As Computer Trading Expands --- Tradebot Moves Its Machines Into Exchange Buildings;  Competitors Follow Suit --- 100 Million Shares in a Day The Wall Street J

unexpectedly plunged. If trading in a particular stock began losing money, an employee could switch off the program for that stock.

In the early 2000s, electronic marketplaces such as Island ECN and Archipelago courted professional traders. They offered rebates on certain kinds of complex trades such as "limit orders," in which traders offer to buy or sell shares within certain price parameters. The rebates allowed Tradebot to profit on some trades that merely broke even, according to several former employees.

By 2001, other firms were employing computer strategies similar to his, and some of them had an advantage: Their computers sat in Island's headquarters building in lower Manhattan. As a result, Tradebot's computers were a fraction of a second behind its rivals in trying to grab the best prices. "We were excluded because of the speed of light," Mr. Cummings says. "We had to move our computers."

Mr. Cummings discussed the problem with Island executive Matthew Andresen. "Our customers outside of New York are at a big disadvantage," Mr. Andresen recalls telling him. "We agree it should be a level playing field."

In addition to transaction fees Mr. Cummings's trades generate for Island, he agreed to pay a few thousand dollars per month to put Tradebot's computers in Island's facilities. The difference was significant: In the 1/50 of a second it used to take to execute an order from Kansas City, Tradebot could buy and sell at least 20 times.

Archipelago, an Island competitor now owned by the NYSE, was also after Tradebot's business. Mr. Cummings told Archipelago he was concerned that its system could take as long as a second or two to process his orders. "I can't manage that risk," he told Mr. Selway, then Archipelago's chief economist, Mr. Selway recalls. At times, Tradebot had to "throttle back" its Archipelago trading because that exchange's system couldn't handle the volume fast enough, says Mr. Cummings. Mr. Selway figures he spent a hundred hours on the phone with Mr. Cummings discussing how to make Archipelago better.

A few months after sealing the Island deal, Mr. Cummings visited Archipelago Chief Executive Gerald Putnam in Chicago and sized up the firm's computer room. Archipelago executives worried that letting Tradebot move its computers in would prompt complaints from other brokerage firms. They told Mr. Cummings to wait for Archipelago to complete a new data center in Weehawken, N.J., that could accommodate traders' computers.

Mr. Cummings didn't wait. He moved some Tradebot computers about a mile away from Archipelago's Chicago office. Then, when Archipelago finished its New Jersey data center, he moved the computers there. If a rival's computers "are in the exchange, and I'm across the street, then I lose," Mr. Cummings explains.

On Oct. 9, 2002, Tradebot for the first time traded 100 million shares in a single day, most of them stocks listed on Nasdaq. At that time, the NYSE was still a private cooperative controlled by floor brokers and specialists who traded stocks the old-fashioned way. It maintained limits on electronic trading, including restrictions on certain big orders and on rapid in-and-out trading. With an eye toward trading more NYSE-listed stocks, Tradebot bought Philadelphia-based Bloom Staloff Corp., which traded NYSE stocks from its specialist business at the Philadelphia Stock Exchange. Tradebot installed faster computers, but the NYSE restrictions proved troublesome. Mr. Cummings shut down the operation at a loss within six months and continued focusing on Nasdaq stocks. (In October of this year, the NYSE started opening its 2,700 listed stocks to electronic trading.)

Analysts estimate that Mr. Cummings's net worth surpassed $10 million several years ago. His trading business is probably worth several times that, although as a private firm, its finances aren't disclosed.

Over the past three years, about 40 other firms have moved their computers closer to the action, with bigger brokerage firms following smaller trading firms. Merrill Lynch & Co., Goldman Sachs Group, Deutsche Bank AG and J.P. Morgan Chase all have computers sitting near marketplace mainframes, or at least in the same neighborhoods.

Some exchanges, such as the Chicago Board of Trade, have resisted co-location, mostly because they don't want to put at a disadvantage investors who trade through firms that haven't moved their computers.

"It begs the question of fairness," says Andrew Brooks, head of stock trading at mutual-fund firm T. Rowe Price in Baltimore. "You shouldn't win just because you have better access to speed." Some investors also complain that rapid traders often cancel and resubmit orders, clogging the trading systems of electronic exchanges when markets are busy.

Fast Lane: Firms Seek Edge Through Speed As Computer Trading Expands --- Tradebot Moves Its Machines Into Exchange Buildings;  Competitors Follow Suit --- 100 Million Shares in a Day The Wall Street J

The Securities and Exchange Commission allows co-location, as long as electronic marketplaces give firms equal access to prized computer locations. The SEC has looked into the fairness issue and intends to continue to monitor it, according to two people familiar with the agency's approach.

Last year, Mr. Cummings says, he grew worried about the future of his trading strategy. More firms were co-locating. Consolidation in the exchange business, he feared, would lead to higher fees. The NYSE had acquired Archipelago, and Nasdaq had bought Island's successor company, INET.

In 2005, Mr. Cummings turned over day-to-day management of Tradebot and shifted most of his focus to a new venture: creating an exchange-like competitor to the NYSE and Nasdaq that would match buyers and sellers for a small fee. He called it Better Alternative Trading System, or BATS.

That June, he emailed about 100 traders and other industry contacts about BATS. Within days, senior executives from both NYSE and Nasdaq called to ask why one of their biggest customers was setting up a rival marketplace.

"The market needs competition," Mr. Cummings recalls telling Robert Greifeld, Nasdaq's chief executive officer.

"I wish you luck, but it's harder than you realize," Mr. Greifeld recalls replying.

Mr. Cummings has already poured about $4 million into the venture, which now occupies most of his time. He now travels on monthly sales calls and sends potential BATS clients a wooden baseball bat with the company's logo.

A few months after starting in January, BATS drew minority investments from Lehman Brothers Holdings Inc., Credit Suisse Group and Morgan Stanley. BATS now regularly handles about 5% of Nasdaq trading, the firm says.



**Automated Buy**

"Algorithmic trading," in which computer programs buy and sell stock, as percentage of overall stock trading:

Other investment firms
Hedge funds
Brokerage firms

2003  2004  2005  2006  2007  2008

Source: Celent analysis        -- Projections --

Fast Lane: Firms Seek Edge Through Speed As Computer Trading Expands --- Tradebot Moves Its Machines Into
Exchange Buildings; Competitors Follow Suit --- 100 Million Shares in a Day The Wall Street J



**Dave Cummings**

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** December 15, 2006

# EXHIBIT C



**Walleye**    294 Grove Lane East
Wayzata, MN 55391 USA

3 August, 2007

Dan Eisner
1 Tom's Point Lane, Apartment 2-4E
Port Washington, NY 11050

Dear Dan:

Per your letter dated July 19, 2007 the firm recognizes and accepts your resignation effective immediately. As suggested, your last day of service in your current capacity will be today, August 3, 2007.

In accepting your resignation, the firm expects you to strictly adhere to the terms of the Confidential Employment, Non-Competition, Non-Solicitation, and Non-Disclosure Agreement ("the Agreement") signed June 23, 2005. The complete document accompanies this letter. Section 13 articulates the terms regarding non-competition:

> Accordingly, so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the "Noncompete Term") for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer; provided, however, that following the termination of Employee other than for "Cause" as provided in Paragraph 14, the provisions of this Paragraph shall only apply to Employee for as long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term.

Consistent with the Agreement, the firm shall continue to pay your base salary at its current prevailing rate to ensure compliance with these non-competition terms.

If you wish to accept employment elsewhere, submit an offer letter and complete job description from your potential employer for the firm's review. Please include contact information for your potential manager and address the letter to me. Upon receipt of such documentation, the firm will evaluate the business pursuits of the firm and the description of your role to evaluate your job's relative qualification in regards to its competitive nature.

We appreciate your service to Walleye and wish you the best of luck.

Sincerely,

Peter Goddard, CEO
Walleye Software, LLC
294 Grove Lane East, Suite 280
Wayzata, MN 55391

# EXHIBIT  D



JAMES D. KREMER
Partner
(612) 340-7859
FAX (612) 340-2777
kremer.james@dorsey.com

August 10, 2007

**VIA E-MAIL AND POSTAL SERVICE**

Peter Goddard
Chief Executive Officer
Walleye Software, LLC
294 Grove Lane East
Suite 280
Wayzata, MN  55391

      Re:    Daniel Eisner

Dear Mr. Goddard:

      Dorsey & Whitney LLP is counsel for Daniel Eisner.  This is in response to your August 3, 1997, letter to Mr. Eisner.

      As you know, Mr. Eisner submitted a letter of resignation on July 19, 2007, and has since ended his employment with Walleye.  Your letter notes Walleye's intent to continue to pay Mr. Eisner his base salary (at the time of the termination of his employment) for a period of two years pursuant to Section 13 of Mr. Eisner's Confidential Employment, Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Agreement").  You also request information from Mr. Eisner regarding any prospective employment to evaluate the "competitive nature" of any such position.

      Please be advised that Mr. Eisner has been offered and accepted a position as Systems Administrator with D. E. Shaw & Co., L.P.  In that role, Mr. Eisner will be a member of Shaw's Systems Group, which provides general IT services.  Mr. Eisner will function as a systems generalist, with responsibility for:  (1) leading the company's search for new data center co-location space to house large grids and other servers; (2) finding, evaluating and deploying new technologies for the company's systems, such as backup systems, high performance servers, and voice-related technologies; and (3) designing and overseeing the development of internal software to increase staff productivity (*e.g.*, conference room booking, improved communications software, etc.).  Mr. Eisner's position with Shaw will not involve the creation, modification or implementation of trading systems or software (which is handled by an entirely separate technical development and support group at Shaw).  Given the nature of Mr. Eisner's anticipated responsibilities, his employment with Shaw does not implicate Section 13 of the Agreement.



Peter Goddard
August 10, 2007
Page 2

To the extent you disagree and are inclined toward action to prevent Mr. Eisner from joining Shaw, there are significant flaws with Section that render it unenforceable. Under Minnesota law, restrictive covenants (such as Section 13 of the Agreement) are "looked upon with disfavor, cautiously considered, and carefully scrutinized." *Kallock v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998); *Salon 2000, Inc. v. Daulwaltur*, 2007 WL 1599223, *2 (Minn. App. 2007). To be enforceable, non-compete agreements must be both necessary for the protection of the employer's legitimate business interests and reasonable as between the parties. *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 898-99 (Minn. 1965). The test applied in examining restrictive covenants is whether the restriction imposed on the employee is greater than reasonably necessary to protect the employer's business, considering the nature of the employment, the temporal restriction imposed, and the geographic scope of the restriction. *Id.*; *United Products Corp. of America, Inc. v. Cederstrom*, 2006 WL 1529478, *3 (Minn. App. 2006).

In Mr. Eisner's case, no legitimate, protectible interest is served by the non-compete. Section 13 of the Agreement is premised on Walleye's investment in "a substantial amount of time and resources in training ... using highly confidential and proprietary training methods, techniques and materials ...." Mr. Eisner did not receive any such training during his employment with Walleye. *See Alpine Glass, Inc. v. Adams*, 2002 WL 3189910, *5 (Minn. App. 2002) (holding that minimal employee training was insufficient to enforce non-compete agreement).

Similarly, during his employment with Walleye, Mr. Eisner had no involvement in customer relationships, and no access to customer data. In addition, he was neither involved in the creation or modification, and has no knowledge of the code, of any proprietary software used by Walleye to guide its trading decisions (including the formulas and/or trading algorithms at the heart of any such software applications). Consequently, the non-compete agreement cannot be enforced on the basis of any perceived threat of misappropriation of claimed confidential, proprietary and/or trade secret information. *See Alpine Glass*, 2002 WL at *5 (non-compete unenforceable where there was no evidence that former employees developed "special relationships" with customers or had access to confidential/trade secret information); *Klick v. Crosstown State Bank of Ham Lake, Inc.*, 372 N.W.2d 85, 88 (Minn. App. 1998) (holding a three-year restriction unreasonable where the bank vice president developed no special relationships with customers and received no special training).

Even if there was some legitimate, protectible business interest of Walleye implicated by Mr. Eisner's prospective employment with Shaw, the non-compete provision is unreasonable. The scope of the non-compete is unlimited both geographically and substantively. It purports to preclude Mr. Eisner from "directly or indirectly, *throughout the world*, whether as a principle, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with *any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer....*" In effect, the non-compete attempts to prevent Mr. Eisner from pursuing his profession, using his general knowledge skills and abilities



Peter Goddard
August 10, 2007
Page 3

(as is his absolute right under Minnesota law), with any entity providing financial and investment advisory services for a two-year period following the end of his employment with Walleye.

Non-compete provisions that are overly broad (let alone unlimited) in geographic scope, such as Section 13 of the Agreement, are unenforceable under Minnesota law. *See, e.g., Ring Computer Systems, Inc. v. Paradata Computer Networks, Inc.*, 1990 WL 132615, *1 (Minn. App. 1990) (Affirming determination that non-compete provision was unenforceable because it lacked any geographic limitation; "Minnesota case law is clear that a covenant not to compete must have both a time and a geographic restriction to be reasonable."); *Berg v. Miller*, 2005 WL 832064, *5 (Minn. App. 2005).

Finally, the two-year duration of the non-compete provision is unreasonable under Minnesota law, particularly in light of the limited duration of Mr. Eisner's employment and nature of responsibilities with Walleye. The reasonableness of the duration of a restrictive covenant is assessed in relation to (1) the length of time necessary to obliterate the identification between employer and employee in the minds of the employer's customers; and (2) the length of time necessary to find and train a replacement for the employee. *Head v. Morris Veterinary Center, Inc.*, 2005 WL 1620328, *2 (Minn. App. 2005); *Klick*, 372 N.W.2d at 88. Here, the first factor has no relevance, as Mr. Eisner had no relationship with Walleye customers. The second factor, too, is of no support for Walleye, as the general IT support provided by Mr. Eisner does not require any unique or specialized training by Walleye (as reflected by the fact that Mr. Eisner received no such training). Under these circumstances, therefore, the non-compete provision fails the temporal test as well. *See Cederstrom*, 2006 WL 1529478 at *3 (holding 18-month non-compete unenforceable where employer did not present evidence of investment of significant time in training former employee, or evidence that the nature of former employee's worked required close contact with customers sufficient to create goodwill). Indeed, given the nature of Mr. Eisner's profession, even a limitation period substantially less than 2 years would be unreasonable and unenforceable. *See Earthweb v. Schlack*, 71 F. Supp.2d 299 (S.D.N.Y. 1999) (Invalidating one-year non-compete because "[w]hen measured against the information technology industry in the Internet environment, a one-year hiatus from the workforce is several generations, if not an eternity.").

As should be evident from the above, we are confident that a Minnesota court will find that the non-compete provision in Mr. Eisner's Agreement with Walleye is unenforceable. Such a determination will carry with it implications for Walleye beyond the individual employment circumstances of Mr. Eisner. Mr. Eisner's departure and potential employment with Shaw would prove to be a disastrous "test case" for Walleye should you elect to pursue that path. We are hopeful, however, that upon consideration this letter and the nature of the position Mr. Eisner has been offered with Shaw, a court's assessment will not be necessary.

Please let me know in writing Walleye's position with respect to Mr. Eisner's prospective employment with Shaw. If you feel you need additional information to assess the situation, you can contact me at (612) 340-7859.



Peter Goddard
August 10, 2007
Page 4

Please be advised that time is of the essence in this matter.  Mr. Eisner would like to start work with Shaw as soon as possible, preferably next week.  At present, his commencement of employment is on hold pending Walleye's confirmation that it does not view such employment as a violation of Section 13 of the Agreement.  If we don't hear from you by the close of business next Tuesday, we'll take your silence as an acknowledgement that Mr. Eisner's prospective employment with Shaw does not implicate Section 13 of the Agreement.

In the event that Mr. Eisner's employment with Shaw is unduly delayed or prevented as a consequence of a delay in your response to this letter, or an indication from Walleye that it intends to claim or claims that employment with Shaw violations the non-compete provision, Mr. Eisner will seek to recover his damages from Walleye.  It trust that, with your prompt and reasoned attention to this matter, it will not come to that.

I look forward to hearing from you.

Very truly yours,

James D. Kremer

cc:     Daniel Eisner

# EXHIBIT  E

THE ATTORNEYS AT LAW

# PARSINEN KAPLAN ROSBERG & GOTLIEB P.A.

August 14, 2007

Kevin R. Coan<br>
(612) 342-0324<br>
kcoan@parlaw.com

**Via E-Mail and U.S. Mail**

James D. Kremer, Esq.
Dorsey & Whitney LLP
50 South 6th Street, Suite 1500
Minneapolis, MN 55402

Re:    **Walleye Trading Advisors, LLC/ Dan Eisner**
       **Our File No.: 13444-12**

Dear Mr. Kremer:

This letter is in response to your August 10, 2007, correspondence to Mr. Peter Goddard, CEO of Walleye Trading Advisors, LLC (the "Company") regarding Mr. Eisner's acceptance of employment with D.E. Shaw & Co., L.P. ("Shaw"). Although your four-page correspondence concludes with the assertion that time is of the essence and we must respond by the close of business today, I do note that your letter dated last Friday did not arrive at the Company until late Friday afternoon, effectively giving only a one-day notice. In any event, please direct any further communications to this office.

We do not agree with the factual background your client has given you. We also do not agree with the legal positions you are putting forward. We do not believe, for a variety of reasons, that Mr. Eisner's employment with Shaw will not be adverse to the Company. We believe the Agreement is clear and enforceable.

The Company will be informing Shaw in writing today that it objects to Shaw's employment of Mr. Eisner. If that employment nevertheless proceeds, we will pursue all available legal remedies. Please confirm on or before August 17, 2007, that your client intends to honor his obligations.

Thank you.

Very truly yours,

Kevin R. Coan

KRC:cgb:



# EXHIBIT  F



THE ATTORNEYS AT LAW

# PARSINEN KAPLAN ROSBERG & GOTLIEB P.A.

August 14, 2007

Kevin R. Coan
(612) 342-0324
kcoan@parlaw.com

John M. Liftin, Esq.
General Counsel
D.E. Shaw & Co., L.P.
39th Floor, Tower 45
120 West Forty-Fifth Street
New York, NY  10036

**Re:** Dan Eisner
Our File No.: 13444-12

Dear Mr. Liftin:

We represent Walleye Trading Advisors, LLC (the "Company"), Dan Eisner's former employer.

We understand that Mr. Eisner has recently accepted employment with D.E. Shaw & Co., L.P. ("Shaw"). This letter is to advise you that Mr. Eisner and the Company are parties to a Confidential Employment, Non-Competition, Non-Solicitation, and Non-Disclosure Agreement dated June 22, 2005 (the "Agreement"). A confidential copy of this document is enclosed for your reference. Pursuant to Paragraph 13 of the Agreement, Mr. Eisner agreed that he would not become associated, in any way, with any business that is similar to, or competitive with, the Company for a period of two years following his termination from employment; provided, that the Company continues to pay Mr. Eisner during the non-compete term. Mr. Eisner voluntarily resigned his employment on August 3, 2007 and the Company intends to pay him his base salary to ensure compliance with the non-competition term.

Mr. Eisner's proposed employment with your firm would violate Paragraph 13 of the Agreement. Walleye Trading takes the provisions of its agreements seriously and is prepared to take whatever actions may be necessary to enforce the same. Accordingly, we request that Shaw discontinue its employment and any other relationship with Mr. Eisner until the expiration of his non-compete obligations. Please provide our office with some written assurances regarding this matter on or before August 17, 2007.

Thank you.

Very truly yours,

Kevin R. Coan

KRC:cgb:
Enclosure

476563v1