UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

DANIEL EISNER,

Plaintiff,

v.

WALLEYE TRADING ADVISORS, LLC,

Defendant

---------------------------------------------------------------- X

07 Civ. 7837

**AFFIDAVIT OF**
**DANIEL EISNER**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

DANIEL EISNER, being duly sworn, deposes and says:

1. I am the plaintiff in this action and submit this affidavit in support of my motion for an injunction to enjoin my former employer, Walleye Trading Advisors, LLC ("Walleye"), from attempting to prevent me from working for D. E. Shaw & Co., L.P. ("D. E. Shaw"). This affidavit is based upon my personal knowledge and review of the relevant documents.

**IT in the Financial Services Industry**

2. I am an information technology ("IT") professional in the financial services industry. I have worked in the financial services industry for my entire career. IT professionals work to create the component parts of a given firm's computer system.

3. In the financial services industry, it is common practice that all or portions of a firm's trading activities be conducted electronically. In the segment of the industry engaged in electronic trading using quantitative strategies, there are three broad categories of technology professionals. The central technology professionals are the quantitative analysts, who are

typically referred to as "Quants." Quants are the individuals who develop the confidential and proprietary mathematical models (or trading algorithms) that perform the essential function of directing that the trading be conducted upon the occurrence of certain events or circumstances. Essentially, Quants write programs that tell the computers when and how to automatically execute a trade. These algorithms are at the heart of the trading system at a firm involved in quantitative trading, are the critical directional tool that drives the success or failure of a firm's trading strategy and are viewed as highly confidential and proprietary. I have never worked as a Quant. In fact, I do not have the requisite background in mathematics to work as a Quant.

4.     Within firms involved in quantitative trading, the second group of technology professionals is the "Software Developers." Taking the algorithms created by the Quants, the Software Developers write code that tells the trading systems how to perform the vast majority of its intended functions. Essentially, the Software Developers write almost all of the computer programs used by the trading system to effectuate the algorithms created by the Quants. Within the financial services industry, I have never worked as a Software Developer.

5.     The remaining category is that of the technology professionals who work in "Systems," focusing on the computer infrastructure of a firm. Systems employees are needed at all financial services engaged in a significant volume of trading, regardless of whether the trading is based on quantitative strategies. My specialization falls within the purview of Systems or "IT." Systems employees utilize industry-standard component parts (including desktops, servers, and routers) and attempt to configure them in a way that achieves maximum speed and capacity. Systems employees generally only write programs that instruct the computers to perform specific functions related to maintaining the infrastructure, such as sending out an email

in the event of a systems crash. This type of programming is referred to in the industry as "plumbing work."

6. Systems employees are constrained by the capacities of the computers that they work with and, since they are not programming specialists such as the Quants and Software Developers, do not generally deviate substantially from industry-standard practice. In other words, Systems employees working at different financial services firms largely undertake the same tasks in a similar method. Of course, the exact infrastructure created from one firm to the next will vary to some degree, but such variations do not make the infrastructure configuration confidential and proprietary. In fact, Systems employees often speak with vendor support professionals in great detail about the infrastructure being developed, without any concern about disclosing details of such infrastructure to third parties outside of the company.

7. The IT industry is a competitive field that requires professionals to stay current in their knowledge of ever-changing technological advancements. IT professionals working in the financial services industry have the additional burden of keeping abreast of specialized technology, industry standards, as well financial market trends. During my career, I have developed considerable expertise and skills that specifically relate to the unique technology used in the financial services industry. In order to pursue my profession, I must constantly hone my skills in a fast-paced and constantly evolving field.

**<u>My Background</u>**

8. I received both my Bachelors and Masters in Science in computer science from the State University of New York, Buffalo ("S.U.N.Y. Buffalo"). During my time at S.U.N.Y. Buffalo, I gained extensive experience in the research and development of IT systems. During school, I also worked as a Systems Analyst for a New York-based technology firm. The primary

focus of my tasks at that firm was to evaluate and integrate new technologies, including servers and personal computers.

9.    Upon graduation, I worked as the Development Project Manager for Securities Industry Automation Corporation ("SIAC"), a subsidiary of the New York Stock Exchange ("NYSE").  SIAC provided technology services for financial institutions and market exchanges, including data network management, data center operations, disaster recovery and network connectivity.  A component of SIAC's work involved setting up "co-location" infrastructure.  A number of financial firms "co-locate" their computers and/or servers at the exchanges (*e.g.*, the NYSE or American Stock Exchange) in order to develop and maintain "lightening-quick" trading with electronic exchange networks.  "Co-locate" simply means that firms physically place some of their computers and/or servers near or next to the servers of the exchange.  This practice allows those firms' transactions to be processed faster than if the servers were located further away from the servers of the stock exchange.  The practice of "co-locating" is well-publicized in the industry and has become a routine practice among firms that engage in quantitative trading.

10.    One of my functions at SIAC was to coordinate IT projects.  As part of that function, I worked with the IT staff responsible for developing the "co-locating" infrastructure to coordinate with other IT groups at SIAC.  I also contributed certain technical details to developing the "co-location"procedures.

11.    My primary responsibility at SIAC, however, was to research and develop new technologies for the NYSE.  In other words, I was involved in developing cutting-edge technologies that, among other things, facilitated infrastructure connections between the NYSE

and financial services firms.  This included evaluating servers, programs, handheld electronic devices, and other computer systems products.

12.     While working at SIAC, I developed a reputation for excellence.  Almost all of my projects, many of which were high profile, were successfully completed.  For example, working with others, I developed portions of the hardware platform and attendant software that currently drives the NYSE trading floor.  My success at this and other projects means that I am perceived as a valuable Systems asset in the industry, *i.e.*, as a Systems employee who is more skilled than some of his peers.

**Employment at Walleye**

13.     In the summer of 2005, I was looking to make a career move and was working with a number of recruiters, who submitted my resume to a number of financial services firms. As part of that process, I was contacted by a recruiter about a position with Walleye.  Thereafter, I had two interviews with Walleye, once by phone and once in person.  For both interviews, I was physically present in New York, New York.

14.     Walleye is a small Minnesota-based financial services company that works as a "market-maker."  A "market-maker" essentially acts as a middleman between sellers and purchasers of stock.  Walleye derives its profit from the "spread" between the price at which the seller is willing to sell and the price the buyer is willing to pay.  During the course of my employment at Walleye, I repeatedly heard the company's principals refer to Interactive Brokers, Inc. as their major competitor.  D. E. Shaw was never mentioned as a competitor.

15.     Walleye conducts its business through a quantitative trading system.  A quantitative trading system is, in essence, a system that automatically makes trades according to parameters determined by the computer.  The computer sets those parameters based on algorithms generated by Quants and programmed by Software Developers.

16. I was hired at Walleye just as the company was getting off of the ground. In fact, I believe that Walleye had only been in operation for approximately one month before I joined. During the interview process, Peter Goddard ("Goddard"), Walleye's Chief Executive Officer, told me that the firm needed someone who was capable of building Walleye's computer infrastructure. After my interview, my recruiter advised me that Walleye had decided to hire me because of my history of successfully executing projects, which indicted to them that I would be able to build Walleye's infrastructure from the ground-up. At no point in the interview process did anyone indicate that they felt that they would need to train me to do the job. To the contrary, Mr. Goddard expressly indicated that the firm needed someone who already had the skills necessary to set up the firm's computer infrastructure.

17. In July 2005, I began working at Walleye in the position of Chief Technologist. Despite the recent assertions of Walleye to the contrary, I never held the title of and never worked as a Senior Developer at Walleye. In fact, initially, I had no title at Walleye, but I found that I needed a title in my interactions with vendors and employees at the various exchanges regarding Walleye's infrastructure. As a result of my need for a title with these individuals, I began to be referred to as the Chief Technologist at Walleye.

18. Although most of its employees work in Minnesota, Walleye operates an office in New York and most of the computer systems of the firm are physically located in a co-location facility in New York, New York. Once employed, I worked out of Walleye's New York office and reported to Ori Kushnir ("Kushnir"), a partner who also worked in the New York office. Although I reported to him, Kushnir was not a Systems employee and, from what I ascertained, did not have any direct experience setting up computer infrastructure of the type needed at Walleye.

19.    Throughout my two-year tenure at Walleye, I only traveled to Walleye's Minnesota offices twice - once to attend a Fourth of July party, and once to attend a company meeting where I was not working on Systems issues.

20.    As a condition of my employment, Walleye required me to execute a Confidential Employment, Non-Competition, Non-Solicitation and Non-Disclosure Agreement (the "Non-Compete"). I reviewed and executed the Non-Compete while physically present in New York. In the relevant paragraph 13, the Non-Compete provides:

> so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the 'Noncompete Term' ) for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer; provided, however, that following the termination of Employee other than for 'Cause' as provided in Paragraph 14, the provisions of this Paragraph shall only apply to Employee for as long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term.

(Attached as Exhibit A is a true and complete copy of the Non-Compete Agreement.) Moreover, the Non-Compete also provides that this restriction is premised upon Walleye's providing "time and resources in training Employee using highly confidential and proprietary training methods, techniques and materials," and that Employee is agreeing "to not use the skills, training and know-how provided by Employer pursuant to this provision." See Ex. A.

21.    At Walleye, I was responsible for the setting up Walleye's Systems infrastructure. Specifically, since Walleye was just starting out, I was responsible for setting up the infrastructure by acquiring and configuring the necessary hardware and writing attendant "plumbing" programs. This involved configuring routers, desktops and servers so that they functioned properly to meet Walleye's needs. In other words, I worked with the partners to

determine the company's needs and then put the infrastructure together in a manner that optimized its effectiveness. The process required that I consult with the partners as to cost, but the partners had little input in the actual configuration of the infrastructure.

22.     Despite the language in the Non-Compete regarding the highly confidential and proprietary training methods, none of the partners or employees provided me with any training on how to set up the infrastructure. Instead of training from Walleye, I obtained answers to any questions that I had by conducting my own independent review of instructional manuals created by various vendors for their products and consulting with the technical support assistance available to the purchasers of such products. Further, as is the case with most computer systems, and in particular in the financial services industry where all firms strive to process trades rapidly, the process of configuring the system never "finished" because the system must routinely be updated with new technology and because the Quants and Software Developers are constantly writing new programs.

23.     With respect to the computer infrastructure created at Walleye, we did not take any special precautions to maintain secrecy regarding the configuration of the infrastructure. Although Walleye required employees to sign a non-disclosure and non-compete agreement, I was never directed to treat the configuration of the infrastructure as confidential. To the contrary, I was encouraged to and regularly consulted with technical support individuals working at our vendors and at the stock exchange, which consultations involved sharing details about aspects of Walleye's infrastructure, including details about the hardware and software being utilized and the manner in which some of it was being configured. No one ever directed me not to have such conversations, nor to apprise any such individuals about the need to treat the configuration of Walleye's infrastructure as confidential. Additionally, all Walleye employees,

regardless of their position, had the same access to Walleye's computers. Further, it was my understanding that the underlying algorithms created by the Quants and programmed by the Software Developers were considered confidential, but no one ever told me that the firm considered the configuration of the infrastructure to be confidential.

24.    As part of the process of setting up Walleye's infrastructure, I co-located Walleye's servers at the stock exchanges. I did not receive any training from Walleye on how to "co-locate" Walleye's servers and computers to the stock exchanges, nor did I use any proprietary information in "co-locating" the servers. Rather, I contacted the exchanges where Walleye intended to "co-locate," completed standardized forms utilized by the exchanges, and conferred with individuals at the exchanges to arrange for shipment of Walleye's servers to the site of the exchanges' servers, which was a routine process for the exchanges. I only received "instruction" by referencing the given operating system or hardware's instruction manual or manuals made available by the exchanges themselves.

25.    As in any instance where a company intending to engage in a significant volume of trading is getting off of the ground, Walleye made substantial financial investments to purchase its systems infrastructure. However, the hardware and software that I worked with at Walleye are standard in the financial services industry. In fact, from working at SIAC, I know that many firms work with much more advanced technology than that acquired by Walleye. I configured Walleye's system using the knowledge I gained during the course of my education, the experience I gained while at SIAC, and, where necessary, by referencing manuals provided with different components of the system. I did not, however, configure Walleye's infrastructure in a manner that is substantially different from the infrastructure of any other financial services

firm involved in similar trading activities.  In fact, Walleye's infrastructure could have been configured by numerous competent Systems professionals.

26.    I was Walleye's sole full-time Systems professional for the duration of my employment.  I did not receive any training whatsoever from Walleye in my field of expertise. Walleye never sent me to participate in any training programs.  In fact, since I was the only full-time Systems employee working at Walleye, there was no one who could provide me with any on-the-job training.  All of Walleye's other technology employees were Quants, who developed Walleye's trading algorithms, or Software Developers, who programmed the majority of Walleye's trading system.  On occasion, with respect to certain programs with which he had more familiarity, I would consult with a part-time IT consultant who provided services to both Walleye and to another firm.  However, I never received any "training" from this part-time individual, nor did I consult with him regarding more than the occasional question.  In reality, anything that I needed to learn to do the job, I learned on my own, consulting with this part-time individual or with the vendors regarding their products as I further developed my skills to complete the tasks asked of me.  Over the time that I worked with Walleye, I did continue to develop my skills and to monitor technological development in the industry, but I had the skills necessary to set up Systems infrastructure at a firm the size of Walleye by the time I was hired by Walleye.

27.    At Walleye, I did not work as a Quant or Software Developer or with any algorithms or software that might be proprietary.  I was not involved in developing, modifying or programming Walleye's trading algorithms or systems.  In fact, I never accessed, nor had reason to access, Walleye's trading algorithms.  My only responsibility regarding Walleye's trading systems related to infrastructure, such as developing methods to send out alerts in the event of a

system crash, programming the system's log-on and shut-down systems and allocating server space to the Quants and Software Developers.

28. In sum, Walleye did not provide me with any specialized training, and my work did not involve the use of any confidential information or unique methodologies.

**My Separation from Walleye and Prospective Employment at D. E. Shaw**

29. On or about July 19, 2007, I resigned my position at Walleye. Prior to that time, I had been offered and verbally accepted a Systems position at D. E. Shaw, an investment and technology firm with its main office in New York, New York. Before I interviewed there, D. E. Shaw required that I sign an agreement not to disclose any of my prior employer's confidential or proprietary information.

30. Specifically, I have been offered a position as a Systems Administrator in D. E. Shaw's Systems department. At D. E. Shaw, I was told that I would be responsible for projects such as: (i) leading the company's search for a new data center co-location space; (ii) finding, evaluating and deploying new technologies for the Systems department, such as backup systems, high performance servers, and voice-related technologies; and (iii) designing and overseeing the development of internal software to increase staff productivity, such as tools to improve conference room scheduling and communications software.

31. None of these tasks involve the use of confidential or proprietary trading systems. Rather, my position at D. E. Shaw would require that I utilize the skills that I developed prior to my employment at Walleye. Specifically, my tasks at D. E. Shaw would be similar to the work that I performed at SIAC, which was to find, evaluate and deploy new technologies. While at SIAC, I also contributed to the development of the "co-location" technology that I will be exposed to at D. E. Shaw. These tasks in the role at D. E. Shaw will utilize the same skills that I brought with me to Walleye and that I continued to hone throughout my career as I worked to

stay current with industry practices. In fact, many of the skills required for the Systems Administrator role offered to me at D. E. Shaw do not even require experience working with electronic trading systems.

**Walleye Attempts to Unreasonably Enforce the Non-Compete**

32.     In conjunction with providing my resignation to Walleye, I advised the partners at Walleye that I had accepted a position at D. E. Shaw. In response, none of the partners voiced an objection.

33.     Despite expressing no objection at the time I tendered my resignation, Walleye's management subsequently took a very different position. In early August 2007, during my exit interview, I was handed a letter dated August 3, 2007, from Goddard accepting my resignation. In that letter, Goddard stated that Walleye intended to enforce the Non-Compete and told me to submit an offer letter and job description from any potential future employer. (Attached as Exhibit B is a true and complete copy of the August 3, 2007 letter.) During that meeting, Kushnir admitted that D. E. Shaw was not a direct competitor of Walleye as D. E. Shaw. Kushnir did, however, state that he harbored ill-will towards D. E. Shaw because it had recruited personnel from his prior firm and expressed concern that it was possible that D. E. Shaw might decide to become a competitor in the future.

34.     In early August of this year, I retained James D. Kremer ("Kremer") of Dorsey & Whitney LLP, to assist in my attempt to have discussions with Walleye regarding my Non-Compete. Initially, by letter dated August 10, 2007, Kremer outlined my job tasks at D. E. Shaw and expressed the position that the new role was not a threat to Walleye, as well as explicitly told Walleye that I would suffer financially as a result of the enforcement of the Non-Compete. Most importantly, Kremer gave a detailed explanation of our position that the Non-Compete was

overly broad and unenforceable. (Attached as Exhibit C is a true and complete copy of the August 10, 2007 letter.)

35. Thereafter, I retained McDermott Will & Emery LLP to assist me in this matter. Over the weeks that followed, we attempted to discuss a resolution with Walleye. Unfortunately, Walleye refused to discuss a resolution of this matter, leaving me with no option but to file this lawsuit.

36. A few weeks after I filed the complaint in this action, I learned that Walleye filed a separate action regarding the Non-Compete in federal court in Minnesota ("the Minnesota Complaint"). During the first week of October 2007, I was served with a copy of the Minnesota Complaint. (Attached hereto as Exhibit D is a true and correct copy of the Minnesota Complaint.) In that complaint, referring to its computer infrastructure, Walleye claims that its "Architecture" is proprietary or confidential. In this regard, Walleye's complaint appears to me to be highly misleading. My work at Walleye was limited to configuring industry-standard products in much the same manner that they are configured at other financial service firms. As I have described above, I configured Walleye's system by using the skills that I developed in college and at SIAC to configure industry-standard hardware and software in a manner that was not revolutionary or even unusual in the industry. When necessary, I referred to manuals provided with that hardware or software, or by the exchanges when dealing with issues specific to co-location. I did not receive any instruction from Walleye, nor did I use any confidential or proprietary material in configuring the firm's "Architecture." While the Quants or Java Programmers may have contributed code that is confidential or proprietary, I did not make such contributions, nor did I not access the trading programs of the Quants and/or the Software Developers.

**The Harm I Will Suffer if the Non-Compete is Enforced**

37.    I have postponed my August 13, 2007 scheduled start date at D. E. Shaw until the dispute with Walleye regarding the Non-Compete is resolved.  As of today, I have not started working for D. E. Shaw.  Pursuant to the terms of the Non-Compete, having opted to try to enforce the Non-Compete, Walleye has continued to pay my base salary.  However, Walleye has not allowed me to continue to participate in any of its benefit or bonus plans.  At the time of my departure from Walleye, I was a participant in Walleye's group medical, dental and vision plans and its 401(k) plan, which plan involved a Walleye-paid matching component.  Additionally, as an active employee at Walleye, I was eligible for and received annual bonuses.  In the financial services industry, it is not unusual for bonuses to exceed base salary in years of strong financial performance.

38.    Having complied with Walleye's request that I not work for D. E. Shaw, I have cashed the checks provided by Walleye to pay me for the period of time that I have refrained from starting work at D. E. Shaw.  Without these checks, my family and I would not be able to pay our monthly expenses.  However, the amount being paid by Walleye is significantly less than the value of my total compensation package at Walleye, as well as significantly less than the value of my total compensation package if I were allowed to commence employment with D. E. Shaw.  Accordingly, Walleye's attempt to preclude me from working for an entity that Walleye previously acknowledged is not a competitor already has caused me financial damages that exceed the amount that I have received from Walleye.  Moreover, I notified Walleye that my depositing of the checks was not an agreement to the terms of the Non-Compete, explaining that the damages Walleye's actions are causing me is greater than the amount that I am receiving.  If Walleye is not enjoined from seeking to enforce the Non-Compete, in addition to financial damages, I will suffer irreparable damage to my career.

39.    Walleye's acts are preventing me from working in my chosen field as an IT professional for two years.    A two-year hiatus is unacceptable in my field because the technology, industry standards, and markets change rapidly.    The technology undergoes major changes approximately every six months; it undergoes revolutionary changes approximately every two years.   Even if I try to keep abreast of new technological developments, I will not truly be up-to-date because I must work directly "hands-on" with new technology in order to understand how it functions.   Stated another way, my skills will not keep up with those actively working in the industry.

40.    As a result, if I cannot work for D. E. Shaw or a comparable financial services firm for two years, it will be difficult for me to find employment in this field after two years. Within the segment of the industry involved in trading, prospective employers want to hire IT professionals whose skills are current and who are up-to-date on technology and market trends. After a two-year hiatus, I will either be unemployable, or be forced to accept a position with significantly less seniority and responsibility than the position I am now being offered at D. E. Shaw.

41.    I have been working in the financial services field for my entire career, and have developed a reputation in the industry.   Thus far, I have enjoyed a successful career and have been on a career trajectory that is at the forefront of my field.   If I am forced to stop working as an IT professional in the financial services industry, I will loose the momentum in my career that I have worked hard to develop.   Further, I cannot simply shift into another IT field because my specialized skills are not in demand in areas outside of the financial services industry.

42.    I will also suffer significant financial hardship if the Non-Compete is enforced and I am prevented from working at D. E. Shaw.   In addition to the value of the Walleye benefits

and bonuses that I will not receive if the Non-Compete is enforced, I will be giving up the higher salary that I have been offered a salary at D. E. Shaw. It was not surprising to me that D. E. Shaw offered me a salary that is substantially higher than my salary at Walleye, because Walleye offered me a salary that was was substantially higher than my salary at SIAC. Moreover, D. E. Shaw is based in New York, which market I understand to involve higher salaries than firms in Minnesota. Moreover, if I am forced to forego this opportunity at D. E. Shaw, or other comparable opportunities, I will loose the ability to continue to advance to positions of greater responsibility and compensation. As such, I will continue to suffer financial harm after the conclusion of the two-year period.

43. For all of these reasons, I respectfully request that the Court enjoin Walleye from engaging in any conduct, including attempting to enforce the Non-Compete, intended to prevent me from working for D. E. Shaw for two years from my separation from Walleye.

DANIEL EISNER

Sworn to before me this 9th
day of October, 2007

Notary Public

BONNIE SHEILA SCHWAB
Notary Public, State of New York
No. 01SC6101264
Qualified in New York County
Commission Expires 11/10/2007

NY1:\1509942\71\0039