# EXHIBIT 1

### CONFIDENTIAL EMPLOYMENT, NON-COMPETITION, NON-SOLICITATION, AND NON-DISCLOSURE AGREEMENT

This Confidential Employment, Noncompetition, Nonsolicitation, and Nondisclosure Agreement ("Agreement") is made this 22nd day of June 2005, by and between Walleye Trading Advisors, LLC, ("Employer"), and Dan Eisner ("Employee").

**BACKGROUND:**

1. Employer desires to engage the services of Employee, and Employee desires to become so employed under the terms and conditions of this Agreement.

2. Employer is engaged in the highly proprietary and unique business of trading securities in local, national and global markets.

3. The trade and goodwill of Employer with its clients has been, and will be, established at substantial cost and effort to Employer, and irreparable damage will result to Employer if this goodwill is diverted from Employer or in any way disrupted.

4. Employer has also expended, and will continue to expend, substantial costs and efforts to teach its employees techniques and methods that are extremely valuable, highly confidential, proprietary, and unique to Employer's industry and that Employer has developed.

5. Employer intends to employ Employee to assist in developing its business, will provide Employee with access to its highly confidential techniques and methods, and will expose Employee to its clients, research, and techniques.

6. During the course of Employee's employment, Employee will also be exposed to other confidential and proprietary information, including methodologies, profits, and specialized skills, which are not generally known to the public or to Employer's competitors and, as a result, have substantial value to Employer.

7. Employer wishes to reasonably protect its confidential and proprietary information and to protect Employer from competition by Employee.

Accordingly, Employer and Employee agree as follows:

**AGREEMENT:**

1. **TERM.** Employee's employment with Employer shall be "at will," meaning that Employee may terminate his or her relationship with Employer at any time and for any reason, and Employer may terminate Employee's employment at any time and for any reason.

2. **DUTIES AND RESPONSIBILITIES.** Employee's duties shall include the application of all of Employee's skills and knowledge as they relate to Employee's position with Employer as a senior developer, with those powers and duties as may be assigned from time to time by Employer.

3. **BEST EFFORTS.** Employee agrees to devote all of Employee's time and best efforts to Employer's business in the performance of Employee's duties hereunder, and Employee shall not, without the express written consent of Employer, become associated with or engage in any business, employment or directorship other than for Employer.

4. **COMPENSATION.** Employee will receive an annual salary of $120,000, paid pursuant to normal payroll practices. This salary will be reviewed and adjusted from time to time in Employer's discretion.

DSE Initial
Dan Eisner, 22 June 2005

5. **DISCRETIONARY BONUS.** Employee may be entitled to receive a payment of bonus compensation (the "Discretionary Bonus"). Employee's entitlement to receive a Discretionary Bonus payment shall be determined in the sole and complete discretion of Employer and be contingent upon the Employee being employed by Employer on the day of the Discretionary Bonus's payment. Payment of all or any portion of a Discretionary Bonus payment shall be made in accordance with the "Terms and Conditions of Discretionary Bonus and Compensation and Identification of Deferred Compensation" attached as Exhibit A hereto.

6. **DEFERRED COMPENSATION.** Employee may be entitled to receive a payment of deferred compensation (the "Deferred Compensation"). Employee's entitlement to receive a payment of Deferred Compensation shall be determined in accordance with the terms and conditions of this Agreement, including Exhibit A attached hereto, and the terms and conditions of the Walleye Trading, LLC Non-Qualified Deferred Compensation Plan (the "Plan"), as may be amended from time to time.

7. **BENEFITS.** During the term of Employee's employment, Employee will be entitled to participate in Employer's benefit plans, including health and retirement plans, which are available to all similarly situated employees in accordance with the terms and provisions of those plans. Employer retains the right to alter or discontinue these plans at any time. In addition, Employee will be entitled to four (4) weeks of vacation pursuant to Employer's existing vacation policy, which may also be altered at Employer's discretion.

8. **NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.** Employee will not, at any time during employment with Employer or anytime thereafter, directly or indirectly, disclose, furnish or make accessible to any person, firm, corporation, or other entity, or make use of, any Confidential Information of Employer or its affiliates, subsidiaries, or principals. For the purposes of this Agreement, "Confidential Information" means any information that derives independent economic value from not being generally known or readily ascertainable by persons outside Employer. Confidential Information includes, but is not limited to: this Agreement; information protected by Minnesota's Uniform Trade Secret Act; client contact information or information concerning client needs, portfolios or investments; methodologies; training materials of any kind; information related to profits or other financial data; market research and analysis or projections; proprietary trading techniques and skills used or developed by the company; products, securities, equities, option sales and other performance information; information of any kind related to the company's trading or product development practices; computer data files of any kind; lists of instruments, securities or positions held by the company, its clients or affiliates; marketing or advertising materials; plans, processes, and projections; the identities of the company's employees and independent contractors; Employer's computer programs, software and computer applications; company personnel and human resources information; company organizational information; proprietary quantitative trading algorithms; and the plans, objectives or strategies of Employer, its affiliates, subsidiaries, principals, investors or clients.

In addition, Employee recognizes that Employer has received or in the future may receive from third parties their confidential or proprietary information subject to a duty on Employer's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees that Employee owes Employer and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm, or corporation (except as necessary in carrying out Employee's work for Employer consistent with Employer's agreement with such third party) or to use it for the benefit of anyone other than for Employer or such third party without the express written authorization of a duly authorized officer of Employer, whether prior to, or following termination of Employee's employment with the Employer.

9. **RETURN OF EMPLOYER PROPERTY.** Employee agrees that, upon demand, and, in any event, after termination of employment with Employer, whether voluntary or involuntary, Employee will promptly return and deliver to Employer (and will not keep in his or her possession or deliver to anyone else) any and all information or property (tangible or intangible) of Employer, its successors, assigns, or third-parties (as set forth above) including and without limitation, any records, data, notes, reports, proposals, lists, correspondence, business plans, other documents or property, tangible trade secrets, Confidential Information, confidential knowledge, data, and all reproductions or electronic versions of any of these items.

DSE Initial
Dan Eisner, 22 June 2005

2

10. **ASSIGNMENT OF INVENTIONS.**

a) In the course and scope of Employee's employment with Employer, Employee may develop copyrightable material (the "Work"). The parties agree that all Works created by Employee shall constitute "works made for hire" under the Copyright Revision Act of 1976, as amended from time to time, and shall be the exclusive property of Employer. To the extent that a Work, or any portion of a Work, may not properly be considered a work made for hire, Employee agrees to assign and hereby does assign to Employer all of its right, title and interest, including all copyright rights, in and to the Work, or such portion of the Work. Employee agrees to execute such documents as Employer may deem necessary from time to time to perfect Employer's rights hereunder. Should applicable law preclude Employer's exclusive ownership of a Work, Employee hereby grants to Employer an unlimited, exclusive, perpetual and royalty free license to use, reproduce and distribute such Work.

b) While Employee is employed by Employer, Employee will promptly inform Employer of the full details of his or her inventions, discoveries, improvements, innovations and ideas (collectively, "Inventions") whether or not patentable, copyrightable or otherwise protectable that he/she conceives, completes or reduces to practice (whether jointly or with others) (whether conceived, completed or reduced to practice by Employee while employed by Employer prior to the date hereof or hereafter) and that:

　　i) relate to Employer's present or prospective business, or actual or demonstrably anticipated research and development;

　　ii) result from any work Employee does using any equipment, facilities, materials, trade secrets or personnel of Employer in the course of their service to Employer; or

　　iii) results from or are suggested by any work that Employee may reasonably be expected to do for Employer in the course of his or her employment.

c) Employee hereby assigns to Employer or Employer's designee, his or her entire right, title and interest in all of the following, that Employee conceives or makes (whether alone or with others) while employed by Employer (whether conceived, completed or reduced to practice by Employee while employed by Employer prior to the date hereof or hereafter):

　　i) all Inventions;

　　ii) all copyrights, trade secrets, trademarks and mask work rights in Inventions; and

　　iii) all patent applications filed and patents granted on any Inventions, including those in foreign countries.

d) Employee's obligations to disclose and assign Inventions under this Paragraph 10 shall not apply to any invention that: (i) was developed entirely on Employee's own time and effort; (ii) used no equipment, supplies, facility, trade secrets or Confidential Information of Employer or its affiliates in its development; (iii) does not relate to Employer Activities or Employer's actual or anticipated activities or research and development; and (iv) does not result from any work performed by Employee for Employer.

e) Employee hereby agrees that he/she shall execute any and all such documents, instruments, agreements or certificates and take such other actions as Employer may reasonably request to further secure Employer's rights in and title to any Inventions.

11. **NON-SOLICITATION OF CLIENTS.** Employee acknowledges that his/her position with Employer will inevitably expose Employee to confidential client information, including client identity and contact information, investing information, and any other information about Employer's clients. In addition, Employee acknowledges that in carrying out his/her duties for Employer, it may become necessary to utilize confidential client information and develop good will with Employer's clients. Accordingly, for a period of two

DSE Initial
Dan Eisner, 22 June 2005

3

(2) years after termination of Employee's employment with Employer, whether voluntary or involuntary, Employee agrees not to solicit or accept business from, or do business with, either as a principal, agent, employee, employer, stockholder, partner, or in any other individual or representative capacity whatsoever, any person or entity with whom Employer has done business or solicited business from during the preceding two (2) years. The term "client" shall specifically include, without any limitation, any investors in any of Employer's funds.

12. NON-SOLICITATION OF EMPLOYEES. Employee acknowledges that Employer has spent, and will spend, substantial efforts in training and recruiting other employees. Accordingly, Employee agrees that, for a period of two (2) years after termination of Employee's employment with Employer, whether voluntary or involuntary, Employee will not, directly or indirectly: (i) solicit, induce, or attempt to induce any person who then is, or was within two (2) years previously, an employee or independent contractor of Employer or its affiliates, subsidiaries or principals (a "Company Employee"), to become connected in any way with a company, entity, firm, business, activity or enterprise with which Employee is directly or indirectly affiliated; or (ii) hire or attempt to hire any such Company Employee to become connected in any way with a company, entity, firm, business, activity or enterprise with which Employee is directly or indirectly affiliated.

13. NON-COMPETITION AGREEMENT. Employee acknowledges that Employer will invest a substantial amount of time and resources in training Employee using highly confidential and proprietary training methods, techniques and materials, and that Employer would not otherwise make this training and know-how available to Employee were it not for Employee's strict adherence to all of the terms of this agreement, specifically including Employee's agreement to not use the skills, training, and know-how provided by Employer pursuant to this provision. Employee further acknowledges that Employer's business is of a global nature, involving investments and trading of securities in local, national and global markets, and that the protections contained in this Agreement must also be of a global nature and scope for Employer's reasonable protection.

Accordingly, so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the "Noncompete Term") for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer; provided, however, that following the termination of Employee other than for "Cause" as provided in Paragraph 14, the provisions of this Paragraph shall only apply to Employee for as long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term. Nothing in this paragraph shall prohibit Employee from trading for their own account, but if Employee uses any resources of Employer, any such activity must conform in all respects with Employer's employee manual and other procedures and policies as determined from time to time with respect to trading and investing in public companies.

14. TERMINATION FOR "CAUSE". For purposes of this Agreement, "Cause" shall mean:

   (i) The diversion or attempted diversion by Employee of business from Employer for Employee's personal gain or benefit;

   (ii) The commission by Employee of an act of dishonesty or moral turpitude involving Employer;

   (iii) A violation of the provisions of this Agreement;

   (iv) Gross negligence or willful misconduct;

   (v) Failing to abide by established internal risk policies by a meaningful margin or by a small margin chronically;

DSE Initial
Dan Eisner, 22 June 2005

4

(vi) Commission by Employee of a felony or serious misdemeanor offense or pleading guilty or *nolo contendere* to same; or

(vii) Persistent failure of Employee to effectively perform his or her duties for Employer.

15. INJUNCTION. Employee acknowledges that the provisions set forth in this Agreement are reasonable and necessary in order to protect and maintain the legitimate business interests of Employer, and that their enforcement would not prevent Employee from earning a livelihood, especially given that Employee is skilled in other areas and would only be skilled in the areas protected by this Agreement as a result of the training and know-how provided by Employer. In the event Employee breaches the promises contained in this Agreement, Employee recognizes that irreparable injury will result to Employer, that Employer's remedy at law for damages will be inadequate, and that Employer shall be entitled to seek an injunction to restrain the continuing breach by Employee, Employee's partners, agents, servants, or employees, or any other persons or entities acting for or with the Employee as provided by law and/or equity. Employer may further be entitled to damages in connection with the enforcement of this Agreement as provided in the Plan and by law and/or equity, and including the recovery of any profits and revenues obtained by Employee while engaging in violations of this Agreement in addition to the recovery of any Deferred Bonus. These remedies are in addition to any other rights and remedies that Employer may have at law or in equity.

16. ENFORCEABILITY. If any provision of this Agreement is, for any reason, adjudged to be void, invalid, or unenforceable by a court of law, the remainder of this Agreement will nonetheless continue and remain in full force and effect. In the event that any provision of this Agreement relating to time periods and/or areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time periods or areas such court deems reasonable and enforceable, said time periods and/or areas of restriction shall be deemed to become and thereafter be the maximum time periods and/or areas which such court deems reasonable and enforceable.

17. SUCCESSORS AND ASSIGNS. Except as otherwise provided herein, the benefits and obligations of this Agreement will inure to the successors and assigns of Employer, to any person or entity which purchases all or substantially all of the assets of Employer and to any subsidiary affiliated corporation or operating division of any other previously described entities.

18. INJUNCTION BOND. If Employer is required to furnish a bond or other surety as a precondition to the issuance of any injunctive relief, Employee hereby agrees that such bond or surety will be in the amount of the minimum allowable by law.

19. SURVIVAL. The terms and conditions of this Agreement will survive the termination of Employee's employment with Employer to the fullest extent necessary for their enforcement and for the protection of Employer, its successors, assigns, and affiliates.

20. CONSENT TO JURISDICTION, SERVICE OF PROCESS AND VENUE. Employee, Employer, and its subsidiaries and assigns consent to venue and jurisdiction in the District Court of Hennepin County, State of Minnesota, and in the U.S. District Court for the District of Minnesota and to service of process under Minnesota law in any action commenced to enforce this Agreement.

21. GOVERNING LAW. This Agreement will be construed and interpreted in accordance with the laws of the State of Minnesota.

22. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between Employer and Employee with respect to the subject matters herein and supercedes and replaces all prior agreements. Employee represents that there were no inducements or representations leading to the execution of this Agreement, except as contained in this Agreement. This Agreement may not be amended other than by a writing signed by the parties.

23. VOLUNTARY AND KNOWING ACTION. Employee acknowledges that Employee has had ample opportunity to review this Agreement and has had the opportunity to consult with an attorney before

DSE Initial
Dan Eisner, 22 June 2005

5

signing it and before accepting employment with Employer, that Employee understands the terms of this Agreement, and that Employee is voluntarily entering into this Agreement and intends to be fully bound by its terms.

24. **NON-WAIVER.** The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other portions of this Agreement or any subsequent breach by such other party.

25. **EMPLOYEE REPRESENTATIONS.** Employee warrants and represents that there were no inducements or representations leading to the execution of this Agreement, except as contained in this Agreement, and further represents that he/she has not accepted any employment offer with Employer, either verbally or in writing, prior to executing this Agreement. Employee represents that that: (i) the execution, delivery and performance of this Agreement by Employee does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment, decree, employment agreement, noncompete agreement or confidentiality agreement to which Employee is a party or by which he is bound; (ii) upon the execution and delivery of this Agreement by Employer, this Agreement shall be the valid and binding obligation of Employee, enforceable in accordance with its terms; and (iii) Employee will not make use of any confidential information, trade secrets or intellectual property belonging to other parties in connection with the performance of Employee's duties hereunder, and that any such use would be unauthorized beyond the scope of Employee's duties and responsibilities to Employer.

26. **EXECUTION IN COUNTERPARTS.** This Agreement may be executed in any number of counterparts, and by different parties upon different counterparts as the same effect as if the signatures thereto where upon the same instrument. Each counterpart shall be deemed an original but together shall constitute one in the same instrument.

Dated: 6/23/05

Employee Name: Daniel Eisner

Dated: 6/28/05

WALLEYE TRADING, LLC

By: _____ (Peter Goddard)

Its: CEO

DSE Initial
Dan Eisner, 22 June 2005

6

**Exhibit A**

Part I.   **Terms and Conditions for Payment of Discretionary Bonus Compensation and Identification of Deferred Compensation:**

1. The "Base Amount" refers to any compensation received by Employee from Employer during the applicable fiscal year in the form of bonuses or salary. Any Discretionary Bonus that does not cause the Base Amount to be exceeded will be paid to the Employee in the form of a single lump sum cash payment on the applicable Bonus Payment Date, subject to withholding tax and other legally required and voluntary deductions in accordance with the Employer's regular payroll practices.

2. If the Discretionary Bonus does cause the Base Amount to be exceeded, then Fifty percent (50%) of the difference between the Employee's total compensation and the Base Amount (the "Excess Amount") shall be deemed "Deferred Compensation" to the Employee, the payment of which shall be subject to the terms and conditions of the Walleye Trading, LLC Nonqualified Deferred Compensation Plan, as amended.

Part II.   **Base Amount and Bonus Payment Date:**

1. Employee's "Base Amount" shall be $250,000.

2. Employee's "Bonus Payment Date" shall be defined as within ten (10) days after the end of the first quarter following Employer's fiscal year end.

DSE  Initial
Dan Eisner, 22 June 2005

7