# EXHIBIT 3



JAMES D. KREMER
Partner
(612) 340-7859
FAX (612) 340-2777
kremer.james@dorsey.com

August 10, 2007

**VIA E-MAIL AND POSTAL SERVICE**

Peter Goddard
Chief Executive Officer
Walleye Software, LLC
294 Grove Lane East
Suite 280
Wayzata, MN 55391

    Re:    Daniel Eisner

Dear Mr. Goddard:

    Dorsey & Whitney LLP is counsel for Daniel Eisner. This is in response to your August 3, 1997, letter to Mr. Eisner.

    As you know, Mr. Eisner submitted a letter of resignation on July 19, 2007, and has since ended his employment with Walleye. Your letter notes Walleye's intent to continue to pay Mr. Eisner his base salary (at the time of the termination of his employment) for a period of two years pursuant to Section 13 of Mr. Eisner's Confidential Employment, Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Agreement"). You also request information from Mr. Eisner regarding any prospective employment to evaluate the "competitive nature" of any such position.

    Please be advised that Mr. Eisner has been offered and accepted a position as Systems Administrator with D. E. Shaw & Co., L.P. In that role, Mr. Eisner will be a member of Shaw's Systems Group, which provides general IT services. Mr. Eisner will function as a systems generalist, with responsibility for: (1) leading the company's search for new data center co-location space to house large grids and other servers; (2) finding, evaluating and deploying new technologies for the company's systems, such as backup systems, high performance servers, and voice-related technologies; and (3) designing and overseeing the development of internal software to increase staff productivity (*e.g.*, conference room booking, improved communications software, etc.). Mr. Eisner's position with Shaw will not involve the creation, modification or implementation of trading systems or software (which is handled by an entirely separate technical development and support group at Shaw). Given the nature of Mr. Eisner's anticipated responsibilities, his employment with Shaw does not implicate Section 13 of the Agreement.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • T 612.340.2600 • F 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA CANADA EUROPE ASIA

◯ ᗰ DORSEY

Peter Goddard
August 10, 2007
Page 2

   To the extent you disagree and are inclined toward action to prevent Mr. Eisner from joining Shaw, there are significant flaws with Section that render it unenforceable. Under Minnesota law, restrictive covenants (such as Section 13 of the Agreement) are "looked upon with disfavor, cautiously considered, and carefully scrutinized." *Kallock v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998); *Salon 2000, Inc. v. Daulwaltur*, 2007 WL 1599223, *2 (Minn. App. 2007). To be enforceable, non-compete agreements must be both necessary for the protection of the employer's legitimate business interests and reasonable as between the parties. *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 898-99 (Minn. 1965). The test applied in examining restrictive covenants is whether the restriction imposed on the employee is greater than reasonably necessary to protect the employer's business, considering the nature of the employment, the temporal restriction imposed, and the geographic scope of the restriction. *Id.*; *United Products Corp. of America, Inc. v. Cederstrom*, 2006 WL 1529478, *3 (Minn. App. 2006).

   In Mr. Eisner's case, no legitimate, protectible interest is served by the non-compete. Section 13 of the Agreement is premised on Walleye's investment in "a substantial amount of time and resources in training ... using highly confidential and proprietary training methods, techniques and materials ...." Mr. Eisner did not receive any such training during his employment with Walleye. *See Alpine Glass, Inc. v. Adams*, 2002 WL 3189910, *5 (Minn. App. 2002) (holding that minimal employee training was insufficient to enforce non-compete agreement).

   Similarly, during his employment with Walleye, Mr. Eisner had no involvement in customer relationships, and no access to customer data. In addition, he was neither involved in the creation or modification, and has no knowledge of the code, of any proprietary software used by Walleye to guide its trading decisions (including the formulas and/or trading algorithms at the heart of any such software applications). Consequently, the non-compete agreement cannot be enforced on the basis of any perceived threat of misappropriation of claimed confidential, proprietary and/or trade secret information. *See Alpine Glass*, 2002 WL at *5 (non-compete unenforceable where there was no evidence that former employees developed "special relationships" with customers or had access to confidential/trade secret information); *Klick v. Crosstown State Bank of Ham Lake, Inc.*, 372 N.W.2d 85, 88 (Minn. App. 1998) (holding a three-year restriction unreasonable where the bank vice president developed no special relationships with customers and received no special training).

   Even if there was some legitimate, protectible business interest of Walleye implicated by Mr. Eisner's prospective employment with Shaw, the non-compete provision is unreasonable. The scope of the non-compete is unlimited both geographically and substantively. It purports to preclude Mr. Eisner from "directly or indirectly, *throughout the world*, whether as a principle, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with *any entity, firm, business, activity or enterprise which is engaged in any business similar to or competitive with Employer....*" In effect, the non-compete attempts to prevent Mr. Eisner from pursuing his profession, using his general knowledge skills and abilities



Peter Goddard
August 10, 2007
Page 3

(as is his absolute right under Minnesota law), with any entity providing financial and investment advisory services for a two-year period following the end of his employment with Walleye.

Non-compete provisions that are overly broad (let alone unlimited) in geographic scope, such as Section 13 of the Agreement, are unenforceable under Minnesota law. *See, e.g., Ring Computer Systems, Inc. v. Paradata Computer Networks, Inc.*, 1990 WL 132615, *1 (Minn. App. 1990) (Affirming determination that non-compete provision was unenforceable because it lacked any geographic limitation; "Minnesota case law is clear that a covenant not to compete must have both a time and a geographic restriction to be reasonable."); *Berg v. Miller*, 2005 WL 832064, *5 (Minn. App. 2005).

Finally, the two-year duration of the non-compete provision is unreasonable under Minnesota law, particularly in light of the limited duration of Mr. Eisner's employment and nature of responsibilities with Walleye. The reasonableness of the duration of a restrictive covenant is assessed in relation to (1) the length of time necessary to obliterate the identification between employer and employee in the minds of the employer's customers; and (2) the length of time necessary to find and train a replacement for the employee. *Head v. Morris Veterinary Center, Inc.*, 2005 WL 1620328, *2 (Minn. App. 2005); *Klick*, 372 N.W.2d at 88. Here, the first factor has no relevance, as Mr. Eisner had no relationship with Walleye customers. The second factor, too, is of no support for Walleye, as the general IT support provided by Mr. Eisner does not require any unique or specialized training by Walleye (as reflected by the fact that Mr. Eisner received no such training). Under these circumstances, therefore, the non-compete provision fails the temporal test as well. *See Cederstrom*, 2006 WL 1529478 at *3 (holding 18-month non-compete unenforceable where employer did not present evidence of investment of significant time in training former employee, or evidence that the nature of former employee's worked required close contact with customers sufficient to create goodwill). Indeed, given the nature of Mr. Eisner's profession, even a limitation period substantially less than 2 years would be unreasonable and unenforceable. *See Earthweb v. Schlack*, 71 F. Supp.2d 299 (S.D.N.Y. 1999) (Invalidating one-year non-compete because "[w]hen measured against the information technology industry in the Internet environment, a one-year hiatus from the workforce is several generations, if not an eternity.").

As should be evident from the above, we are confident that a Minnesota court will find that the non-compete provision in Mr. Eisner's Agreement with Walleye is unenforceable. Such a determination will carry with it implications for Walleye beyond the individual employment circumstances of Mr. Eisner. Mr. Eisner's departure and potential employment with Shaw would prove to be a disastrous "test case" for Walleye should you elect to pursue that path. We are hopeful, however, that upon consideration this letter and the nature of the position Mr. Eisner has been offered with Shaw, a court's assessment will not be necessary.

Please let me know in writing Walleye's position with respect to Mr. Eisner's prospective employment with Shaw. If you feel you need additional information to assess the situation, you can contact me at (612) 340-7859.

DORSEY & WHITNEY LLP



Peter Goddard
August 10, 2007
Page 4

    Please be advised that time is of the essence in this matter. Mr. Eisner would like to start work with Shaw as soon as possible, preferably next week. At present, his commencement of employment is on hold pending Walleye's confirmation that it does not view such employment as a violation of Section 13 of the Agreement. If we don't hear from you by the close of business next Tuesday, we'll take your silence as an acknowledgement that Mr. Eisner's prospective employment with Shaw does not implicate Section 13 of the Agreement.

    In the event that Mr. Eisner's employment with Shaw is unduly delayed or prevented as a consequence of a delay in your response to this letter, or an indication from Walleye that it intends to claim or claims that employment with Shaw violations the non-compete provision, Mr. Eisner will seek to recover his damages from Walleye. It trust that, with your prompt and reasoned attention to this matter, it will not come to that.

    I look forward to hearing from you.

Very truly yours,

James D. Kremer

cc:    Daniel Eisner

DORSEY & WHITNEY LLP