UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
DANIEL EISNER,

                Plaintiff,                  07 Civ. 7837

       v.

                                                    **AFFIDAVIT OF**
                                                    **PETER REISS**

WALLEYE TRADING ADVISORS, LLC,

                Defendant.
------------------------------------------------------------- x

STATE OF NEW YORK       )
                                    ) ss.:
COUNTY OF NEW YORK   )

        PETER REISS, being duly sworn, deposes and says:

        1.     I am employed by D. E. Shaw & Co., L.P. ("D. E. Shaw" or "the Company") in the Information Technology/Systems Department ("Systems"). Since May of 1999, I have worked as the head of Systems. I make this affidavit in support of Daniel Eisner's ("Eisner") motion for a preliminary injunction enjoining Walleye Trading Advisors, LLC ("Walleye") from engaging in conduct, including seeking to enforce a non-competition agreement (the "Non-Compete") against Eisner, designed to prevent him from commencing employment with D. E. Shaw. This affidavit is based upon my personal knowledge.

        2.     D. E. Shaw is a global investment and information technology firm with its main office in New York, New York. Since its inception in 1988, D. E. Shaw has earned an

international reputation for financial innovation and technological leadership. D. E. Shaw's activities range from the acquisition of existing companies and the financing or development of new ones to investment strategies based on either quantitative strategies utilizing computational and mathematical models or qualitative strategies designed by expert investment professionals. D. E. Shaw is one of the pioneers of quantitative finance, such that it has more experience in this field than the vast number of small companies, like Walleye, who have entered the field in the past five to ten years. D. E. Shaw's computer systems are configured using some of the most advanced technology available, reflecting its long-standing commitment to development of such technology.

3. D. E. Shaw employs a number of professionals to undertake various technology-driven tasks at the Company. Like many financial services companies engaged in quantitative trading, D. E. Shaw separates the functions of these employees. Technology professionals in the "Front Office" are generally either: (a) quantitative analysts ("Quants"), with a background in mathematics, who are engaged in the development of proprietary trading algorithms and trading programs; or (b) software developers ("Software Developers"), who write code that tells the trading system how to effectuate the algorithms created by the Quants. In contrast, technology professionals in the "Systems" department (also referred to as the "IT" group) are responsible for the implementation and maintenance of Systems infrastructure. Systems infrastructure in this industry typically is comprised of industry-standard commodity hardware and software, such as

Linux servers, standard network connections and communications protocols, and similar commodity products and services - all of which are widely available throughout the financial services industry.

4. In my position at D. E. Shaw, I have knowledge about the functions being performed by the Systems department employees. Systems employees work with the Company's computer infrastructure and generally have no reason to access the Company's proprietary trading algorithms and trading programs being worked on by Front Office Quants and Software Developers. To the extent that Systems department employees, such as myself, interact with the Quants or Software Developers of the Front Office, such interaction typically consists of Systems providing infrastructure support, such as providing servers, databases, and disk storage and installing shared standard software, such as perl, python, and C++.

5. In 2005, the Systems department was forwarded and reviewed Eisner's resume. Based upon the experience reflected on that resume, we directed our recruiting department to schedule Eisner for an interview. However, before that interview was scheduled, we learned that Eisner was no longer available.

6. In 2007, we again received Eisner's resume from a recruiter and again decided to interview him. On June 11, 2007, I interviewed Eisner for the position of a Systems Administrator in D. E. Shaw's Systems department. Based upon that interview, I was impressed with Eisner's experience and knowledge, particularly the breadth of his Systems knowledge. Although I thought that Eisner's experience overseeing the systems infrastructure at Walleye, another (albeit much smaller) financial services firm would be useful, I was more impressed with the work that he had done in his prior job at Securities Industry Automation Corporation, a subsidiary of the New York Stock Exchange.

7.  Based upon his knowledge and experience with Systems infrastructure, I recommended that the Company hire Eisner as a Systems Administrator for a role in which he would provide Systems support to the Company's hedge fund business, which business is not involved in market making. My decision to recommend that D. E. Shaw offer Eisner a position had nothing to do with any confidential information that he may have been exposed to while working at Walleye. In fact, I never asked about and had no interest in knowing about Walleye's proprietary trading systems or any other confidential information, which information Eisner would have been precluded from bringing to D. E. Shaw by our standard employment agreement.

8.  In the Systems Administrator role that he has been offered at D. E. Shaw, we intended for Eisner to be responsible for: (i) leading the company's search for a new data center co-location space; (ii) finding, evaluating and deploying new technologies for the Systems department (such as backup systems, high performance servers, and voice-related technologies); and (iii) designing and overseeing the development of internal software to increase staff productivity (such as tools to improve conference room scheduling and communications software). (However, as Eisner's start has been delayed, we have had to task another employee to work on the search for new co-location space.) None of these tasks involve programming for the Company's confidential and proprietary trading systems. Moreover, Eisner will have no reason to use any knowledge about the infrastructure at Walleye in performing any of these tasks.

9.  In the interview process, Eisner informed me that he worked on co-location of Walleye's computers at various exchanges. The process that the many firms who co-locate their servers at an exchange utilize is neither confidential nor proprietary. "Co-location" simply

means that firms physically place their servers and/or computers near or next to the computers of the exchange so as to increase the speed at which those firms' transactions are completed. The practice of "co-locating" is well-publicized, both in trade publications and more general readership publications and is a topic any many industry seminars. For example, in December 2006, the Wall Street Journal published a front-page article about such practices. (Attached as Exhibit A is a true and complete copy of that December 15, 2006 article.) In fact, the practice is so well-established that the exchanges and operating systems vendors have instruction manuals and protocols detailing the procedure to "co-locate" servers. D. E. Shaw has co-located its servers and/or computers for many years - long prior to ever seeing Eisner's resume.

10.     I understand that Walleye seeks to enforce a Non-Compete Agreement to preclude Eisner from working at D.E. Shaw or a comparable firm for two years from his separation from Walleye. Such a hiatus from the industry would have a significant negative impact on Eisner's career.

11.     The IT industry is a competitive field that requires Systems professionals to stay current with ever-changing technological advancements. Moreover, Systems professionals in the financial services industry have the additional burden of staying current regarding specialized technological developments being utilized in the industry. In order to pursue a career as an IT professional in financial services firms involved in electronic trading activities, one must consistently hone his or her skills in a fast-paced and constantly evolving field. In my role, I generally would not hire a Systems professional who had not worked in the industry for two years because I would expect that the candidate's skills and knowledge of industry practices and

norms would be out-dated. Accordingly, if Eisner is prevented from working as a Systems professional in the financial industry for two years, his career will be significantly impacted.

_____
PETER REISS

Sworn to before me this
2nd day of October, 2007

_____
Notary Public
Matthew J. Neel
Notary Public #02NE6078781
Commission Expires 01/24/2011

NYK 1124325-2.042771.0039