UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

DANIEL EISNER,                        :

      Plaintiff,                   :

      v.                           :    07 Civ. 7837

WALLEYE TRADING ADVISORS, LLC,        :

      Defendant.                   :

                                           :

------------------------------------ X


## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION


McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173-1922
212.547.5400

*Attorneys for the Plaintiff*
*Daniel Eisner*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 3

ARGUMENT .......................................................................................................... 13

I.    EISNER WILL BE HARMED IF THE NON-COMPETE IS ENFORCED ................. 14

II.   EISNER IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT
      THE NON-COMPETE IS UNENFORCEABLE ........................................... 15

III.  THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF EISNER ............................ 24

CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

AM Medica Communications Group v. Kilgallen, 261 F. Supp. 2d 258 (S.D.N.Y. 2003) ...................................................................................................15, 17, 18

Aguilar v. Baine Service System, Inc., 538 F. Supp. 581 (S.D.N.Y. 1982) .....................14

Alpine Glass, Inc. v. Adams, C4-02-804, 2002 Minn. App. LEXIS 1392 (Minn. Ct. App. Dec. 17, 2002) ..............................................................................16, 19, 23

BDO Seidman v. Hirshberg, 690 N.Y.S.2d 854, 93 N.Y.2d 382 (1999)....................16, 19

Carroll v. Associated Musicians of Greater N.Y., Civ. No. 60-2939, 1962 U.S. Dist. LEXIS 5773 (S.D.N.Y. Oct. 4, 1962) ..................................................................14

Cherne Industrial, Inc. v. Grounds & Associates, Inc., 278 N.W.2d 81 (Minn. 1979) ......................................................................................................................20, 21

Earthweb, Inc. v. Schlack, 71 F. Supp. 2d 299 (S.D.N.Y. 1999) ..........................17, 19, 24

Heartland Securities Corp. v. Gerstenblatt, 99 Civ. 3694, 2000 U.S. Dist. LEXIS 3496 (S.D.N.Y. Mar. 22, 2000) .......................................................................16, 17, 18

IBM v. Liberty Mutual Insurance Co., 363 F.3d 137 (2d Cir. 2004) ...............................15

Ivy Mar Co. v. C.R. Seasons, Ltd., 907 F. Supp. 547 (E.D.N.Y. 1995)................15, 18, 22

Jay's Custom Stringing, Inc. v. Yu, 01 Civ. 1690 (WHP), 2001 U.S. Dist. LEXIS 9298 (S.D.N.Y. July 5, 2001) .......................................................................15, 16, 20

Klick v. Crosstown State Bank, 372 N.W.2d 85 (Minn. Ct. App. 1985) .........................15

Milstead v. O Records & Visuals, Ltd., No. 84 Civ. 3657 (RLC), 1984 U.S. Dist. LEXIS 16139 (S.D.N.Y. June 5, 1984) ......................................................................14

Nigra v. Young Broadcasting of Albany, Inc., 676 N.Y.S.2d 848, 177 Misc. 2d 664 (Sup. Ct. Albany Co. 1998) ..............................................................................15

Pella Windows & Doors v. Buscarnera, 07 CV 82 (SLT) (JMA), 2007 U.S. Dist. LEXIS 52382 (E.D.N.Y. Jul. 18, 2007).................................................................23, 24

Reed, Roberts Associates, Inc. v. Strauman, 386 N.Y.S.2d 677, 40 N.Y.2d 303 (1976)........................................................................................................................19

Ring Computer System, Inc. v. ParaData Computer Networks, Inc., No. C4-90-
    889, 1990 Minn. App. LEXIS 922 (Minn. Ct. App. Sept. 10, 1990)...........................17

Scelsa v. City University of N.Y., 806 F. Supp. 1126 (S.D.N.Y. 1992) ....................14, 25

Silipos, Inc. v. Bickel, 1:06-c, 2006 U.S. Dist. LEXIS 54946 (S.D.N.Y. Aug. 8,
    2006) ...............................................................................................15, 17, 18, 20, 23

Ultra Lube, Inc. v. Dave Peterson Monticello Ford-Mercury, Inc., CT-02-658,
    2002 Minn. App. LEXIS 1184 (Minn. Ct. App. Oct. 15, 2002)..................................21

United Products Corp. of America v. Cederstrom, A05-1688, 2006 Minn. App.
    Unpub. LEXIS 594 (Minn. Ct. App. June 6, 2006) ......................................................15

Daniel Eisner ("Eisner"), by and through his attorneys, McDermott Will & Emery LLP, submits this memorandum of law in support of his motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

At its essence, this action involves a Systems professional, Eisner, whose schooling and entire career have focused on developing skills and advancing along a career path as a Systems professional in the financial services industry. After developing substantial skills as a Systems professional in school and in prior jobs, in 2005, Eisner was hired by Walleye Trading Advisors, LLC ("Walleye"), a Minnesota-based financial services company that is engaged in electronic trading as a "market-maker," to build Walleye's computer infrastructure. Without any other full-time Systems professional in its employ and looking for an individual who would create their computer infrastructure, Walleye cannot credibly assert that it did not believe Eisner had substantial Systems administration skills at the time he was hired in July 2005.

In conjunction with joining Walleye, Eisner executed an agreement that contains a two-year post-employment restrictive covenant that purports to prohibit Eisner from working anywhere in the world for any company in the financial services industry. Under applicable law, on its face, this non-compete is over broad and unenforceable. Additionally, given the circumstances of Eisner's employment with Walleye, the non-compete is unenforceable as applied to Eisner. More specifically, Eisner utilized his pre-existing Systems skills and consulted with technical manuals and technical support personnel outside of Walleye to create a computer infrastructure that is not substantially different from the infrastructure of any other financial services firm involved in electronic trading. Walleye did not provide any Systems training to Eisner to assist him in performing these tasks, nor did Eisner utilize any confidential or proprietary information in building the computer infrastructure. Rather, Eisner utilized

industry-standard practices and commercially-available computers and software to create Walleye's infrastructure in a manner that was not confidential or proprietary and, therefore, not entitled to protection through a non-compete.

Despite the lack of a legitimate basis to do so, Walleye has prevented Eisner from commencing employment with D. E. Shaw & Co., L.P. ("D. E. Shaw"), an investment and technology firm that engages in a wide range of investment strategies, some of which involve electronic trading. Of import, D. E. Shaw is not a market-maker and, thus, is not competitor of Walleye - a fact that one of Walleye's partners admitted to Eisner at his exit interview. In response to Walleye's actions, Eisner and D. E. Shaw attempted - to no avail - to reason with Walleye. However, Walleye has continued to assert that the non-compete is enforceable and precludes Eisner's employment with D. E. Shaw. Accordingly, Eisner and D. E. Shaw temporarily have deferred Eisner's start date to allow for resolution of this issue. However, as time passes in a field in which technological advances happen rapidly and one's skills quickly become outdated, Eisner's career is being irreparably damaged in a way that cannot be remedied by money damages. Theses circumstances call out for an injunction preventing Walleye from engaging in conduct, including attempting to enforce the non-compete, to prevent Eisner from working as a Systems professional at D. E. Shaw.

## **BACKGROUND**

<u>The Industry</u>

Eisner is an information technology ("IT")/Systems professional who, over the course of his career, has developed considerable expertise and skill in the IT sector of the financial services industry. The IT industry is a competitive field that requires professionals to keep up to date with ever-changing technological advancements. Moreover, IT professionals in the financial services industry have the additional burden of keeping abreast of specialized technological developments, industry standards, and financial market trends. In sum, in order to pursue his profession, Eisner must constantly be honing his skills in a fast-paced and constantly evolving field. (Affidavit of Daniel Eisner, sworn to on October 9, 2007 ("Eisner Aff."), ¶¶ 2, 7.)

By way of background, in the financial services industry, it is common practice that all or portions of a firm's trading activities be conducted electronically. In the segment of the financial services industry that is engaged in electronic trading using quantitative strategies, there are three broad categories of technology professionals. The central technology professionals are the quantitative analysts ("Quants"). Quants develop mathematical models (or trading algorithms) and proprietary trading software. Essentially, the Quants configure the computers so that the computer will know when and how to automatically execute a trade. These algorithms are at the heart of the trading system, are the critical directional tools that drive the success or failure of the system, and are considered to be highly confidential and proprietary. Eisner has never worked as a Quant, and his lack of background in mathematics would prevent him from fulfilling the tasks of a Quant. (<u>Id.</u> at ¶ 3.)

The second category of technology professionals engaged in quantitative trading are "Software Developers." The Software Developers write the code that tells the computer system how to perform the vast majority of its functions. Software Developers write almost all of the

programs used by the system, including those that effectuate the algorithms created by the Quants. Eisner has never worked as a Software Developer in the financial services industry. (Id. at ¶ 4.)

The remaining category is that of the technology professionals who work with Systems, also known as the IT professionals, which individuals are needed at firms engaged in all types of trading – not just firms engaged in electronic trading. The Systems sector focuses on the computer infrastructure of a firm. Eisner's specialization falls within the purview of Systems. Systems employees use standard component parts (i.e., desktops, servers, routers and software) and attempt to configure them in a way that achieves the greatest speed and capacity. In accomplishing this task, Systems employees focus on configuring the system, rather than writing programs. Systems professionals generally only write programs in order to instruct the computers to perform specific tasks relating to maintaining the infrastructure. In the industry, this is known as "plumbing work." (Id. at ¶ 5.)

A skilled Systems professional can make a system run incrementally faster by making minor adjustments in which components are used in the system and how those components are linked together. However, Systems professionals working at different financial services firms largely undertake the same tasks in a similar method. The exact infrastructure varies to some degree from one firm to the next, but that does not make the infrastructure configuration confidential and proprietary. (Id. at ¶ 6.)

Eisner's Background

In 2001, Eisner received his Bachelors and Masters degrees in computer science from the State University of New York, Buffalo ("S.U.N.Y. Buffalo"). At S.U.N.Y Buffalo, Eisner gained extensive experience in the research and development of IT systems. During school,

Eisner also worked as a Systems Analyst for a New York-based technology firm. Eisner's primary responsibility at that firm was to evaluate and integrate new technologies. (Id. at ¶ 8.)

After graduation, Eisner began working at the Securities Industry Automation Corporation ("SIAC"), a subsidiary of the New York Stock Exchange ("NYSE"). SIAC provided technology services for financial institutions and market exchanges. An aspect of SIAC's work involved setting up "co-location" infrastructure. "Co-location" simply means that firms physically place some of their computers and/or servers near or next to the servers of the exchange. This allows those firms' transactions to be processed at a faster pace than if the servers were located further away from the servers of the stock exchange. The practice of "co-locating" is well-publicized in the industry and has become a routine practice among firms that engage in electronic trading. (Eisner Aff. ¶ 9; Affidavit of Peter Reiss, sworn to on October 2, 2007 ("Reiss Aff."), ¶ 9.)

During his employment at SIAC, Eisner was promoted to the position of Development Project Manager. One of Eisner's job functions was to work with the staff responsible for developing the "co-locating" infrastructure to coordinate with other groups. He also contributed certain technical details to developing the "co-location" technology. (Eisner Aff. ¶ 10.) Eisner's primary responsibility was researching and developing new technologies for the NYSE. Eisner was involved in developing cutting-edge technologies, including portions of the operating system that drives the exchange's trading floor. Eisner developed a reputation for excellence in the industry as a highly-skilled Systems employee. (Id. at ¶¶ 11-12.)

Eisner's Employment at Walleye

In July 2005, Eisner began working at Walleye in the position of Chief Technologist. Walleye is a small Minnesota-based financial services company. Specifically, Walleye is a "market-maker," meaning that it acts as a middleman between purchasers and sellers of a stock

and derives a profit from the "spread" between the sale price and purchase price. The trades are effectuated by a quantitative trading system that automatically makes trades based on the algorithms written by the Quants and programmed by the Software Developers. Walleye's major competitor is Interactive Brokers, Inc. (Id. at ¶¶ 14-15.)

In July 2005, after two interviews that were held in New York, Walleye hired Eisner to work in is New York office.[1] Upon information and belief, Walleye had only been in operation approximately 30 days when Eisner began working as its Chief Technologist. During the interview process, Walleye's Chief Executive Officer, Peter Goddard ("Goddard"), told Eisner that he needed to hire someone who was capable of building Walleye's computer infrastructure. Upon information and belief, Walleye hired Eisner because of his Systems expertise and his proven record of successfully completing projects. (Id. at ¶¶ 13, 16-18.) In other words, Walleye hired Eisner because it believed that he had the skills necessary to successfully configure its computer infrastructure.

As a condition of Eisner's employment with Walleye, he was required to execute an at-will employment agreement that contained a non-competition covenant (the "Non-Compete"), which Non-Compete he signed in New York. After asserting an entitlement to prevent Eisner from using his "skills, training and know-how," the Non-Compete provides, in relevant part, that:

> so long as Employee is employed by Employer, and for a period of two (2) years after Employee's termination of employment (the 'Noncompete Term') for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, throughout the world, whether as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity, engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which is engaged

---

[1] Although most of its employees work in Minnesota, Walleye operates an office in New York and most of the computer systems of the firm are physically located in a co-location facility in New York. Once employed, Eisner worked out of Walleye's New York offices and reported to Ori Kushnir ("Kushnir"), a Walleye partner who also worked in the New York office. (Id. at ¶ 18.)

> in any business similar to or competitive with Employer; provided, however, that
> following the termination of Employee other than for 'Cause' as provided in
> Paragraph 14, the provisions of this Paragraph shall only apply to Employee for as
> long as Employer continues to pay Employee his or her base salary (subject to all
> applicable withholding taxes) at Employee's last prevailing rate (excluding any
> bonuses, benefits or any other compensation) during the Noncompete Term.

(Id. at ¶20, Ex. 1 at ¶ 13.) Other then requiring employees, like Eisner, to sign the Non-Compete, Walleye did not take steps to preserve confidentiality regarding its Systems infrastructure. (Eisner Aff. at ¶ 23).

In his position at Walleye, Eisner was responsible for creating and implementing Walleye's computer infrastructure. Specifically, since Walleye was a newly formed firm, Eisner acquired and configured the hardware and software and wrote the attendant "plumbing" programs necessary to set up Walleye's infrastructure. The Quants and Software Developers provided the substantive programming, or "coding," to the system. Eisner, for his part, consulted with Walleye's partners as to cost and determined what hardware best suited Walleye's needs based on the company's budget, but the partners had little input into the actual configuration of the infrastructure. Using skills that he acquired prior to coming to Walleye and for which Walleye hired him, Eisner configured the computer system in a manner that attempted to maximize speed. As part of that process, Eisner "co-located" some of Walleye's servers at exchanges. As in any instance when a firm intending to engage in a significant volume of trading is getting off of the ground, Walleye made substantial financial investments in its Systems infrastructure. However, Walleye's hardware and software are standard in the financial services industry, and indeed far less advanced than the technology used by other financial services firms. (Id. at ¶¶ 21, 24-25.)

Eisner configured Walleye's servers in a manner that is standard for financial services firms engaged in electronic trading. Eisner did not receive any training from Walleye on how to set up the infrastructure or co-locate the servers, nor did he use any of Walleye's proprietary

technology in so-doing. Rather, Eisner used the skills he had developed at S.U.N.Y. Buffalo and at SIAC (*i.e.*, the skills that Walleye hired Eisner for) to perform his work. When necessary, Eisner referred to instruction manuals on the relevant hardware or software, as well as "co-location" manuals provided to the members of the exchanges by the exchanges and spoke with technical support personnel provided by the vendors of the various hardware and software components being utilized at Walleye. (Id. at ¶¶ 23-25.)

Throughout his employment at Walleye, Eisner did not receive any training in his field of expertise. In fact, as Eisner was the only full-time employee with substantial experience in Systems, there was no one who could provide any substantial Systems training to Eisner. With the exception of one part-time employee, Walleye's other technology employees were Quants and Software Developers. (Id. at ¶ 26.)

In his position at Walleye, Eisner was not involved in developing or modifying the programming related to Walleye's proprietary trading algorithms, trading decisions or client information. In fact, Eisner did not access the vast majority of the trading system during his employment because it was not necessary for him to have knowledge of intricacies of the trading system as a whole in order to complete his assigned tasks. Eisner never had reason to access - *and never accessed* - Walleye's proprietary information regarding its trading algorithms, trading decisions or clients. (Id. at ¶ 27.)

Eisner's Separation from Walleye and Employment at D. E. Shaw

On or about July 19, 2007, Eisner resigned his position at Walleye. Prior to that time, Eisner had been offered and accepted a position in the Systems department at D. E. Shaw, an investment and technology firm with its main office in New York, New York. (Id. at ¶ 29.) D. E. Shaw's activities range from the acquisition of existing companies and the financing or development of new ones to the deployment of investment strategies based on either quantitative

strategies based on computational and mathematical models or qualitative strategies designed by expert investment professionals. D. E. Shaw is one of the pioneers of quantitative investing, with significantly more experience in the field than the vast number of small companies, like Walleye, who have entered the field in the past five to ten years. D. E. Shaw's computer systems are configured using some of the most advanced technology available, reflecting its long-standing commitment to development of such technology. (Reiss Aff. at ¶ 2.)

This was not the first time that Eisner was considered for a position at D. E. Shaw. In June of 2005, D. E. Shaw received Eisner's resume from a headhunter. Upon review of Eisner's resume, D. E. Shaw ascertained that Eisner's work at SIAC made him a strong candidate for a Systems Administrator role at the Company. In fact, D. E. Shaw was in the process of trying to schedule Eisner for an interview when it was informed that Eisner was no longer available. (Affidavit of Tomislav Pavlicic, sworn to October 9, 2007 ("Pavlicic Aff."), ¶ 4; Reiss Aff. ¶ 5.) Thereafter, in 2007, when D.E. Shaw again received Eisner's resume from the same recruiter, the Systems hiring managers again requested that Eisner be interviewed. Given the desire to interview Eisner prior to his employment at Walleye, it is evident that D. E. Shaw was not interested in Eisner because of any information that he may have had access to while working at Walleye. (Pavlicic Aff. ¶¶ 6-7; Reiss Aff. ¶ 6.)

Prior to his interview, D. E. Shaw required that Eisner sign an agreement not to disclose any confidential or proprietary information that he might have obtained from a prior employer. (Eisner Aff. ¶ 29; Pavlicic Aff. ¶ 7.) Thereafter, D. E. Shaw's head of Systems and other technology employees interviewed Eisner and concluded that his skills and the breadth of his Systems knowledge made him a good candidate for a Systems Administrator position. Peter Reiss ("Reiss"), the Systems hiring manager, found Eisner's experience overseeing the

infrastructure at Walleye - albeit a much smaller financial services firm - relevant, but Reiss was more impressed with the work that Eisner had done in his prior job at SIAC. (Reiss Aff. ¶¶ 6-7.)

D. E. Shaw's decision to offer Eisner a position had nothing to do with any confidential information that he might have been exposed to at Walleye. Indeed, Reiss never asked about and had no interest in knowing about Walleye's trading systems or any other confidential information. In any event, Eisner would have been precluded from bringing any of Walleye's confidential information to D. E. Shaw by D. E. Shaw's standard employment agreement. (Reiss Aff. ¶ 7; Pavlicic Aff. ¶ 7.)

D. E. Shaw employs a number of professionals to undertake various technology-driven tasks at the Company. Like many financial services companies engaged in quantitative trading, D. E. Shaw separates the functions of its technology-related employees. Technology professionals in the "Front Office" are generally Quants or Software Developers. In contrast, IT professionals in the "Systems" department are responsible for the implementation and maintenance of Systems infrastructure. Eisner has been offered the position of Systems Administrator within D. E. Shaw's Systems department - not in the Front Office. (Reiss Aff. ¶¶ 3-4, 7; Pavlicic Aff. ¶¶ 2, 6.)

As a Systems Administrator, D. E. Shaw intended for Eisner to be responsible for projects such as: (i) leading the company's search for new data center co-location space; (ii) finding, evaluating and deploying new technologies for the Systems department (such as backup systems, high performance servers and voice-related technologies); and (iii) designing and overseeing the development of internal software to increase staff productivity (such as tools to improve conference room scheduling and improved communications software). None of the aforementioned tasks involves the use of Walleye's confidential or proprietary information. Most importantly, none of these tasks requires skills that Eisner did not already have in

abundance prior to commencement of his employment with Walleye. In fact, many of the skills required for this position do not even require experience working with electronic trading systems. (Reiss Aff. ¶ 8; Eisner Aff. ¶ 31.)

<u>Walleye's Attempts to Stop Eisner from Working at D. E. Shaw</u>

In conjunction with his resignation from Walleye, Eisner advised Walleye that he had accepted a position with D. E. Shaw. Initially, none of the partners voiced an objection to Eisner's prospective employment at D. E. Shaw. Despite voicing no initial objection, Walleye's management subsequently took a very different position on Eisner's prospective employment with D. E. Shaw. (Eisner Aff. ¶¶ 18, 32.)

In early August, at his exit interview, Eisner was handed a letter signed by Goddard, which letter accepted his resignation and stated, for the first time, that Walleye intended to enforce the Non-Compete. In that letter, Goddard requested that Eisner submit an offer letter and job description from any potential future employer. During that exit interview, Kushnir, a partner at Walleye and Eisner's direct supervisor, admitted that D. E. Shaw is not a direct competitor of Walleye. However, Kushnir indicated that he had a concern that D. E. Shaw might decide to become a competitor in the future and complained that D. E. Shaw allegedly had recruited personnel from his prior firm. Fearing a dispute, Eisner retained James D. Kremer ("Kremer") of Dorsey & Whitney LLP, to assist in discussions with Walleye regarding the Non-Compete. By letter dated August 10, 2007, Kremer outlined Eisner's prospective job duties at D. E. Shaw and gave a detailed explanation of Eisner's position that the Non-Compete was overly broad and unenforceable. Thereafter, Eisner retained McDermott Will & Emery LLP to assist in this matter. (Eisner Aff. ¶¶ 32-35, Exs. 2-3.)

After repeated attempts to discuss a resolution of this matter failed, on September 5, 2007, Eisner filed this action. Almost a month later, on September 27, 2007, Walleye filed a

related action in the United States District Court for the District of Minnesota (the "Minnesota Complaint"). In the Minnesota Complaint, Walleye claims that its Systems "Architecture" (referring to its infrastructure) is somehow proprietary or confidential. However, as described above, Eisner configured Walleye's computer systems by using the skills that he developed in college and at SIAC to configure industry-standard hardware and software to industry-standard specifications. When necessary, Eisner referred to manuals provided with that hardware or software or by the exchanges when dealing with issues specific to co-location, and consulted with technical support individuals outside Walleye at various vendors about the configuration of the infrastructure. Eisner did not receive any confidential or proprietary instructions from Walleye, nor did he use any confidential or proprietary material in configuring Walleye's infrastructure or "Architecture." (Id. at ¶ 36, Ex. 4.)

Nothing about the manner in which Walleye's Systems are configured is cutting-edge or particularly advanced. In fact, Eisner worked with relatively standard technology at Walleye, rather than the more advanced technology utilized by certain financial services firms. While Eisner is undoubtedly good at his job, his work at Walleye could have been completed by numerous competent Systems professionals. (Id. at ¶ 25.)

Eisner Will Be Irreparably Harmed if the Non-Compete is Enforced

Walleye has engaged in actions intended to prevent Eisner from working for two years in the financial services industry, i.e., at the type of firms at which his skills are in demand. A two-year hiatus is unacceptable in the financial services industry because the technology, industry standards, and market change and develop rapidly. The technology undergoes major changes approximately every six months; it undergoes revolutionary changes approximately every two years. Even if Eisner tries to keep abreast of new technological developments, he will not truly be up-to-date because he must work directly "hands-on" with new technology in order to

understand how it functions. Put another way, Eisner's skills will not remain competitive with those professionals actively working in the industry if he is forced to sit on the sidelines for two years. (Reiss Aff. ¶ 11; Eisner Aff. ¶ 39; Pavlicic Aff. ¶ 8.)

As a result, if Eisner cannot work for D. E. Shaw or a comparable financial services firm for two years, it will be difficult for him to find employment in his chosen field at the conclusion of the non-compete period. More specifically, within the segment of the industry involved in trading, prospective employers hire IT professionals whose skills are current and who are up-to-date on current technology and market trends. After a two-year hiatus, Eisner will either be unemployable in his field of expertise, or he will be forced to accept a position with significantly less seniority and responsibility than the position that he is now being offered at D. E. Shaw. (Reiss Aff. ¶ 11; Pavlicic Aff. ¶ 8; Eisner Aff. ¶ 40.)

Further, Eisner has been working in the financial services industry for his entire career, and has developed a reputation in the industry. He has enjoyed a successful career to date, and is on a career trajectory that is at the forefront of the field. If Eisner is forced to stop working in the financial services field, he will lose momentum in the career that he has worked so hard to develop. Further, Eisner cannot simply shift into another IT field because his specialized skills are not in demand in areas outside of the financial services industry. (Eisner Aff. ¶ 41.)

## ARGUMENT

Under New York law, it is well established that Eisner is entitled to a preliminary injunction upon demonstrating that he will be irreparably harmed absent the issuance of a preliminary injunction and either that (a) he is likely to succeed on the merits of his claim that the Non-Compete is not enforceable or (b) there exist sufficiently serious questions going to the merits that make them a fair ground for litigation, and that balance of hardships tips in his favor.

See e.g., Scelsa v. City Univ. of N.Y., 806 F. Supp. 1126, 1134 (S.D.N.Y. 1992). As set forth more fully below, Eisner has satisfied his burden and is entitled to a preliminary injunction.

## I.    EISNER WILL BE IRREPARABLY HARMED IF THE NON-COMPETE IS ENFORCED.

"The harm generated by loss of employment extends beyond financial boundaries." Aguilar v. Baine Service Sys., Inc., 538 F.Supp. 581, 584 (S.D.N.Y. 1982). Walleye's attempt to prevent Eisner from working as an IT professional in the financial services industry will irreparably injure Eisner's career. First, Eisner will lose his reputation for excellence and cutting-edge skills that he has worked hard to develop. If he is forced out of the field, Eisner cannot keep up-to-date on emerging technology because he must work with the new technology as it arrives in order to hone his skills. Carroll v. Associated Musicians of Greater N.Y., Civ. No. 60-2939, 1962 U.S. Dist. LEXIS 5773, at *15 (S.D.N.Y. Oct. 4, 1962) (irreparable harm where employee prohibited from honing skills by working with others).[2]

Second, if Eisner is forced out of the financial services field, it will be nearly impossible for him to re-enter the field after two years without having worked with the current industry technology. Financial services firms generally do not hire systems IT professionals who have been out of the industry for any significant period of time. As such, his lack of exposure to new technology in the industry during the pendency of his two-year hiatus will cause Eisner irreparable harm. Milstead v. O Records & Visuals, Ltd., No. 84 Civ. 3657 (RLC), 1984 U.S. Dist. LEXIS 16139, at *4 (S.D.N.Y. June 5, 1984) (irreparable harm found where plaintiff's career harmed by lack of exposure).

Finally, even if Eisner could find employment in the financial services industry, he would irretrievably lose the momentum that he has developed in his career and be thrown off of his current trajectory. This will force Eisner to accept significantly lower salaries, as well as less

---

[2] Copies of unpublished decisions are appended hereto in alphabetical order.

responsibility and seniority, in the future. New York courts have held that this type of loss, although arguably financial, also may constitute irreparable harm. Nigra v. Young Broad. of Albany, Inc., 676 N.Y.S.2d 848, 849, 177 Misc. 2d 664, 667 (Sup. Ct. Albany Co. 1998) (journalist irreparably harmed where non-compete required her to accept half of the salary that other stations would pay).

## II.  EISNER IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT THE NON-COMPETE IS UNENFORCEABLE.

Non-competition agreements are generally disfavored under both New York and Minnesota law,[3] and are only enforced under limited circumstances. See AM Medica Comm's Group v. Kilgallen, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003); Jay's Custom Stringing, Inc. v. Yu, 01 Civ. 1690 (WHP), 2001 U.S. Dist. Lexis 9298, at *12 (S.D.N.Y. July 5, 2001); Klick v. Crosstown State Bank, 372 N.W.2d 85, 87 (Minn. Ct. App. 1985) (non-competition clauses have "long been carefully scrutinized by courts and have been traditionally disfavored . . . "). In fact, New York courts are "loathe to enforce restrictive covenants absent a showing of misappropriation of confidential information of trade secrets." Ivy Mar Co. v. C.R. Seasons, Ltd., 907 F.Supp. 547, 554 (E.D.N.Y. 1995). Courts in both New York and Minnesota take this strict approach to protect the public policy against inhibiting a person's livelihood. See Silipos, Inc. v. Bickel, 1:06-cv-02205-RCC-DFE, 2006 U.S. Dist. LEXIS 54946, at *8 (S.D.N.Y. Aug. 8, 2006); Jay's, 2001 U.S. Dist. Lexis 9298, at *11; United Prods. Corp. of Am. v. Cederstrom, A05-1688, 2006 Minn. App. Unpub. LEXIS 594, at *8 (Minn. Ct. App. June 6, 2006) (Minnesota courts disfavor non-competes because they restrict an employee's right to work).

---

[3] The Non-Compete contains a choice of Minnesota law. However, given New York's interest in protecting New York employees from over-reaching non-competition agreements, this Court may choose to apply New York law in determining whether the Non-Compete is enforceable. The Court need not decide that issue because there is no actual conflict between the laws of New York and Minnesota on this issue - both jurisdictions would find the Non-Compete to be unenforceable. See e.g. IBM v. Liberty Mut. Ins. Co., 363 F.3d 137, 142 (2d Cir. 2004). Accordingly, we have cited to cases from both jurisdictions for the Court's reference.

A non-competition agreement is only enforceable if it is: (i) necessary to protect the employer's legitimate interest; (ii) reasonable in time and area; (iii) not harmful to the public; and (iv) not unreasonably burdensome to the employee.  BDO Seidman v. Hirshberg, 690 N.Y.S.2d 854, 93 N.Y.2d 382 (1999); Alpine Glass, Inc. v. Adams, C4-02-804, 2002 Minn. App. LEXIS 1392, at *10-11 (Minn. Ct. App. Dec. 17, 2002) (non-competes are only enforced if they serve employer's legitimate interest and are not overly broad).

Here, the Court should find that the Non-Compete is so overbroad as to be unenforceable on its face.  The Non-Compete seeks to prevent Eisner from working anywhere in the world in the financial services industry for two years – a restriction that is so unreasonably broad as to be unenforceable on its face.  Even if the Court does not conclude that the Non-Compete is unenforceable on its face, the Court should find that Non-Compete is unenforceable as applied to Eisner because Eisner used the skills in his job at Walleye that he had developed at S.U.N.Y. Buffalo and in prior employment to work with industry-standard technology to create Walleye's Systems infrastructure.  Eisner did not receive any special training or confidential information from Walleye to accomplish this task.  Indeed, this is the type of work that many trained Systems professionals in this field routinely undertake, making the Non-Compete unenforceable as applied to Eisner.

A.    The Non-Compete is Unenforceable on its Face.

The Non-Compete is unenforceable on its face because it is overly broad and unreasonably restrictive.  Restrictive covenants that purport to preclude an employee from working in his chosen profession anywhere in the world for two years generally are unenforceable.  Heartland Sec. Corp. v. Gerstenblatt, 99 Civ. 3694 (WHP), 2000 U.S. Dist. LEXIS 3496, at *21 (S.D.N.Y. Mar. 22, 2000) (citing cases).  See Jay's, 2001 U.S. Dist. LEXIS 9298, at *16 (noting that plaintiff had failed to identify any case that supports the enforcement of

such a broad covenant); <u>AM Medica</u>, 261 F. Supp. 2d at 264 (two year restrictive covenant unenforceable). Here, there is no reason to derogate from that rule.

First, the lack of any geographic limitation supports a finding that the Non-Compete is unenforceable on its face. The Non-Compete purports to prohibit Eisner from working in his industry "throughout the world." Courts rarely find this type of worldwide reach to be reasonable under any circumstances. <u>Silipos</u>, 2006 U.S. Dist. LEXIS 54946, at *18 (citing cases); <u>Ring Computer Sys., Inc. v. ParaData Computer Networks, Inc.</u>, No. C4-90-889, 1990 Minn. App. LEXIS 922, at *3 (Minn. Ct. App. Sept. 10, 1990) (non-competes that do not contain a geographical limitation are unenforceable in Minnesota). Here, certainly, Walleye has no exigent need for additional protections that would warrant an unlimited geographic scope.

Second, the Non-Compete is unenforceable on its face because its two-year term is too long, particularly in light of the industry in which Eisner works. In fact, even a one-year non-compete in the IT field has been held to be "too long given the dynamic nature of [the] industry." <u>Earthweb, Inc. v. Schlack</u>, 71 F. Supp. 2d. 299, 313 (S.D.N.Y. 1999). <u>See also</u> <u>Heartland</u>, 2000 U.S. Dist. LEXIS 3496, at *21-22 (two-year post-employment restriction on working in the securities industry found to be "patently unreasonable and unenforceable). Thus, it is without question that the two-year term is too long, such that this Court should find the Non-Compete unenforceable on its face.

Finally, the Non-Compete cannot be enforced because its very terms purport to preclude Eisner from pursuing his career anywhere in the financial services industry. The Non-Compete provides that Eisner shall not "directly or indirectly . . . engage in or have interest in or become associated with an entity, firm, business activity or enterprise which is engaged in any business *similar to or competitive with* Employer." This broad-based prohibition against working in an entire industry should not be enforced because it would be unreasonable and against public

policy to bar Eisner from working in an entire industry. See Silipos, 2006 U.S. Dist. LEXIS 54946, at *20 (non-compete unenforceable where, as here, it prevented employee from working with anyone "directly or indirectly" engaged in "business of the company"); Heartland, 2000 U.S. Dist. LEXIS 3196, at *26-27 (non-compete unenforceable where it precluded employees from working in chosen profession); AM Medica, 261 F. Supp. at 263 (non-compete unenforceable where employee prohibited from working "in the only industry she has known during her professional career.").

Thus, this Court should find that the Non-Compete's unreasonably broad geographic, temporal and industry scope renders it unenforceable as a matter of law.

**B.    The Non-Compete is Unenforceable as Applied to Eisner.**

In the Non-Compete, Walleye asserts that the restrictive covenants are legitimate because Walleye expends "time and resources in training Employee using highly confidential and proprietary training methods, techniques and materials." (Eisner Aff. Ex. 1 at ¶13.) Further, Walleye acknowledge that it intends the Non-Compete to prevent employees, such as Eisner, from using "the skills, training and know-how" that they acquire at Walleye. (Id.) However, Walleye never expended time and resources to provide any Systems training to Eisner and courts have routinely found that restrictive covenants are not enforceable to prevent an employee from using his skills. Try as they might, Walleye cannot establish that Eisner's Systems skills (developed prior to this employment at Walleye and through on-the-job experiences - not training by Walleye) or knowledge about Walleye's industry-standard infrastructure are entitled to protection in the form of a non-compete. See Ivy Mar, 907 F.Supp. at 558 (employee's competitive advantage based on prior experience in industry and knowledge gained in employment not protectable).