The court's reasoning in Reed, Roberts Associates, Inc. v. Strauman is instructive. 386 N.Y.S.2d 677, 680-81, 40 N.Y.2d 303, 309 (1976). There, an employer sought to enforce a non-compete to prohibit an employee from working for any competitor in the New York area for three years. The court refused to enforce the non-compete to preclude the employee from using his talents for another employer. In so doing, the court stressed that "[a] contrary holding would make those in charge of operations or specialists . . . virtual hostages of their employers." Id. The court further held that it should not "inhibit the employee's ability to realize his potential both professionally and financially by availing himself of opportunity." Id. Similarly, here, Walleye cannot hold Eisner hostage in an attempt to prevent him from using his Systems skills. As such, this Court should find the Non-Compete to be unenforceable against Eisner and allow Eisner to avail himself of the opportunities presented at D. E. Shaw.

In order for the Non-Compete to be enforceable against Eisner, Walleye must show that one of the following legitimate interests is protected by the Non-Compete: (1) trade secrets; (2) confidential customer information; (3) its client base; or (4) the services of employees that are unique and extraordinary. BDO Seidman, 690 N.Y.S. 2d at 857, 93 N.Y.2d at 389. See also Earthweb, 71 F. Supp. 2d. at 313; Alpine Glass, 2002 Minn. App. LEXIS 1392, at *11 (customer good will and trade secrets or confidential information are legitimate interest that may be protected through a non-compete). The Non-Compete does not protect any of those interests because: (i) Eisner did not work with or access any of Walleye's trade secrets; (ii) Eisner did not access Walleye's client information; (iii) Eisner cannot steal away Walleye's client base because he is a Systems professional who did not work with the firm's clients; and (iv) Eisner's services are not unique or extraordinary.

In fact, the allegations in the Minnesota Complaint demonstrate that Walleye is not seeking to protect any legitimate interests. In that complaint,[4] Walleye claims that the work that Eisner did to configure Walleye's computer infrastructure is a trade secret. Such assertion is meritless.

Courts look to the following factors to determine if information constitutes a trade secret: (i) the extent to which the information is known outside of the business; (ii) the extent to which the information is known by employees; (iii) the measures taken to guard the secrecy of the information; (iv) the value of the information to the business and its competitors; (v) the amount of monies expended by the business to develop the information; and (vi) the ease with which the information could be acquired or duplicated. Jay's, 2001 U.S. Dist. LEXIS 9298, at *14. Accord Cherne Indus., Inc. v. Grounds & Assocs., Inc, 278 N.W.2d 81, 90 (Minn. 1979) (defining trade secrets or confidential information as (1) not readily known or ascertainable; (2) that provides a competitive advantage; (3) that was gained at the employer's expense; (4) and that the employer intended to keep confidential).

Mere knowledge of the intricacies of a business operation does not qualify as a trade secret. Silipos, 2006 U.S. Dist. LEXIS 54946, at *11 (internal quotations omitted). In the Minnesota Complaint, Walleye uses the imposing term "Architecture" in what appears to be an attempt to convert its industry-standard infrastructure into a trade secret. That attempt must fail because Walleye's "Architecture" is nothing more than industry-standard hardware and software

---

[4] By filing in Minnesota, Walleye has asserted its position that this dispute should proceed in Minnesota. The applicable agreement contains a clause that required Eisner, a New York resident working in New York, to consent to jurisdiction in a Minnesota forum, but it did not contain a requirement that all disputes regarding the agreement be litigated exclusively in Minnesota. (Eisner Aff. Ex. 1 at ¶ 20.) Moreover, this dispute involves ample ties to New York: Eisner is a New York resident. Eisner was hired by Walleye based on interviews held in New York. Eisner signed the Non-Compete in New York. Eisner worked in Walleye's offices in New York and reported to a Walleye partner who also worked in New York. Eisner performed all of his Systems work for Walleye in New York. In fact, almost all of Walleye's infrastructure is located in New York. At present, Eisner seeks to start working for D. E. Shaw, a New York-based firm, in its New York headquarters. Plainly, New York has ample ties to the dispute so as to support the choice of a New York venue.

that was configured in a standard manner by Eisner to attain the industry-standard goal of optimizing speed. There is nothing unique about Walleye's infrastructure. In fact, Walleye has less advanced technology than many other financial services firms. Most qualified IT professionals in this field would be able to appropriately configure Walleye's "Architecture." (Eisner Aff. ¶¶ 24-26.) These matters of general knowledge in the industry are not trade secrets. Cherne Indus., 278 N.W.2d at 90; Ultra Lube, Inc. v. Dave Peterson Monticello Ford-Mercury, Inc., CT-02-658, 2002 Minn. App. LEXIS 1184, at *9 (Minn. Ct. App. Oct. 15, 2002) (technical knowledge not trade secret where, as here, it is known throughout industry).

Upon review of the pleadings, the allegations that are missing from the Minnesota Complaint speak volumes. Walleye does not allege that Eisner worked with proprietary algorithms or code. Such allegations are missing because Eisner used skills that he developed in college and at SIAC to configure Walleye's system using industry-standard hardware and software. Eisner never accessed - or had occasion to access - Walleye's proprietary trading algorithms. In configuring the "Architecture," Eisner used information that is known outside of Walleye. In fact, not only was Eisner never told that Walleye considered the configuration of its infrastructure (as opposed to the underlying trading codes) to be confidential, but also Eisner was encouraged to and did consult with third-party vendors and employees at various exchanges about the configuration of the Architecture, such that Walleye cannot establish that the infrastructure is based on the information not known outside of Walleye. Further, infrastructure of this nature is used at countless firms and could easily be duplicated. (Eisner Aff. ¶¶ 23-25, 27.)

Moreover, Walleye makes the generalized allegation that Eisner received "training," but the Minnesota Complaint does not specify who provided such training or the nature of the training. Presumably, this is because Eisner did not receive any Systems instruction from

Walleye.  In fact, Walleye was the sole full-time Systems professional employed by Walleye, therefore, there was no one to "train" him.  Eisner was hired because his prior work experience indicated that he was capable of configuring Walleye's infrastructure "from the ground up."  It is not only nonsensical for Walleye to allege that it hired a Systems expert to build its infrastructure who was incapable of performing his assigned duties, but also inconsistent with the statements made by Walleye's partners at the time they hired Eisner.  The only "training" that Eisner received was from his independent review of instruction manuals accompanying the hardware and software that he configured, as well as some consultation with a part-time IT employee and outside technical support personnel.  (Id. at ¶¶ 22, 26.)

In reality, Walleye has not identified a trade secret entitled to protection.  Instead, Walleye is impermissibly attempting to keep Eisner from using his general skills and know-how - not any specialized know-how that belongs to Walleye.  "[N]o restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment."  Ivy Mar Co., 907 F. Supp. at 554.  Eisner should be allowed to advance his career and apply his skill to the job that he has been offered with D. E. Shaw.  See Ivy Mar, 907 F. Supp. at 558.

Moreover, even if Walleye could identify a legitimate trade secret (which it cannot), it cannot show that there is any danger that Eisner would disclose that information to D. E. Shaw, further mandating the conclusion that Eisner will be able to prevail on his claim that the Non-Compete is unenforceable as applied to him.  The only information about which Walleye could reasonably claim trade secret protection is the trading algorithms or trading software.  However, Eisner is not a Quant or a Software Developer and he did not develop or use any of Walleye's trading algorithms or software.  Indeed, Eisner does not have the mathematical background necessary to create or work with the type of complex mathematical algorithms for which

-22-

Walleye may legitimately claim trade secret protection. As such, the Non-Compete cannot be used to protect against the threat that Eisner might disclose information that he never accessed and, in any event, could not understand to a degree necessary to replicate it. Pella Windows & Doors v. Buscarnera, 07 CV 82 (SLT) (JMA), 2007 U.S. Dist. LEXIS 52382, at *10 (E.D.N.Y. Jul. 18, 2007) (non-compete unenforceable where, as here, employee could not replicate purported trade secret information); Silipos, 2006 U.S. Dist. LEXIS 54946, at *13 (non-compete unenforceable where, as here, employee's lack of technical knowledge prohibited him from meaningfully using trade secrets); Alpine Glass, 2002 Minn. App. LEXIS 1392, at *11 (non-compete unenforceable where no evidence that employee actually engaged in confidential work).

Finally, the Court should find that Eisner will be able to convince a court that the Non-Compete cannot be enforced to prevent him from working for D. E. Shaw because D. E. Shaw is not a competitor of Walleye. Here, Walleye is attempting to use the broad-brush prohibition in the Non-Compete to prevent Eisner from working for a company that is not a direct competitor of Walleye. Walleye is a "market-maker," meaning that it acts as a middleman between purchasers and sellers of stock. Walleye makes its money on the "spread" between the price of the purchase and the price of the sale. (Eisner Aff. ¶ 14.) In contrast, D. E. Shaw is global investment and technology firm engaged in activities that range from the deployment of investment strategies based on either mathematical models or human expertise to the acquisition of existing companies and the financing or development of new ones. (Reiss Aff. ¶ 2.) In fact, at the time of Eisner's resignation, Kushnir, Eisner's direct supervisor and a Walleye partner, confirmed Eisner's understanding that D. E. Shaw is not a competitor of Walleye. (Eisner Aff. ¶ 32.) Since Walleye and D. E. Shaw are not competitors, Walleye will suffer no harm if Eisner takes the position that he has been offered at D. E. Shaw.

For all of the reasons outlined above, this Court should find that Eisner has demonstrated that he is likely to succeed on his claim that the Non-Compete is unenforceable to preclude him from working as a Systems Administrator at D. E. Shaw.

## III.    THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF EISNER.

On balance, the equities favor Eisner, whose career is being irreparably harmed as he is forced to sit on the sidelines of his chosen career. Most importantly, Eisner will be significantly harmed absent a preliminary injunction because he is falling behind in technological developments each and every day that he does not work. More specifically, within the segment of the industry in which Eisner has worked, prospective employers hire IT professionals whose skills are current and who are up-to-date on current technology and market trends. After a two-year hiatus, Eisner will either be unemployable in his field of expertise, or he will be forced to accept a position with significantly less seniority and responsibility than the position that he is now being offered at D. E. Shaw. (Reiss Aff. ¶ 11; Pavlicic Aff. ¶ 8; Eisner Aff. ¶ 40.) Even a one-year hiatus from the IT industry would be "several generations, if not an eternity." Earthweb, 71 F. Supp. 2d 299 (one-year non-compete in IT industry imposed "significant hardship".)

Additionally, Eisner has been working in the financial services industry for his entire career, and has developed a reputation in the industry. He has enjoyed a successful career to date, and is on a career trajectory that is at the forefront of the field. If Eisner is forced to stop working in the financial services field, he will lose momentum in the career that he has worked so hard to develop. Eisner cannot simply shift into another IT field because his specialized skills are not in demand in areas outside of the financial services industry. (Eisner Aff. ¶ 41.) Pella Windows, 2007 U.S. Dist. LEXIS 52382, at *8 (non-compete unenforceable where it would

force employee to take a "step-down" in his career); <u>Scelsa</u>, 806 F. Supp. at 1136 (balance of hardships tips in favor of employee where loss of job would cause loss of status in the field).

Moreover, if the Non-Compete is enforced, Eisner will suffer financial damages that cannot be quantified. In the short term, Eisner is suffering financial damages, which are only partially mitigated by the fact that, pursuant to the Non-Compete, Walleye continues to pay Eisner his base salary. However, Eisner is not continuing to receive his benefits (medical, vision, dental and 401(k) with an employer-matching component) and is not eligible to receive a bonus in a field in which bonuses can be substantial, such that the money being paid by Walleye is significantly less than Eisner's total compensation package prior to his departure. The monies being paid by Walleye also are significantly less than the total compensation package in the position offered to Eisner by D. E. Shaw. (Eisner Aff. ¶¶ 37-38.) Further, if Eisner is able to find a job in the financial services industry after a two-year absence, any such position would be at a lower level with lower compensation, such that enforcement of the Non-Compete would have a future financial impact on Eisner than cannot be calculated. In such circumstances, the salary being paid by Walleye does not come close to redressing the harms to his career and earning potential being caused to Eisner by his being precluded from working as an IT professional in the financial services field for two years.

Walleye, for its part, has no protectible interests. As discussed more fully above, Eisner did not work with any trade secret information that might be entitled to protection. As such, the balance of hardships tips strongly in favor of Eisner, warranting that this Court issue the injunction sought by Eisner.

## CONCLUSION

For the foregoing reasons, Eisner respectfully requests that this Court grant his motion for

a preliminary injunction.

Dated: October 9, 2007               Respectfully submitted,
      New York, New York.

                               MCDERMOTT WILL & EMERY LLP

                               By:   Terri L. Chase (TC-9091)

                               340 Madison Avenue
                               New York, New York  10173-1922
                               212.547.5400

                               *Attorneys for the Plaintiff*
                               *Daniel Eisner*