LEXSEE 2002 MINN APP LEXIS 1392

**Alpine Glass, Inc., Appellant (C4-02-804), Respondent (C5-02-1010), vs. Robert Adams, et al., Defendants, MidAmerica Auto Glass, Inc., Respondent (C4-02-804), Appellant (C5-02-1010).**

**C4-02-804, C5-02-1010**

**COURT OF APPEALS OF MINNESOTA**

*2002 Minn. App. LEXIS 1392*

**December 17, 2002, Filed**

**NOTICE:**    [*1]    THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**PRIOR HISTORY:**    Hennepin County District Court. File No. CT015134. Hon. Bruce Hartigan.

**DISPOSITION:**    Affirmed.

**COUNSEL:** Thomas E. Glennon, Thomas E. Glennon & Associates, P.A., Minneapolis, MN (for Alpine Glass).

Michael D. Madigan, David G. Parry, Dunkley, Bennett, Christensen & Madigan, P.A., Minneapolis, MN (for MidAmerica Auto Glass).

**JUDGES:** Considered and decided by Toussaint, Chief Judge, Kalitowski, Judge, and Halbrooks, Judge.

**OPINION BY:** Halbrooks

**OPINION**

**UNPUBLISHED OPINION**

**HALBROOKS, Judge**

Alpine Glass, Inc. contends that there are genuine issues of material fact precluding summary judgment on its tortious-interference-with-contract claim and that the district court erred in concluding that its employment agreement did not serve a legitimate business interest and was unenforceable as a matter of law. Because the noncompete agreement at issue serves no legitimate business interest and is unenforceable, the district court did not erroneously grant summary judgment. We affirm.

**FACTS**

Alpine Glass, Inc. (Alpine) and MidAmerica Auto Glass, Inc. (MidAmerica) are direct competitors in the business [*2] of installing and repairing vehicle windshields. There are over 126 businesses listed in the Minneapolis yellow pages involved in this highly competitive industry. Alpine and MidAmerica engage in various means of soliciting clients, including telemarketing "cold calls" to potential customers. Each requires telemarketing employees to sign noncompete agreements--12 months for Alpine's employees and 18 months for MidAmerica's. Alpine's employment agreement requires employees to promise they will not (1) engage in any business or service in competition with Alpine; (2) disclose or use Alpine's confidential business information; (3) divert or take away Alpine's business or patronage; and/or (4) solicit Alpine's employees to leave for one year after their own separation from Alpine, and also requires that the employees agree to return Alpine's property upon leaving their employment. MidAmerica's employee agreement contains similarly worded noncompete terms.

Alpine started doing business in Minnesota in 1995 and began using employment agreements for all new employees in November 1999. Four of the six former employees sued by Alpine for violation of the agreement were new employees who were [*3] required to sign the agreement as a condition of their employment. The other two employees, Jacqueline Flolo and Timothy Winn, began working with Alpine in 1997. They were asked to sign an agreement in exchange for $ 1,200 consideration. An addendum mailed later to Flolo and Winn stated that the geographic scope of the noncompete obligation was the entire state of Minnesota.

During 1997-2001, Alpine employed 5 to 26 telemarketers at any one time. In that time period, Alpine hired 225 to 460 telemarketers. An interview for an Alpine telemarketing position took approximately 15 min-

utes; the position required no education or experience. The rate of turnover in the position was high.

The day-to-day duties of a telemarketer consist of making cold calls to businesses from a computer-generated customer list. A CD or a computer disk containing names of individuals and businesses generated the customer lists. The CD or disk could be purchased from Office Max, Office Depot, or a similar source. The person answering the telephone was asked if they had a cracked or chipped windshield. If the answer was "no," the telemarketer was instructed to hang-up. If the person responded affirmatively, [*4] the telemarketer attempted to sell Alpine's services.

Winn supplemented the computer-generated customer list by personally recording the license plates of any cars he saw with broken windshields and then buying owner information from the department of motor vehicles with his own money. Winn recorded this information in a three-ring-binder, which he took to work with him. Winn used the list to solicit additional business for Alpine. After Winn left Alpine, he continued to gather information in this manner and to refer work to Alpine for a commission.

Winn left Alpine on April 28, 2000, and began working for a roofing company. After approximately seven months, Winn joined MidAmerica. Winn brought with him a list of businesses to which he sold or solicited for Alpine and the three-ring binder containing his list of potential customers.

Alpine sued MidAmerica and six former employees who had signed employment agreements with Alpine, claiming that the former employees violated their agreements when they started working for MidAmerica within one year of leaving Alpine.

Alpine sought (1) injunctive and/or equitable relief to restrain and enjoin former employees from violating employment [*5] agreements with Alpine, and (2) compensatory and injunctive relief against MidAmerica for tortious interference with Alpine's contractual relationships with its former employees.

MidAmerica counterclaimed, alleging that Alpine (1) tortiously interfered with MidAmerica's contractual relationships with some of its former employees and (2) unfairly competed with MidAmerica by employing several former MidAmerica employees. MidAmerica also sought a declaratory judgment that Alpine did not have a protectible interest sufficient to justify enforcement of telemarketing employees' covenants not to compete. MidAmerica did not individually sue its former employees who went to work for Alpine, and it subsequently dismissed its counterclaim as it related to three of the four. Acknowledging the similarity of both businesses

and the wording of their employment agreements, MidAmerica concedes that, if Alpine lacks a protectible interest, it also does.

In the summer of 2001, Alpine and its former employees entered into an agreement and a mutual release compromising and settling all disputes. Under the terms of the settlement, each former employee resigned from employment with MidAmerica and agreed [*6] to abide by the terms of the employment agreement.

Alpine and MidAmerica brought cross-motions for summary judgment. The district court issued an order and memorandum granting MidAmerica's motion for summary judgment and dismissing with prejudice Alpine's claim of tortious interference with contractual relations on the basis that Alpine's employment agreement did not serve a legitimate business interest. Because MidAmerica conceded that the relationship between its customers and employees was substantially similar to Alpine's, the district court also found that MidAmerica's noncompete agreement did not serve a legitimate business interest. As a result, the court granted Alpine's motion for summary judgment without reaching MidAmerica's tortious-interference claim.

The district court concluded as a matter of law that Alpine's employment agreement did not serve a legitimate business interest, did not "protect Alpine's goodwill," and that the agreement was "not justifiable as a necessary means to protect" Alpine's trade secrets or confidential information. In support of these conclusions, the district court found that the extent of employee contact with Alpine customers was a "cold [*7] call," and that Alpine's telemarketers had no ongoing relationship with Alpine customers. The court also concluded that the parties presented no evidence that employees had access to confidential information or trade secrets.

Both Alpine and MidAmerica appealed from the judgment of dismissal, and the appeals were consolidated for review by this court.

## DECISION

On appeal, Alpine argues that the district court erroneously granted summary judgment because the noncompete agreement serves legitimate business interests. MidAmerica asserts that the district court correctly determined that Alpine's noncompete agreement is invalid and unenforceable as a matter of law because Alpine produced no evidence tending to show that its noncompete agreement protects Alpine's goodwill, trade secrets, or confidential information. MidAmerica concedes that because it is similarly situated to Alpine, if this court upholds the district court's ruling against Alpine, then MidAmerica's counterclaim of tortious interference was also properly dismissed.

When reviewing an appeal from summary judgment, this court must ask (1) whether there are any genuine issues of material fact and (2) whether [*8] the district court erred in its application of the law. *State by Cooper v. French, 460 N.W.2d 2, 4 (Minn. 1990)*. To determine whether a genuine issue of material fact exists, the court must examine, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Fabio v. Bellomo, 504 N.W.2d 758, 761 (Minn. 1993)* (citation omitted). The function of the district court is to determine whether material fact exists, not to weigh the evidence. *DLH, Inc. v. Russ, 566 N.W.2d 60, 70 (Minn. 1997)*. We view the evidence in the light most favorable to the party against whom judgment is granted. *Fabio, 504 N.W.2d at 761*. Here, we must ask whether Alpine articulated facts that raised a genuine issue for trial on the question of whether it had a protectible business interest.

Before reaching the tortious-interference-with-contract claim, this court must determine whether the underlying contract was valid and enforceable. As a threshold issue, we consider whether the employment agreement creates an interest that the law will protect. *See Bennett v. Storz Broad. Co., 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965)* [*9] (concluding that the first inquiry should be whether the restrictive covenant creates a legally protected interest). If the agreement is found to be invalid, the claim must be dismissed. *Midwest Sports Mktg. Inc. v. Hillerich & Bradsby of Canada, Ltd., 552 N.W.2d 254, 267 (Minn. App. 1996), review denied (Minn. Sept. 20, 1996)*.

Minnesota courts carefully scrutinize the validity of noncompete agreements. *Jim W. Miller Constr., Inc. v. Schaefer, 298 N.W.2d 455, 458 (Minn. 1980)*. Noncompete agreements have traditionally been disfavored as restraints on an individual's ability to make a living. *Bennett, 270 Minn. at 533, 134 N.W.2d at 898*. Although not determinative, Minnesota courts have specifically looked at the type of employment in determining reasonableness, such as whether the employee was a business executive. *Eutectic Welding Alloys Corp. v. West, 281 Minn. 13, 20 n.8, 160 N.W.2d 566, 571 n.8 (1968)*. Because restrictive covenants are agreements in restraint of trade, they are enforced only to the extent reasonably necessary to protect a legitimate business interest. *Bennett, 270 Minn. at 534, 134 N.W.2d at 899*. [*10] But, if the noncompete agreement serves a legitimate employer interest and is not overly broad, we will enforce it. *Kallok v. Medtronic, Inc., 573 N.W.2d 356, 361 (Minn. 1998)*.

As a preliminary matter, the noncompete agreement appears overly broad. For one year after separation from employment with Alpine,

Employee will not seek or accept employment with or render services to any person or entity that competes in any sense with Alpine in the States of Minnesota, Iowa, Kentucky and/or New York in connection with the marketing, promotion, sale or installation of the same or similar products, goods or services marketed, promoted, sold or installed by Alpine during Employee's employment with Alpine, nor will Employee engage in the marketing, promotion, sale or installation of such products goods or services for any person or entity who was a client, customer or account of Alpine during Employee's employment with Alpine.

Specifically, the noncompete agreement is far reaching in terms of geography, time, and type of employment prohibited. The next step in determining whether to enforce a particular agreement is to balance the employer's interest in protection from [*11] unfair competition against the employee's right to earn a living. *Id.* Weighing into the balance, we consider the context, or the nature and character of the employment. *Bennett, 270 Minn. at 534, 134 N.W.2d at 899*.

In testing the reasonableness of a noncompete agreement, and in considering the potential for unequal bargaining power between an employee and employer, Minnesota courts have found two categories of legitimate interests that an employer may protect through a noncompete agreement: (1) the employer's good will with its customers, and (2) trade secrets or confidential information. *See Roth v. Gamble-Skogmo, 532 F. Supp. 1029, 1031 (D. Minn. 1982)*.

In determining whether the employee is in a position to trade on the employer's good will, Minnesota courts have looked at whether the employee developed a special relationship with the customer. *Klick v. Crosstown State Bank of Ham Lake, Inc., 372 N.W.2d 85, 88 (Minn. App. 1985)*. When an employee was the primary contact between the employer and four major customers, worked closely with the customers, and considered them to be friends, the relationship was sufficiently close [*12] to give rise to a legitimate interest in protecting itself. *Webb Publ'g Co. v. Fosshage, 426 N.W.2d 445, 447-51 (Minn. App. 1988)*. But where evidence "clearly showed that respondent did not develop any special relationships with bank customers," a three-year restrictive covenant was found to be not justified. *Klick, 372 N.W.2d at 88*.

Minnesota courts have also reasoned that an employer's investment in training its employees should be considered an element of a protectible business interest. *IDS Life Ins. Co. v. SunAmerica, Inc., 958 F. Supp. 1258, 1274 (N.D. Ill. 1997)* (applying Minnesota law), *aff'd in part and vacated in part by, 136 F.3d 537 (7th Cir. 1998)*. Where employers make a "serious investment" in

training and training opportunities for employees, a legitimate business interest may exist. *Id.*

Alpine asserts that it created an issue of fact as to its legitimate protectible business interests. We disagree. In considering the context and nature of the employment, the former Alpine employees worked as telemarketers who made cold-call telephone solicitations to unknown potential customers. Alpine presented [*13] no evidence that its former employees developed "special relationships" with customers or that Alpine developed the calling list beyond commercially available CDs containing lists of individuals and businesses. *See Klick, 372 N.W.2d at 88* (holding a three-year restriction unreasonable where the bank vice president developed no special relationships with customers, received no special training, and gained no substantial insight into bank operations).

Furthermore, although a "serious investment" in training and training opportunities for employees may provide evidence of a protectible business interest, the evidence here shows that the telemarketing positions requires no education or experience. *See IDS Life, 958 F. Supp. at 1274* (concluding that a restrictive covenant will not fail where the corporation spends $ 30 million annually on training agents even where agents are independent contractors). Moreover, Alpine asserts no facts to suggest anything but minimal employee training, such as going over a script, reading the training manual out loud, having a new employee listen to other telemarketers for a short time, and making some cold calls under [*14] the supervision of another telemarketer. In balancing the employer's legitimate business interests against the employee's right to earn a livelihood, rather than supporting the legitimate business interest that Alpine claims to protect, this evidence weighs in favor of the employee. On this record, the district court's conclusion that Alpine's employment agreement did not serve a legitimate, protectible business interest was not erroneous.

Minnesota courts have also found a legitimate interest in protecting trade secrets or confidential information. *Cherne Indus., Inc. v. Grounds & Assocs., Inc., 278 N.W.2d 81, 90 (Minn. 1979)*. The Minnesota Supreme Court defined confidential information as (1) protected matter not generally known or readily ascertainable; (2) that provides a demonstrable competitive advantage; (3) that was gained at the expense to the employer; and (4) is such that the employer intended to keep confidential. *Id.* Indeed, "matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection." *Id.* (quotation omitted). And an employer may not merely intend that materials [*15] be kept confidential. *Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 901-02 (Minn. 1993)*. Rather, the employer must show that reasonable

efforts were reasonably undertaken to maintain the secrecy of the information. *Id.*

As proof of confidentiality and Alpine's effort to maintain the secrecy of its materials, Alpine's regional sales manager, Edward Silvestri, stated that employees cannot take home the training material because it is confidential. But undercutting the potency of this fact was Silvestri's statement that employees received no memorandum or indication that the manual should not be taken home. Alpine also referenced the employment agreement as indicative of the confidential material known to telemarketers. But the agreement makes only conclusory statements regarding the confidentiality of the work without providing any specific examples. For example, the agreement states that Alpine employees may have access to or may contribute to trade secrets, sales and marketing processes, client/customer lists or identification, sales and marketing information, confidential business, services and systems information and other valuable and confidential [*16] information of Alpine which is/was developed by Alpine at considerable time and expense.

But Alpine has provided no evidence that telemarketing employees actually engaged in any confidential work. Additionally, much of Alpine's "confidential information" is disclosed to the general public through its advertisements and phone solicitations.

Besides simply listing areas of confidential material potentially known to Alpine employees, Alpine focused on the conduct of Timothy Winn, a former Alpine employee. When Winn resigned from Alpine, he took the three-ring binder containing the customer list that he had created. Evidence suggests that Alpine knew and consented to Winn removing the binder when he left Alpine. Upon leaving Alpine, Winn worked as a roofer for seven months before he went to work for MidAmerica. Alpine presented no evidence that it took steps to preserve the secrecy of any information in Winn's binder when Winn left Alpine. Furthermore, Winn stated in his deposition that he was not aware of pricing or insurance contact information, although he had made some suggestions as to sales and marketing approaches.

We conclude that because Alpine failed to create a genuine [*17] issue of fact for trial as to the existence of Alpine's protectible business interests or trade secrets and because the record does not contain evidence to support a determination that the employer's interest outweighs the employee's, the noncompete agreement is not valid. Because MidAmerica is similarly situated to Alpine in regard to the validity of its noncompete agreement, summary judgment for both parties was properly granted by the district court.

**Affirmed.**