LEXSEE 2002 MINN APP LEXIS 1184

**Ultra Lube, Inc., Appellant, vs. Dave Peterson Monticello Ford-Mercury, Inc., et al., Respondents.**

C8-02-658

COURT OF APPEALS OF MINNESOTA

2002 Minn. App. LEXIS 1184

October 15, 2002, Filed

**NOTICE:** [*1] THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**PRIOR HISTORY:** Wright County District Court. File No. C2001217. Hon. Kim R. Johnson.

**DISPOSITION:** Affirmed in part and reversed in part.

**COUNSEL:** James B. Fleming, Metcalf, Larson, Muth & Fleming, P.C., Monticello, Minnesota (for appellant).

Eric J. Magnuson, John D. Thompson, Steven R. Kluz, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, Minnesota (for respondents).

**JUDGES:** Considered and decided by Anderson, Presiding Judge, Klaphake, Judge, and Hudson, Judge.

**OPINION BY:** Hudson

**OPINION**

UNPUBLISHED OPINION

HUDSON, Judge

Appellant Ultra Lube sued its former service manager, alleging that he breached a covenant not to compete and misappropriated trade secrets. Ultra Lube also sued the service manager's new employer for tortious interference with an employment contract. The district court granted respondent's motion for summary judgment on all counts. Appellant contends there are genuine issues of material fact as to its claims and that it is entitled to summary judgment as a matter of law. We affirm in part and reverse in part.

FACTS

On June 30, 1998, Ross Haire began working at Ultra Lube, Inc. [*2] (Ultra Lube), a light automotive service shop in Monticello, Minnesota providing quick services such as oil changes, fluid checks and refills, replacements of oil filters and occasionally basic tire repair. Prior to his employment at Ultra Lube, Haire had no training or experience in the automotive or oil change business. As a condition of employment, Haire signed an employment agreement which provided that he would not divulge "confidential information, trade secrets and proprietary information of Ultra Lube," work for a competitor while working for Ultra Lube, or "solicit or encourage to leave Ultra Lube's employ any Ultra Lube employees." The agreement also contained a non-compete clause which provided that Haire would not

(i) become employed by or be associated within any capacity, or (ii) perform any work within or on behalf of any person, corporation, partnership or other entity * * * competing or potentially competing with Ultra Lube within ten (10) miles of the city limits of the City of Monticello, Minnesota for a twelve-month period following the date he ceased to be an employee of Ultra Lube.

While working at Ultra Lube, Haire received on-the-job technical training [*3] about how to perform service on vehicles. The training Haire received primarily concerned information that is generally known in the automotive rapid-oil-change industry, such as how to change oil and do vehicle inspections. However, Haire also received specialized training unique to Ultra Lube, which involved dividing the work on a vehicle between an upper-bay technician and a lower-bay technician who would both work on the vehicle simultaneously. In addition, he received specialized training on how to effectively "up-sell," which involved persuading customers to purchase miscellaneous products and services in addition to the basic oil change service.

When he started at Ultra Lube, Haire made $ 8.00 per hour as a hood technician, with the majority of his work involving oil changes. In November 1999, Haire was "promoted" to "service manager," a title given to all employees who completed Ultra Lube's training. In this capacity, Haire's job duties remained essentially the same, but also included overseeing the cleanup of the shop, inventory, assisting and training new employees, and cleaning and performing basic maintenance on the equipment. Haire did not receive a raise when he began [*4] working as a "service manager;" his pay remained $ 8.00 per hour.

At Ultra Lube, Haire proved to be adept at up-selling; he averaged more money spent per customer than any past or present employee of Ultra Lube. But by April 2000, Haire became dissatisfied with his job, and on May 6, 2000, Haire left Ultra Lube stating that he was tired of changing oil and didn't want to be a "lube tech" all his life.

Shortly thereafter, Haire began working for respondent Dave Peterson Monticello Ford-Mercury, Inc. (Monticello Ford) at the Monticello Ford Quick Lane (Quick Lane). Haire started at $ 9.00 per hour. Quick Lane managers had actively pursued Haire for some time, periodically calling Haire at home and at Ultra Lube during business hours to discuss Haire's possible employment with Monticello Ford. Monticello Ford management was aware of Haire's non-compete clause with Ultra Lube, but encouraged Haire to ignore it, assuring Haire that they "would handle it."

Quick Lane is a service center that performs routine vehicle maintenance and sells Ford factory parts and services to customers from factory-trained technicians. Quick Lane offers a broader array of services than Ultra Lube. In addition [*5] to the services offered by Ultra Lube, Quick Lane provides more extensive inspections, tire sales, detailing, wheel alignments, tune-ups, and the replacement and/or repair of brakes, struts, shocks, batteries, air conditioning, exhaust systems, hoses and bulbs.

Within a year, Haire was promoted to shop foreman at Quick Lane and was responsible for training all Quick Lane technicians. Although Haire trained the Quick Lane technicians in the technical (and generally known) aspects of changing oil, he also instructed them on how to effectively up-sell miscellaneous products to customers. Haire also suggested that Quick Lane use Ultra Lube's procedure for changing oil, which involved dividing the work between an upper-bay technician and a lower-bay technician.

On May 19, 2000, Ultra Lube sued Monticello Ford and Ross Haire (together "respondents") alleging misappropriation of trade secrets, breach of contract and tortious interference with contract, and brought a motion for a temporary injunction to enjoin Monticello Ford from employing Haire or acquiring or using Ultra Lube's confidential business information. After a hearing on May 31, 2000, the district court denied the motion for [*6] a temporary injunction.

During discovery, Ultra Lube expressed concerns about divulging trade secrets and the court issued a protective order restricting Quick Lane from using any of Ultra Lube's allegedly confidential information. This order remained in effect throughout discovery. Upon the close of discovery, respondents moved for summary judgment on all counts. The district court granted this motion, concluding that no issues of material fact existed with regard to the claims of trade secret misappropriation, breach of contract, or tortious interference with contract. In its order, the district court found, (1) with regard to the misappropriation of trade secrets claim, Ultra Lube failed to produce specific facts relating to information it disclosed to Haire from which Ultra Lube derived independent benefit or which were not generally known or readily ascertainable within the automotive service and repair industry, (2) with regard to the breach of the non-compete clause claim, the fact that Haire was "an average employee who received modest wages for modest employment" rendered the non-compete clause overly broad, invalid and unenforceable, (3) the absence of an enforceable non-compete [*7] clause made the tortious interference with the non-compete clause claim moot, and (4) there was no evidence that agents or officers of Monticello Ford-Mercury interfered with the non-disclosure clause relating to trade secrets.

This appeal followed.

## DECISION

"On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law." State by *Cooper v. French*, *460 N.W.2d 2, 4 (Minn. 1990)* (citation omitted). A reviewing court need not defer to a trial court's decision on a pure question of law. *Frost-Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n, 358 N.W.2d 639, 642 (Minn. 1984)*.

A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. * * * On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted.

*Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993) [*8] (citations omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). "The party resisting summary judgment must do more than rest on mere averments." 566 N.W.2d at 71. A genuine issue for trial "must be established by substantial evidence." *Id.* at 69-70 (quoting *Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976)).

I.

*Misappropriation of Trade Secrets*

To prove misappropriation of a trade secret, a plaintiff must show that (1) a trade secret existed, (2) the defendant acquired the trade secret through a confidential relationship, and (3) the defendant used or disclosed the trade secret. *Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691, 701 (Minn. 1982). The Uniform Trade Secrets Act defines a trade secret as information, including a formula, pattern, compilation, [*9] program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Minn. Stat. § 325C.01, subd. 5* (2000). "Matters of general knowledge within an industry may not be classified as trade secrets or confidential information entitled to protection." *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 90 (Minn. 1979) (quotation and citation omitted).

Respondents have clearly demonstrated that the technical aspects of changing oil are not trade secrets because they are matters of general knowledge within the automotive industry. The record makes clear that Haire taught Quick Lane employees how to change oil. But the mere fact that Ultra Lube considered this information confidential because Haire knew how to change oil and some Quick Lane employees apparently did not, does not make changing oil a trade secret.

However, [*10] Ultra Lube also claims that over the course of Haire's employment, he participated in numerous managers' meetings where considerable confidential information and trade secrets were disclosed, including information on marketing and business operations. According to Ultra Lube, management made it clear to all employees that this information was confidential. Ultra Lube has so far shed little light on the precise nature of this confidential information, making it difficult on this record to determine if the information disclosed to Haire did in fact constitute trade secrets. Ultra Lube did, however, identify two specific examples of alleged trade secrets that were misappropriated by Haire and Monticello Ford: Ultra Lube's up-selling techniques, and Ultra Lube's method of dividing the work on a vehicle during an oil change. Although the record is not detailed, we believe that material fact questions exist regarding the nature, quality and extent of Ultra Lube's alleged trade secrets as they relate to (1) Ultra Lube's methods of persuading customers to purchase parts and services beyond the initial oil change and (2) Ultra Lube's division of labor on vehicles.

*A. Up-Selling*

[*11] In his deposition, Lee Mielke, one of Ultra Lube's owners, stated that he developed, among other things, Ultra Lube's customer service techniques, including their up-selling procedures. On the whole, Mielke was vague about the nature of the trade secrets and confidential information disclosed to Haire, but Mielke specifically identified up-selling as part of the confidential information shared with Haire during his employment with Ultra Lube.

The record also suggests that Haire shared this information with Quick Lane employees. Mike Lawler, a former Quick Lane employee, stated in an affidavit that Haire frequently instructed Quick Lane employees on up-selling techniques, often indicating that "this is the way we did it at Ultra Lube." Lawler also indicated that Haire was the only employee at Quick Lane that had any experience in this area.

Even though Ultra Lube shared this information with Haire (and he in turn shared it with Quick Lane employees), the question remains whether this information was generally known in the automotive rapid-oil-change industry, and whether Ultra Lube took reasonable steps to protect the information such that it might properly be deemed a trade [*12] secret. Although the record is far from definitive, the record presented is sufficient to create a genuine issue of material fact regarding: (1) the nature, scope and extent of Ultra Lube's up-selling process; (2) whether it was generally known in the industry and the steps Ultra Lube took to protect this information; and (3) the extent to which Haire disclosed the up-selling techniques he learned at Ultra Lube with the employees at Quick Lane.

*B. Upper-bay and Lower-bay Technicians*

The record also sufficiently supports Ultra Lube's claim that Ultra Lube developed the concept of dividing

the work on vehicles between upper-bay and lower-bay technicians who would work on the car simultaneously. Quick Lane was not servicing cars using this procedure until Haire was hired and suggested that Quick Lane adopt the two-technician procedure. Although Haire primarily trained Quick Lane employees on the technical aspects of changing oil--which is not a trade secret--the procedure for using two technicians was something unique to Ultra Lube and which Ultra Lube deemed confidential and made reasonable efforts to keep confidential. We conclude that there are genuine issues of material [*13] fact with respect to (1) the nature, quality and extent of Ultra Lube's process for using multiple technicians; (2) whether that process was generally known in the automotive rapid-oil-change industry; and (3) what steps Ultra Lube took to protect the confidentiality of that information.

### C. Miscellaneous Information

The record suggests that Haire was also privy to other confidential information, including information on pricing, employee training and incentive compensation plans--all of which Ultra Lube considered to be confidential and so informed its employees. As proof that this information was not generally known or readily ascertainable by the public, Ultra Lube claims that the information has been marketed to other business in the automotive rapid-oil-change industry, including Conoco and Jiffy Lube franchisees, and that this information has economic benefit to Ultra Lube because of its confidentiality.

Respondent does not dispute that Ultra Lube has marketed certain information to other businesses; but by the same token, Ultra Lube provided no evidence to show that either Conoco or Jiffy Lube executed confidentiality agreements regarding this information, or that [*14] Ultra Lube made any other efforts to maintain its confidentiality. Moreover, as respondent notes, it appears that Haire was never privy to any specific marketing plan and was never given any written documents or materials stamped "confidential." The training materials that were provided appeared to be accessible to any Ultra Lube employee. Moreover, Haire denied that he was ever involved in pricing and stated that the marketing information was nothing more than information on how to handle competitors' coupons.

Ultra Lube counters by noting that it must purposely be vague about the nature, quality and scope of the confidential information and trade secrets it shared with Haire, because to disclose them, even for purposes of this litigation, would be detrimental to their business. Ultra Lube argues that the district court concurred, as evidenced by the protective order issued prohibiting Quick Lane from using any confidential information obtained during discovery.

In the end, with the exception of Ultra Lube's up-selling and two-technician procedures, it is admittedly difficult on this record to identify the specific information that Ultra Lube claims constitute trade secrets. But [*15] we believe that it is precisely this uncertainty that militates against summary judgment on the misappropriation of trade secrets claim. Summary judgment is a "blunt instrument" to be used only where it is clearly applicable; it is inappropriate when reasonable persons might draw different conclusions from the evidence presented. *See Donnay v. Boulware, 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966); DHL, Inc., 566 N.W.2d at 70.* Here, while the record is "thin," we believe that reasonable persons might draw different conclusions from the evidence presented, and that the evidence cited by Ultra Lube is legally sufficient to support Ultra Lube's claim that there are genuine issues of material fact with respect to the nature, quality and extent of Ultra Lube's trade secrets, particularly as it relates to Ultra Lube's up-selling techniques and the use of multiple technicians in the bays to service vehicles. Therefore, we hold that the trial court erred in granting summary judgment in favor of Monticello Ford on the misappropriation of trade secrets claim.

### II.

### Non-compete Clause

Covenants not to compete are agreements in partial restraint [*16] of trade, limiting as they do the right of a party to work and earn a livelihood. *Bennett v. Storz Broadcasting Co., 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965).* Minnesota courts disfavor non-compete agreements, *Freeman v. Duluth Clinic, Ltd., 334 N.W.2d 626, 630 (Minn. 1983),* and scrutinize such contracts with care. *National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982).*

Because restrictive covenants are agreements in restraint of trade, they are enforced only to the extent reasonably necessary to protect a legitimate business interest. *Bennett, 270 Minn. at 534, 134 N.W.2d at 899-900.* The determination of the necessity for the restriction is dependent upon the nature of the business, the nature of the service of the employee, and other pertinent conditions. *Id. at 534, 134 N.W.2d at 899.* The test of reasonableness of a non-competition clause is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the [*17] employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

*Id. at 534, 134 N.W.2d at 899.* The validity of the contract in each case must be determined on its own facts, and a reasonable balance must be maintained between the interests of the employer and the employee. *Id. at 535-36, 134 N.W.2d at 899-900.*

The *Bennett* court also noted, however, that to extract covenants not to compete from "average employees" may become an oppressive restraint upon the employee's opportunities to work and earn a living. *Id. at 535, 134 N.W.2d at 899.* In discussing how non-compete agreements affect such employees, the Minnesota Supreme Court has expressed concern about the unequal bargaining power in such situations:

It may well be surmised that such a covenant finds its way into an employment contract not so much to protect the business as to needlessly fetter the employee, and prevent him from seeking to better his condition by securing employment with competing concerns. One who has nothing [*18] but his labor to sell, and is in urgent need of selling that, cannot well afford to raise any objection to any of the terms in the contract of employment offered him, so long as the wages are acceptable.

*Menter Co. v. Brock, 147 Minn. 407, 411, 180 N.W. 553, 555 (1920).* A person's right to labor in any occupation in which he is fit to engage is a valuable right, which should not be taken from him, or limited, by injunction, except in a clear case showing the justice and necessity therefor. *Standard Oil Co. v. Bertelsen, 186 Minn. 483, 487, 243 N.W. 701, 703 (1932).* The supreme court has also distinguished restrictive covenants upon business executives and professional employees noting that, with such employees, "the interest to be protected is more substantial and there is usually some consideration for the restraint," as opposed to situations where "modest wages [are] paid for modest employment." *Eutectic Welding Alloys Corp. v. West, 281 Minn. 13, 20 n.8, 160 N.W.2d 566, 571 n.8 (Minn. 1968).*

Appellant argues that Quick Lane's use of Haire's training and skills to compete with Ultra Lube demonstrates that Haire was more than [*19] an "ordinary employee" with no specialized skills. Likewise, Ultra Lube notes the great lengths Monticello Ford went to in order to hire Haire away from Ultra Lube; including repeated calls to Haire both at his home and at Ultra Lube during business hours. The mere fact, however, that Haire had certain skills Quick Lane's employees did not, does not mean that Haire was the type of employee on which a restrictive covenant can be enforced. Haire's duties at Ultra Lube were not professional or managerial; he was an oil lube technician and he was paid relatively meager wages. In fact, even after Haire attained the title of "service manager," his wages remained at $ 8.00 per hour and his duties remained largely the same. We can hardly think of a better example of "modest wages for modest employment."

Ultra Lube next argues that Haire's knowledge of confidential business information learned during his training rendered the non-compete agreement necessary to protect Ultra Lube's legitimate business interests. But the need to protect Ultra Lube's business interests must be weighed against Haire's right to earn a livelihood. *Walker Employment Serv., Inc. v. Parkhurst, 300 Minn. 264, 271, 219 N.W.2d 437, 441 (1974).* [*20] On this record, we find that Ultra Lube's interest in protecting itself from local competitors is outweighed by Haire's right to better his condition at Quick Lane, whose business encompassed a broader range of services and where Haire was offered more responsibilities. Accordingly, we hold that the covenant not to compete is unenforceable and the district court properly granted summary judgment on this claim.

### III.

### *Tortious Interference with the Contract*

Finally, Ultra Lube argues that there are material fact questions regarding whether respondents interfered with both Haire's non-compete agreement, and Haire's confidentiality clause. Interference with non-compete agreements by a third party is a tort for which damages are recoverable if the non-compete agreement is deemed valid and elements of tortious interference of a contractual relationship are established. *Kallok v. Medtronic, Inc., 573 N.W.2d 356, 361 (Minn. 1998).* Tortious interference requires proof of "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Id. at 362* [*21] (quotation and citation omitted).

Here Haire's employment agreement with Ultra Lube included both non-compete and non-disclosure of trade secret clauses. Respondent argues that if the non-compete clause is invalid, the tortious interference claim must fail. *See Oak Park Development Co., Inc. v. Snyder Bros. of Minnesota, Inc., 499 N.W.2d 500, 505 (Minn. App. 1993)* (existence of binding contract required for interference to be actionable).

But because we hold that the district court erred in granting summary judgment on the misappropriation of trade secrets claim, the non-disclosure of trade secrets clause in the employment agreement remains viable, and is severable from the non-compete clause which we hold to be unenforceable. Therefore, we conclude that it is possible for appellant to prove up a claim of tortious interference despite our invalidation of the non-compete clause, as long as all of the other elements of the cause of

action are otherwise satisfied. *See Nordling v. Northern States Power Co., 478 N.W.2d 498, 505 (Minn. 1991)* (holding that claim for tortious interference would lie even if employee's wrongful discharge claim based on employee [*22] handbook failed); *National Recruiters, Inc., 323 N.W.2d at 740-41 (Minn. 1982)* (considering tortious interference claim separately from validity of noncompetition agreement).

There is strong evidence that Monticello Ford managers knew about Haire's non-compete agreement with Ultra Lube, yet actively recruited him and assured him that they would "handle" the matter. Thus, genuine issues of material fact exist not only with respect to Monticello Ford's knowledge of the non-compete agreement, but also with respect to whether Monticello Ford officers engaged in a deliberate course of conduct designed to procure Haire's breach of the agreement and gain access to Ultra Lube's trade secrets. Therefore, we conclude that the district court erred in granting summary judgment in favor of Monticello Ford on the tortious interference with contract claim. **Affirmed in part and reversed in part.**