UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DANIEL EISNER,

        Plaintiff,

-against-

WALLEYE TRADING ADVISORS, LLC,

        Defendant.

------------------------------------------------------------x

07-CIV-7837 (AKH)

ECF CASE

AFFIDAVIT OF
ORI KUSHNIR

STATE OF NEW YORK   )
                            ) ss.:
COUNTY OF NEW YORK )

        Ori Kushnir, being duly sworn, deposes and says:

        1.     I am one of the founding members of Walleye Trading Advisors, LLC ("Walleye Trading"), the defendant in this action, and submit this affidavit in opposition to the motion by plaintiff, Daniel Eisner ("Eisner"), for an injunction enjoining Walleye Trading from attempting to prevent Eisner from working for D. E. Shaw & Co., L.P. ("D. E. Shaw"). I have personal knowledge of all matters discussed herein.

Preliminary Statement

        2.     It is vital to Walleye Trading that Eisner honor the reasonable restrictive covenant contained in the Employment Agreement between him and Walleye Trading and refrain from working at D. E. Shaw as a Systems Administrator.

        3.     Defendant, Walleye Trading, is a Minnesota-based financial services company that operates hedge funds and is engaged in the highly proprietary and unique business

of trading securities in local, national and global markets in the United States and Asia using quantitative strategies to execute trades using a highly specialized computerized trading system. Walleye Trading's computer system is carefully optimized to provide speed and stability (and other qualities) as efficiently and inexpensively as possible, and provides Walleye Trading with a competitive advantage over other firms that follow similar high-volume computer-intensive trading strategies.

4.     While employed at Walleye Trading, Eisner was intimately involved with the development, implementation and maintenance of Walleye Trading's computerized trading system. Consequently, Eisner learned highly proprietary information regarding Walleye Trading's business that could unfairly benefit D. E. Shaw.

5.     Eisner cannot seriously argue that D. E. Shaw is not a direct competitor of Walleye Trading in the small and highly competitive field of firms that utilize quantitative trading strategies that emphasize rapid, high-volume, trade execution. I personally know many people employed by D. E. Shaw, I have interviewed and attempted to hire people employed by D. E. Shaw, I have worked with and for former employees of D. E. Shaw, and I have been told by numerous prospective candidates interviewing at Walleye Trading that they are also interviewing at D. E. Shaw. I am, therefore, familiar with the general nature of D. E. Shaw's trading strategies and know that D. E. Shaw is a direct competitor of Walleye Trading.

6.     Given D. E. Shaw's emphasis on high-frequency trading based on quantitative strategies that depend on a high-speed IT infrastructure, and the relative large size of its quantitative trading effort as part of its overall firm, D. E. Shaw is one of only 18 firms in the securities industry that Walleye Trading considers to be direct competitors, such that Eisner's employment there as a systems professional will stand an extremely high likelihood of providing

D. E. Shaw with a competitive advantage over Walleye Trading that D. E. Shaw would not otherwise have had. There are literally hundreds of other firms in the securities industry at which Eisner can work without violating his restrictive covenant with Walleye Trading.

7.  Finally, enforcement of the restrictive covenant will not prejudice Eisner in any way. <u>Walleye Trading has continued to pay Eisner his full salary of $120,000,</u> and will do so for up to two years following his departure from Walleye Trading. Eisner is free to supplement this significant income by working for any of the thousands of other employers whose businesses are not predominated by high frequency trading using quantitative strategies but that nevertheless employ large teams of IT professionals to do high-end systems work. Far from harming Eisner, the restrictive covenant at issue in this case will likely be a windfall to Eisner.

Background

8.  The focus of my educational and employment experience has been primarily on computer technologies. In 1992 I received the equivalent of a bachelor's of science degree in computer science and physics from Tel Aviv University in Tel Aviv, Israel. From approximately 1992 to 1997, I was Lead Researcher for the Israeli Ministry of Defense, researching and developing large-scale data communications, networking and related technologies. I was awarded the second highest award for non-combat contributions to national security for my research, an award given to only a handful of individuals each year. From 1997 to 1999, I was Lead Technologist for an Israeli company named Xacct that developed billing technologies for Internet networks. From 1999 to 2002, I was Senior Software Developer for a hedge fund management firm called Arbitrade, based in Minnetonka, Minnesota. From 2003 to 2004, I was Head of Software Development at Amaranth Advisors LLC, a large hedge fund based in Greenwich, Connecticut. I also am the founder and owner of a company called June

Technologies, which provides consulting services to hedge funds concerning trading models and technologies. I am also the co-inventor of several patents in the field of computer science, for example U.S. patent no. 6963912 – "Method and apparatus for session reconstruction", U.S. patent no. 6615262 – "Statistical gathering framework for extracting information from a network multi-layer stack," U.S. patents nos. 7065571, 6957255 and various international patents.

9. In May 2005 I became a founding member of Walleye Trading. Although Walleye Trading's main office is located in Wayzata, Minnesota, I have always worked for Walleye Trading from an office in New York City located initially at 262 West 38th Street and currently on 73 Spring Street in Manhattan. I am chiefly responsible for developing and maintaining all technology for Walleye Trading, which includes primary responsibility for developing all customized software applications, building and maintaining Walleye Trading's technology infrastructure, negotiating with and retaining outside technology vendors and providing technological support for Walleye Trading's research departments. I have also conducted research for several of Walleye Trading's investment strategies.

10. From inception, Walleye Trading has focused on quantitative trading strategies that emphasize the use of rapid, high-volume trade execution to take advantage of perceived price discrepancies among various securities. As a simplified example, Walleye Trading's analysts will develop a quantitative trading strategy based on extensive analysis of the historical performance of two securities whose prices are highly correlated. Walleye Trading's analysts try to identify circumstance where a change in the price of Security A will likely be followed by a change in the price of Security B. Such instances of deviation from historical correlation present trading opportunities. However, often the opportunities are small and fleeting, and the lag time between a change in price of Security A and Security B will be as little as

several milliseconds or at most a few seconds. The two factors of small price movement and extremely short lag time mean that, in order for Walleye Trading to maximize the value of a trading strategy, Walleye Trading must quickly execute a large number of orders and trades. A high-speed, super reliable computer system is essential to implement these strategies effectively. Conversely, because of the large number of orders and quotes Walleye Trading's strategies generate, a poorly designed system can result in losses of millions of dollars of missed or erroneous trades.

Eisner's Employment at Walleye Trading

11.     When Walleye Trading was founded in 2005, we had to design and build its computer system from scratch. In many ways, this provided Walleye Trading with a great advantage, because we were not burdened with legacy systems and could design and implement a state-of-the-art system. Shortly after Walleye Trading was founded, we determined that we needed to hire a dedicated systems person to work with me on the design and implementation of Walleye Trading's computerized trading system. The position would have significant responsibility for designing what we call the "architecture" of Walleye Trading's computerized trading system, as well as managing the purchase of the computers and related hardware and software required to run trading operations on the system, and managing the installation and maintenance of that system. We worked with recruiters specializing in the placement of IT professionals in the financial industry and over the course of several weeks I interviewed approximately a dozen candidates.

12.     I recommended to Walleye Trading's other members that we hire Eisner primarily because of Eisner's educational background and skills, and to a lesser degree his recent relevant employment experience at Securities Industry Automation Corporation. Walleye

Trading's other members agreed with my recommendation, and in or around June 2005, we made Eisner an offer of employment, which he accepted.

   13. While interviewing Eisner, I reviewed with him, among other things, Walleye Trading's standard employment agreement, entitled "Confidential Employment, Non-Competition, Non-Solicitation, and Non-Disclosure Agreement (the "Employment Agreement"). As has been my standard practice when hiring new employees both at Walleye Trading and at my prior firms, I reviewed the material terms of the Employment Agreement with Eisner including, in this case, the Employment Agreement's provision whereby an employee may be precluded from working for a competitor for two years to the extent that Walleye Trading continues paying the employee's salary. Also in accordance with my standard practice, I recommended that Eisner have an attorney review the Employment Agreement. Eisner signed the Employment Agreement on June 22, 2005 and began working for Walleye Trading immediately thereafter.

   14. During the approximately two years that Eisner was employed by Walleye Trading, Eisner was intimately involved in the design, implementation and maintenance of Walleye Trading's highly specialized computerized trading system.

   15. Contrary to Eisner's claim in his affidavit submitted in support of his application for a preliminary injunction (Eisner Aff. ¶ 23), Walleye Trading does consider the architecture of its computer system highly confidential. While I might discuss aspects of it on an as-needed basis with vendors or other non-competitor third parties (as I imagine Eisner did from time to time), those third parties would not thereby have gained an intimate working knowledge of Walleye Trading's architecture. I would never discuss such matters with a competitor, or give a blueprint of it to anyone. Eisner knew Walleye regarded the system as proprietary because, aside from knowing that such matters are confidential as a matter of custom and practice in the

securities industry, I specifically discussed the Employment Agreement's confidentiality provisions with him at the time he was hired.

16. Eisner also misrepresents his work at Walleye Trading was <u>not</u> generic or commoditized "plumbing" work involving mostly consultation of "instruction manuals." Eisner Aff. ¶¶ 21-22. To the contrary, Eisner worked closely with me and other Walleye personnel to address a myriad of complex issues that arose during the design and development of our highly specialized computer system that is optimized to be efficient, robust, secure, reliable, scaleable, manageable and inexpensive. The design and implementation of Walleye Trading's computer system required many fundamental judgment calls and complex trade-offs to obtain a system that is optimized for expense and functionality. Moreover, it was clear that Eisner was constantly learning on the job and gaining highly unique and valuable experience while employed at Walleye Trading.

17. Several examples illustrates the specialized nature of Eisner's work at Walleye Trading, and the large extent to which he learned highly confidential information through a process of trial and error, and in close collaboration with me and other Walleye Trading personnel.

    a. One of Eisner's first responsibilities at Walleye Trading was to supervise the purchase of the servers that would run Walleye Trading's trading system. Eisner negotiated the purchase of 16 identical "blade" servers manufactured by a well known server manufacturer with whom Eisner was familiar. However, after the servers were delivered and partially installed, we determined that it would be difficult to deliver adequate power to the serves at the co-location center where they are housed. We also determined that the use of identical blade servers created a vulnerability in Walleye Trading's trading system because the

servers would rely on a centralized management component (a "backplane"). Any defect or limitation in the backplane would likely manifest a corresponding defect or limitation in some or all the servers and thereby impair Walleye Trading's entire system. Consequently, we stopped using the blade servers that Eisner purchased, and were refunded the amount paid. We replaced the servers with servers manufactured by different manufacturers, and we purchased them incrementally so that we could determine their appropriateness before making a large commitment. This process of trial and error involving creative resolution of non-obvious or standardized problems repeated itself again and again during Eisner's work on our system.

        b.       Another example occurred during the set up of the servers, when we needed to make a critical decision regarding the configuration of the servers' hard drive capacity. This is an oversimplified description, but suffice it to say, we needed to decide whether to use "centralized" hard drives and "diskless" servers or "distributed" hard drives. Eisner initially advocated using a centralized hard drive configuration. After an analysis and weighing of the costs, redundancy, performance, security and other aspects of the various configurations, and a protracted attempt to stabilize the centralized solution proposed by Eisner, we decided to use a distributed configuration. We determined that a distributed system provides greater functionality and smaller risk to our system.

        c.       Further, I worked closely with Eisner to develop an optimal software deployment scheduling and notification environment. Again, my description is necessarily oversimplified, but a large integrated computer system such as Walleye Trading's needs to adopt specific schedules and protocols for launching, correcting and terminating software over dozens of servers. Further, the software will run at different levels such as at a testing level, a staging level and at a production level. When changes are made to software

running on the servers, there must be an orderly sequence for updating all the servers and making accommodation for the different software levels. Further, when errors or failures are detected in the system, there must be an orderly process for recording errors, terminating operations and correcting errors while retaining functionality of the system. Not surprisingly, the design of the optimal system will depend on the type of operations running on the system. When Eisner joined Walleye Trading he did not know how best to design such an environment for a computer system running high volume, program-driven trading operations. He learned about the operations that would be running on Walleye Trading's system and consulted with me and others to determine how to best optimize that environment.

        d.     A final example is taken from Eisner's work on the process of optimally co-locating Walleye Trading's servers, the very job D. E. Shaw has now hired him for. See Eisner Aff. ¶ 30. Eisner misrepresents the process of co-locating Walleye Tradings's computers as a turn-key operation requiring only completion of "standardized forms" and a "routine process." Eisner Aff. ¶ 24. This is not true. Co-location of a large and highly complex computer system is an extremely complex process requiring solicitation of bids from numerous service providers, careful review and negotiation of complex service levels to be provided by the co-location vendor and negotiation of complex pricing structures available from such vendors. A co-location arrangement that is sufficient for one type of trading strategy might be entirely inappropriate for another trading strategy involving different trading volumes and requiring different speed of execution, to name just two examples. If development of a co-location strategy was as simple and rote as suggested by Eisner, neither Walleye Trading nor D. E. Shaw would pay him hundreds of thousands of dollars to do it.

18.   These four examples are by no means an exhaustive list of the many highly specialized tasks Eisner worked on and learned about while working on Walleye Trading's computer system. Eisner participated in dozens of other design and implementation decisions that have resulted in a highly optimized computer system that provides Walleye Trading an extremely important competitive advantage. For example, I personally know that Walleye Trading's optimized computerized trading system handles as many or more orders and trades as other firms, but does so for a fraction of the transaction, maintenance, hardware and software costs incurred by those firms. Eisner became intimately familiar with the optimal design of this system while employed at Walleye Trading.

19.   Further, Eisner's claim that he performed non-specialized, run-of-the-mill work at Walleye Trading is implausible when compared against his 2005 resume and, most likely, his current resume. A copy of Eisner's 2005 resume is attached hereto as Exhibit A. Among other things, Eisner's 2005 resume boasted that he "[l]ead the design, build, and maintenance of custom, Linux-based 'NextGen' operating system which powers 6000+ trader terminals" (emphasis added). Further, he "[d]esigned the current Network Security model for the New York Stock Exchange Trading Floor." I find it unbelievable that an IT professional with such experience and both a Batchelor's and Master's Degree in Computer Science would have transitioned from SIAC to a job at Walley Trading that supposedly required only ordinary "plumbing" work guided by standard instructional manuals. I also would guess, but do not know, that the resume that Eisner submitted to D. E. Shaw does not characterize his Walleye Trading responsibilities as mere "plumbing" and does not boast of the large amount of time at Walleye Trading that he supposedly devoted to hum-drum "review of instructional manuals created by various vendors for their products and consulting with the technical support assistance available

to the purchasers of such products." Eisner Aff. ¶ 22. Eisner is simply re-writing his history at Walleye Trading for the purpose of evading the terms of the Employment Agreement.

20. Eisner was also exposed to non-computer proprietary information while employed at Walleye Trading. Although Eisner's primary responsibilities concerned computer systems, he was constantly exposed to proprietary information relating to Walleye Trading's trading strategies. I frequently hold meetings and conference calls and create reports and other documents in Walleye Trading's New York office relating to Walleye Trading's trading strategies. Consequently, I know that Eisner, like other non-Quant employees at Walleye Trading, learned a significant amount about our trading strategies just by being in our small office on a day-to-day basis and interacting with other Walleye Trading employees and discussing Walleye Trading's business. Eisner's claim that rigid divisions separate "Quants" and "Software Developers" from interacting on any substantive level with "Systems" personnel does not reflect the day-to-day reality at Walleye Trading, in which employees of all stripes regularly communicate formally and informally about important business matters relating to various business functions (e.g., a "software developer" might work on a research issue, or a researcher might write systems code, etc.).

D. E. Shaw is a Direct Competitor of Walleye Trading

21. D. E. Shaw is a direct competitor of Walleye Trading and, contrary to Eisner's statement in paragraph 33 of his affidavit, I have never stated otherwise. A significant portion of D. E. Shaw's business is devoted to quantitative trading using trading strategies that employ concepts, analytical methods and trading system structures extremely similar to those employed at Walleye Trading. D. E. Shaw's web-site features "Quantitative Strategies" as the

first of D. E. Shaw's three areas of specialization.[1] D. E. Shaw's website describes its quantitative strategies as involving "the use of mathematical techniques to identify profit opportunities arising from subtle anomalies affecting the prices of various securities," which also accurately describes Walleye Trading's trading methodology.

22. Given the size and nature of D. E. Shaw's business, Eisner's employment there as a systems professional will stand an extremely high likelihood of providing D. E. Shaw with a competitive advantage over Walleye Trading that D. E. Shaw would not otherwise have had. As I discuss below, I think this is precisely why D. E. Shaw is prepared to compensate Eisner so handsomely, and why Eisner has chosen D. E. Shaw as the firm at which he would like to work.

23. Over the years I have come to know many current and former D. E. Shaw employees personally. I have worked with and for former D. E. Shaw employees, I have interviewed current D. E. Shaw employees seeking employment at Walleye Trading or other firms I have been associated with, and prospective employees interviewing at Walleye Trading have told me that they are also interviewing at D. E. Shaw. I therefore have a good understanding, on a general level, of D. E. Shaw's quantitative trading activities and how similar they are to Walleye Trading's.

24. Importantly, I also believe that when the situation is reversed, and D. E. Shaw's employees seek employment elsewhere, D. E. Shaw views firms such at Walleye Trading to be competitors. My former employer Arbitrade followed a similar quantitative trading strategy as used by Walleye Trading and employed former D. E. Shaw employees including an employee named Alex Wang. When D. E. Shaw learned that Mr. Wang was going

---

[1] See http://www.deshaw.com/WhatWeDo.html, a copy of which is annexed as Exhibit B.

to join Arbitrade, D. E. Shaw notified him that D. E. Shaw sought to enforce the terms of the non-competition provision in their D. E. Shaw employment agreements.

25.  Further, I also note that while Eisner's affidavit claims that Walleye Trading is not a competitor of D. E. Shaw, the affidavits of D. E. Shaw employees Tomislav Pavlicic and Peter Reiss make no such claim. I am confident that if Walleye Trading hires D. E. Shaw employees in the future, D. E. Shaw will argue that such employment is prohibited by the restrictive covenants in their D. E. Shaw employment agreements. The affidavits of Messrs. Pavlicic and Reiss clearly have been crafted so as not to prejudice D. E. Shaw's ability to argue in the future that Walleye is a competitor of D.E. Shaw.

26.  As stated above, I never told Eisner that D. E. Shaw was not a competitor of Walleye Trading at our early August 2007 meeting following Eisner's resignation, or indeed at any other time. During that meeting, I told Eisner that Walleye Trading would likely seek to enforce the restrictive covenant in the Employment Agreement but that if he could give us particular information about the scope of his contemplated responsibilities or the group that he would be working for at D. E. Shaw, we might not enforce the restrictive covenant in the Employment Agreement. We discussed at length D. E. Shaw's status as a competitor of Walleye Trading, as is confirmed by Eisner's claim that we discussed other employees recruited by D. E. Shaw from my prior firm and discussed that D. E. Shaw might be a competitor "in the future." Eisner Aff. ¶ 33. Nearly verbatim, I answered Eisner's question regarding the scope of the Employment Agreement as follows: "We are reasonable people and we will only try to enforce the agreement if a reasonable person would think that a firm is a competitor. For example, if you go and work for a toy/game company, obviously that is not a competitor. Even in the industry, if you go back to SIAC or to any of the exchanges, or to the large majority of positions in

investment banks, we won't mind, but D. E. Shaw is a firm that has hired over the past couple of years a number of senior Arbitrade employees and that any reasonable person would say is a competitor, so we need more information about your position there before we can decide." I further explained, after he asked about what I was worried about, that "If he went to D. E. Shaw, it would be faster and less expensive for them to replicate Walleye Trading's architecture than it was for us [to build it]" and he agreed with this statement.

27.   Eisner also misleadingly claims that D. E. Shaw is not a competitor of Walleye Trading's because Walleye Trading is a "market maker." Eisner Memo of Law at 2; Eisner Aff. ¶ 14. This argument is absolutely baseless. The fact that Walleye Trading is a market maker of certain securities on certain exchanges -- which means that Walleye Trading is required to post prices at which it will both purchase and sell those securities -- does not mean that Walleye Trading's trading strategies are fundamentally different from D. E. Shaw's. In fact, it has been argued that D. E. Shaw's business model is essentially the same as a market maker's. Attached as Exhibit C is a recent article entitled "Hedge Clipping" from the July 2, 2007 edition of <u>The New Yorker</u> magazine discussing the trading strategies used by D. E. Shaw and other similar firms:

> . . . firms like Renaissance Technologies, Citadel Investment Group, and <u>D. E. Shaw</u> appear to generate consistently high returns and low volatility . . . Kat questioned whether such firms, which trade in huge volumes on a daily basis, ought to be categorized as hedge funds at all. "<u>Basically, they are the largest market-making firms in the world, but they call themselves hedge funds because it sells better</u>," Kat said. "<u>The average horizon on a trade for these guys is something like five seconds. They earn the spread. It's very smart, but their skill is in technology.</u> It's in sucking up tick-by-tick data, processing all those data, and converting them into second-by-second positions in thousands of spreads worldwide. <u>It's just algorithmic market making</u>.

Exhibit C at 6 (emphasis added). Furthermore, Walleye Trading is not exclusively a market maker; in fact, a large portion of its trading activity is currently carried out in strategies that are not market-making strategies, but rather are one-sided, high-frequency trading strategies.

28. Consequently, Eisner's argument that D. E. Shaw is not a competitor of Walleye Trading because Walleye Trading is a market maker and D. E. Shaw is not, is an empty distinction designed to conceal the fact that the two companies compete head to head in terms of their employment and implementation of quantitative trading strategies.

<u>The Field of Walleye Trading's Competitors is Small</u>

29. D. E. Shaw is one of only 18 firms that Walleye Trading considers to be its direct competitors for the purposes of enforcing the Non-Compete Agreement against an employee such as Eisner.

30. Walleye Trading's competitors including the following firms:

D. E. Shaw
Citadel
Two Sigma
Citgo
Renaissance Technologies
Timber Hill a/k/a Interactive Brokers
Wolverine Trading
Susquehanna Investment Group
CTC, LLC
Automated Trading Desk group at Citigroup
Statarb group at Barclays Capital
Equitec
Millennium Partners
Renn Tech
AMM group at Morgan Stanley
EVT group at UBS
Citigroup Derivatives Markets (CDMI)
Trading Machines LLC

31. D. E. Shaw is one of the largest and most prominent firms within this small group.

Eisner's Responsibilities at D. E. Shaw Would Be the Same as, or
<u>Virtually the Same as, his Responsibilities at Walleye Trading</u>

32. Further, Eisner's contemplated responsibilities at D. E. Shaw will be essentially identical to his responsibilities at Walleye Trading. Eisner characterizes his first two responsibilities at D. E. Shaw as (1) "leading the company's search for a new data center and co-location space"; and (2) "finding, evaluating and deploying new technologies for the Systems department, such as backup systems, high performance servers, and voice related technologies." Eisner Aff. at ¶ 30. As discussed above, at Walleye Trading Eisner assumed virtually identical responsibilities and, in fact, led Walleye Trading's "search for a new data center and co-location space" and led Walleye Trading's evaluation and deployment of "backup systems [and] high performance servers." In fact, in 2005, when Walleye Trading was searching for an IT systems employee, I gave the recruiters the following criteria:

> Scope: Initially building out our production environment (networking, hardware, support protocols), writing application level monitoring code, researching hardware and operating system level solutions that can improve our system performance. Later on – we'll see." Emailed to Kevin Boston on 6/21/2005

33. Based on the foregoing, Eisner cannot claim that his employment at D. E. Shaw will not be "similar to or competitive with" Walleye Trading's operations as that phrase is used in the Employment Agreement.

<u>Eisner Will Not Be Prejudiced by Observing the Restrictive Covenant</u>

34. Eisner's statement that he will be prejudiced by observing the restrictive covenant contained in his Employment Agreement is demonstrably false. Most likely, the two year-period covered by the Employment Agreement will provide a financial windfall to Eisner and provide him the most annual compensation he has ever earned.

35. It must initially be observed that enforcement of the Employment Agreement will not cause Eisner any financial prejudice. For up to two years following Eisner's resignation on July 19, 2007, Walleye Trading will continue to pay Eisner his base salary of $120,000 per year, representing total compensation of $240,000 <u>for not doing any work</u>.

36. Eisner attempts to mislead the Court by arguing that continued payment of only his base salary of $120,000 presents a significant hardship because "[i]n the financial services industry, it is not unusual for bonuses to exceed base salary in years of strong financial performance" and payment of only his base salary would be "significantly less than the value of my total compensation package at Walleye Trading." This is not true. Walleye Trading paid Eisner a bonus of $20,000 for 2005 and $35,000 for 2006. His bonus for 2007 would likely be in this range. Continued payment of Eisner's base salary, therefore, represents the vast majority of Eisner's compensation at Walleye Trading

37. Eisner can <u>easily</u> make up this lost compensation of approximately $27,500 per year through virtually any other employment. Most likely, Eisner will obtain highly skilled employment paying far in excess of this amount. In my opinion, and in the opinion of an IT recruiter with over 20 years' experience (<u>see</u> accompanying affidavit of Michael Levinson), Eisner should have no trouble obtaining employment paying at least $100,000 per year, representing total annual compensation to Eisner of $220,000 ($100,000 from his new firm and $120,000 from Walleye Trading), or approximately $65,000 *more* than he earned in 2006 and, to my knowledge, far more than he has ever been paid by any employer at any time.

38. Eisner nevertheless implies that his financial windfall is less than the amount he will earn at D. E. Shaw. Eisner Aff. ¶ 38; Complaint at ¶ 27. Initially, if this is true, payment of such a salary tends to confirm that D. E. Shaw is hiring Eisner for his recent

experience at Walleye Trading and not because Eisner spent the last two years doing "plumbing" work and reading tech-support manuals – too say nothing of D. E. Shaw's likely funding of Eisner's legal costs associated with this lawsuit.

39.   But more importantly, it is impossible to tell whether Eisner's claim of dire financial prejudice is true because his sixteen-page affidavit does not disclose what his promised compensation at D. E. Shaw will be. Paragraph 27 of the Complaint suggests that D. E. Shaw has agreed to pay him a base salary of approximately $200,000. But given his glaring omission of any precise information in this regard, I am extremely skeptical of Eisner's claim that enforcement of the Employment Agreement will cause him significant lost income from D. E. Shaw.

40.   Eisner's claims of "career" prejudice also are not credible and are self-contradictory. On the one hand, Eisner argues that he will be rendered a virtual dinosaur if he cannot immediately start working for D. E. Shaw because of the rapid pace of change within his field. Eisner Aff. ¶ 39. On the other hand, Messrs. Pavlicic and Reiss claim that D. E. Shaw has little or no interest in the work that Eisner did at Walleye Trading and is interested only in the work that Eisner did for the SIAC in 2005 and before. Pavlicic Aff ¶ 7 and Reiss Aff. ¶ 6. There is no way to reconcile Eisner's characterization of the IT field with D. E. Shaw's purported reasons for hiring him.

41.   I further disagree with Eisner's claim that enforcement of the restrictive covenant will cause him career prejudice because there are literally thousands of firms, both within the financial services field and in other fields, that employ large teams of IT professionals to perform cutting-edge and highly lucrative computer systems services, but who do not compete

with Walleye Trading in the field of quantitative securities trading. With his impressive educational and employment backgrounds, Eisner could easily get a job at one of those firms.

42.     Moreover, even in the highly unlikely event that Eisner decided to take a well-paid vacation for two years, he would still be highly employable at the end of that time. The field of information technology simply does not change as quickly or as thoroughly as Eisner claims. The most commonly used programming languages, such as Java and C++, have been around for many years (since 1995 and 1979, respectively) and will likely be around for many more years. Similarly, the most common operating systems like Windows and Linux have been, and will continue to be, around for many years. Moreover, the areas of significant changes in computer technology occur at a level that is beyond the involvement of computer specialists like Eisner. The fact that processing speed may double every two years, for example, does not mean that a systems specialist like Eisner constantly has to be involved with that evolution in order to take advantage of it. Indeed, if the scope of Eisner's job is as limited as he describes in (Eisner Aff. ¶ 30), then all he needs to know is which products are being offered for sale, so that he can select the appropriate ones and install them at data centers. Certainly, that is not a skill that is easily lost.

43.     I happen to be familiar with a relevant real-world example that contradicts Eisner's claim of career prejudice. John Thornley is to the best of my knowledge a senior employee of D. E. Shaw, and worked in Lehman Brothers' IT department until approximately 2005. When he left Lehman Brothers, he took an extended vacation of approximately 15 months, during which time he traveled extensively with his family. In 2007, he returned to full-time employment at D. E. Shaw. I do not think that Mr. Thornley was prejudiced by his sustained absence from the field and today holds a lucrative and important position at D. E. Shaw.

Conclusion

44.     For the foregoing reasons, it is vital to Walleye Trading that Eisner abide by the terms of his Employment Agreement and refrain from working for D. E. Shaw. Eisner gained substantial cutting-edge knowledge and experience while employed by Walleye Trading. He was intimately involved with the development and implementation of Walleye Trading's sophisticated computerized trading system, which provides Walleye Trading a significant competitive advantage in this extremely competitive field. Further, D. E. Shaw is a direct competitor of Walleye Trading's in the field of quantitative securities trading. Finally, Eisner will not be prejudiced by observing the terms of his Employment Agreement but will, instead, enjoy a financial windfall over the next two years

_____
Ori Kushnir

Sworn to before me this
23rd day of October 2007

_____
Notary Public

HARRY W LIPMAN
Notary Public - State of New York
No. 02LI5054312
Qualified in Kings County
Commission Expires January 08, 2010