UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
DANIEL EISNER,

                Plaintiff,

-against-

WALLEYE TRADING ADVISORS, LLC,

                Defendant.

-------------------------------------------------------------- X

07 CIV 7837 (AKH)

AFFIDAVIT OF
L. MICHAEL LEVINSON
IN OPPOSITION TO
PLAINTIFF'S MOTION
FOR A PRELIMINARY
INJUNCTION

STATE OF NEW JERSEY   )
                                ) ss.:
COUNTY OF ESSEX       )

        L. MICHAEL LEVINSON, being duly sworn, deposes and says:

        1.       I am the President and founder of The JML Group Ltd., a recruiting firm started in 2002, located in Millburn, New Jersey, and I have over thirty years' experience as an operations, technology, and business manager both in major corporations and in executive recruitment businesses. The JML Group Ltd.'s primary practice areas are in information technology, operations, and accounting/finance.

        2.       I was President of The Concorde Group, a New York City-based recruiting firm I founded in 1990. This company's clients were primarily drawn from the leading companies in the financial services, healthcare, and information services industry. For the four-year period preceding 1990, I worked for two different executive recruiting firms.

        3.       From 1970 to 1986, I held managerial positions in the manufacturing, banking, and securities industries. At AT&T (Western Electric), I was in a fast-track management program where I held various positions in manufacturing, finance, and information technology. From there I went to Citibank, where I managed departments in the check-

processing division, which included back-office operations and technology groups. I then worked for Goldman Sachs, as Vice President, Information Services, where my responsibilities included converting computer systems.

4. I received a B.S. in Industrial Distribution/Engineering from Clarkson University, and an M.B.A. in Operations Research from New York University, where I was a Research Assistant.

5. I have read the complaint in this action (the "Complaint"), the affidavits of Daniel Eisner ("Eisner Aff."), Tomislav Pavlicic ("Pavlicic Aff.") and Peter Reiss in support of Daniel Eisner's motion for a preliminary injunction, and Mr. Eisner's 2005 resume, a copy of which is annexed as Exhibit D. I have been advised that Mr. Eisner used this resume to apply for employment at Walleye Trading in 2005.

6. Based on my review of these documents, and on my experience as a professional recruiter making IT placements for clients in the financial services industry for over twenty years, I submit this affidavit in opposition to Mr. Eisner's motion for a preliminary injunction.

7. In short, I can see no reason why Mr. Eisner will suffer irreparable injury, if he continues to honor his non-compete covenant with Walleye Trading Advisors, LLC ("Walleye Trading") as set forth in paragraph 13 of the Confidential Employment, Non-Competition, Non-Solicitation, and Non-Disclosure Agreement dated June 22, 2005 (the "Non-Compete Agreement") (Eisner Aff. Ex. 1).

8. In addition, having read the accompanying affidavit of Ori Kushnir, I can see significant reasons why Walleye Trading is and should be concerned with Mr. Eisner going to work for D. E. Shaw & Co., L.P. ("D. E. Shaw").

Mr. Eisner Should Not Suffer any Harm if the Court
Enforces His Non-Compete Agreement as Written

9. The Non-Compete Agreement is narrowly tailored to prohibit Mr. Eisner from working only for companies that are similar to, or competitive with, Walleye Trading for up to two years, provided, significantly, that Walleye Trading continues to pay his base salary, which I understand to be $120,000 per year. Eisner Aff. Ex. 1 (¶ 13).

10. If Mr. Eisner complies with the Non-Compete Agreement and, for example, works for a firm that does not compete with Walleye Trading, therefore, he will earn an additional $120,000 per year.

11. Mr. Eisner acknowledges that, since he resigned from Walleye Trading in July 2007, he has received and accepted Walleye Trading's continued payments to him of his base salary of $120,000. Eisner Aff. ¶ 38.

12. I understand from Mr. Eisner's affidavit, moreover, that he has received an offer of employment from D. E. Shaw as a Systems Administrator in that company's Systems Department, but has not started to work there due to the Non-Compete Agreement. Eisner Aff. ¶ 30.

13. I am not personally familiar with Walleye Trading's business, but I know that D. E. Shaw is a large investment firm whose business areas include proprietary trading based on quantitative strategies that attempt to exploit tiny price anomalies in the worldwide securities markets, and that such trading is executed by computers that operate on a complex and sophisticated IT infrastructure in which speed and reliability are critical.

14. Having read the accompanying affidavit of Ori Kushnir, I understand that Walleye Trading considers itself to be a competitor of D. E. Shaw, and a small handful of other

firms in the securities industry, with respect to this kind of specialized options, equities and futures trading.

15. I understand from my executive recruiting experience in the securities industry, that incremental changes in the operational speed and/or reliability of such systems can create competitive differences between firms that execute this high-speed, high volume trading based on quantitative strategies, and, accordingly, that such firms generally regard their proprietary technologies as highly confidential.

16. Although Mr. Eisner states that he resigned from Walleye Trading in July 2007 to take a "Systems position" at D. E. Shaw, he does not state that he attempted to obtain a systems position at any firm in the securities industry other than D. E. Shaw.

17. Given Mr. Eisner's 2005 resume (Exhibit D), and his subsequent experience at Walleye Trading from June 2005 through July 2007 (as described by Mr. Eisner in his affidavit), and assuming he interviews reasonably well, it is my considered professional opinion that Mr. Eisner could find gainful employment at any of a number of companies in the securities industry (including at large banks that engage in securities trading activities) that do not engage in the kind of highly specialized quantitative trading that D. E. Shaw engages in.

18. For example, all the securities exchanges such as the NYSE, Nasdaq, the International Securities Exchange (ISE) and others have positions that do not compete with Walleye. The IT infrastructure departments in most of the securities industry, including many of the investment banks and retail brokerage firms that do not compete with Walleye (e.g., Goldman Sachs, Merrill Lynch, Ameritrade, E*Trade, Wachovia, Bank of America, etc.). The electronic trading vendor community (e.g., ITG), the computer game industry, biotech and pharmaceutical industry, and many others also employ teams of IT professionals in interesting, cutting-edge, lucrative, dynamic positions.

19. Given the terms of his Non-Compete Agreement with Walleye, therefore, Mr. Eisner may work in his "chosen field as an IT professional" for a number of different firms in the securities industry for the next two years <u>and</u> get paid an extra $240,000 from Walleye Trading.

20. In fact, even if we were limited to just hedge funds that use a sophisticated, high-speed IT infrastructure for their electronic trading and trades processing, there are a number of firms which, in my experience and opinion, would have potential interest in IT professionals with backgrounds similar to Mr. Eisner's as a systems employee. <u>See</u> article from Alpha Magazine, listing top 100 hedge funds, a copy of which is annexed as Exhibit E. Moreover, with further research, I could supply a list of firms that are not hedge funds but that also use complex technology infrastructures and thus would have potential interest in IT professionals with Mr. Eisner's apparent experience.

21. In view of the above, I disagree with Mr. Eisner's statement that "Walleye's acts are preventing me from working in my chosen field as an IT professional for two years." Eisner Aff. ¶ 39. Similarly, I dispute the Complaint's conclusory allegation that the "financial impact on Eisner should the Non-Compete [Agreement] be enforced to prevent him from working at D. E. Shaw" is such that he "will likely suffer financial losses significantly greater than $150,000." Complaint ¶ 27.

22. Indeed, in my experience, it is rare to see a non-compete where the former employer is required to continue paying its former employee in order for the non-compete to be enforceable.

23. Indeed, far from being "irreparably injured" by enforcement of his non-compete covenant, Mr. Eisner will likely benefit from it if he gets a job at commensurate pay

level with Walleye at a non-competitor of Walleye Trading; and, given Mr. Eisner's experience and the number of potential employers in the securities industry, I think this is reasonable.

**The Facts and Circumstances of this Case Suggest that**
**Enforcement of the Non-Compete is Appropriate Here**

24. In his affidavit, Mr. Pavlicic, a recruiter in D. E. Shaw's "Strategic Growth Department," states that D. E. Shaw was interested in interviewing Mr. Eisner in June 2005 for a "Systems Administrator" position. Pavlicic Aff. ¶ 4.

25. Mr. Pavlicic fails to disclose the compensation level at which D. E. Shaw would have been prepared to hire Mr. Eisner, assuming D. E. Shaw had offered Mr. Eisner a position in June 2005.

26. At that time (June 2005), Mr. Eisner had been out of school for only four years, but through his experience at Securities Industry Automation Corporation ("SIAC"), he appears to have developed a strong background in designing and building IT infrastructures for securities firm and market exchanges. Eisner Aff. ¶ 10.

27. In the ensuing two years or so at Walleye Trading, Mr. Eisner acknowledges that he spearheaded the construction of Walleye Trading's computer infrastructure, "from the ground up." Eisner Aff. ¶ 16.

28. I understand from reading the accompanying affidavit of Ori Kushnir (who appears to have a rather in-depth background in computer technology), that Mr. Eisner's work for Walleye Trading was based in large part on Mr. Kushnir's direction, proprietary knowledge and oversight.

29. Moreover, in my experience, given Mr. Eisner's background, Walleye Trading was compensating him at a competitive level. We do not know what D. E. Shaw was prepared to pay Mr. Eisner before he developed Walleye Trading's IT infrastructure "from the

ground up," but given that D. E. Shaw is now prepared to compensate Mr. Eisner "significantly in excess of his base salary at Walleye," with the potential for additional bonuses and salary increases over the initial two years" (Complaint ¶ 27), it is reasonable to conclude that D. E. is compensating Mr. Eisner based upon his knowledge or expertise gained from developing Walleye Trading's IT infrastructure.

30.     I therefore find it reasonable to conclude, based upon documentation provided, that D. E. Shaw is seeking the services of Mr. Eisner because of the knowledge and experience that Mr. Eisner gained at Walleye Trading with respect to building a high-speed, highly reliable IT infrastructures.

_____
L. Michael Levinson

Sworn to before me this
23rd day of October, 2007

_____
Notary Public

KAREN J. SHVARTS
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 7/25/2011