SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------ X

DANIEL EISNER,                                               :

                        Plaintiff,                  :    07 CIV 7837 (AKH)

        -against-                                         :

WALLEYE TRADING ADVISORS, LLC                               :

                    Defendant.

------------------------------------------------------------------------ X

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

ROTTENBERG LIPMAN RICH, P.C.
369 Lexington Avenue, 16th Floor
New York, New York  10017
(212) 661-3080

Attorneys for Defendant
Walleye Trading Advisors, LLC

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................................ii-iii

PRELIMINARY STATEMENT .........................................................................................1

FACTS ...............................................................................................................................5

ARGUMENT ......................................................................................................................7

    A.    Standards for Issuance of a
            Preliminary Injunction ..............................................................................7

    B.    Plaintiff Cannot Establish Irreparable
            Harm ..........................................................................................................8

    C.    Plaintiff is Unlikely to Prevail on
            the Merits of His Claim............................................................................12

    D.    Plaintiff Has Raised Issues of
            Fact That Should be Considered
            at an Evidentiary Hearing .......................................................................16

CONCLUSION.................................................................................................................17

<u>TABLE OF AUTHORITIES</u>

Cases                                                                          Page

<u>Alside, Inc. v. Larson</u>,
    220 N.W.2d 274 (1974) .................................................................................15

<u>Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.</u>,
    830 F.2d 13 (2d Cir.1987)............................................................................7

<u>Bell & Howell v. Masel Supply Co.</u>,
    719 F.2d 42 (2d Cir.1983)............................................................................8

<u>Bennett v. Storz Broad. Co.</u>,
    134 N.W.2d 892 (Minn. 1965).....................................................................12

<u>Bradford v. New York Times Co.</u>,
    501 F.2d 51 (2d Cir. 1974)......................................................................10, 12

<u>Cherne Indus. Inc. v. Grounds & Assoc. Inc.</u>,
    278 N.W.2d 81 (Minn. 1979).......................................................................15

<u>Commodity Futures Trade Comm'n v. Incomco, Inc.</u>,
    649 F.2d 128 (2d. Cir. 1981).......................................................................16

<u>Davies & Davies Agency, Inc. v. Davies</u>,
    298 N.W.2d 127 (Minn. 1980).....................................................................15

<u>Dean Van Horn Consulting Assoc. v. Wold</u>,
    367 N.W.2d 556 (Minn. Ct. App. 1985)......................................................15

<u>Dynamic Air, Inc. v. Bloch</u>,
    502 N.W.2d 796 (Minn. Ct. App. 1993)......................................................15

<u>Eutectic Welding Alloys Corp. v. West</u>,
    160 N.W.2d 566 (Minn. 1968).....................................................................10

<u>Hanson Trust PLC v. ML SCM Acquisition, Inc.</u>,
    781 F.2d 264 (2d Cir.1986)........................................................................7-8

<u>Innoviant Pharmacy, Inc. v. Morganstern</u>,
    390 F.Supp.2d 179 (N.D.N.Y 2005) ...........................................................10

<u>Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.</u>,
    920 F.2d 171 (2d Cir. 1990)........................................................................14

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,
    596 F.2d 70 (2d Cir. 1979)..................................................................8

Jolly v. Coughlin,
    76 F.3d 468 (2d Cir. 1996)..................................................................8

Kallok v. Medtronic, Inc.,
    573 N.W.2d 356 (Minn. 1998)............................................................12

L-3 Communications Corp. v. Kelly,
    10 Misc.3d 1055 (Suffolk Co. 2005) ...................................................10

LaRouche v. Webster,
    566 F. Supp. 415 (S.D.N.Y. 1983) ......................................................16

Linkco, Inc. v. Fujitso Ltc.,
    2002 WL 237838 (S.D.N.Y. 2002).......................................................14

Loveridge v. Pendleton Woolen Mills, Inc.,
    788 F.2d 914 (2d Cir. 1986)................................................................8

Maltby v. Harlow Meyer Savage, Inc.,
    166 Misc.2d 481 (N.Y. Co. 1995) ................................................. 11-12

Med. Soc'y of New York v. Toia,
    560 F.2d 535 (2d Cir.1977)..................................................................7

Medtronic, Inc.  v. Advanced Bionics Corporation,
    630 N.W.2d 438 (Minn. Ct. App. 2001)............................... 11-12, 14

Medtronic, Inc. v. Gibbons,
    527 F. Supp. 1085 (D. Minn. 1981)..............................................10, 12

Modern Controls, Inc. v. Andreadakis,
    578 F.2d 1264 (8th  Cir. 1978) ........................................................12-13

Natsource, LLC v. Paribello,
    151 F.Supp.2d 465 (S.D.N.Y. 2001).....................................................15

New York Magazine v. Metropolitan Trans. Auth.,
    136 F.3d 123 (2d Cir. 1998).................................................................8

Overholt Crop Ins. Serv. Co., Inc.. v. Bredeson,
    437 N.W.2d 698 (Minn. Ct. App. 1989).............................................14-15

Patton v. Dole,
    806 F.2d 24 (2d Cir.1986).....................................................................7

Reed, Roberts Associats, Inc. v. Strauman,
    40 N.Y.2d 303, 353 N.E.2d 590 (1976)....................................................12

Roth v. Gamble-Skogmo, Inc.,
    582 F. Supp. 1029 (D. Minn. 1982)........................................................15

Thermorama, Inc. v. Buckwold,
    125 N.W.2d 844 (Minn. 1964)..............................................................10

Ticor Title Ins. Co. v. Cohen,
    173 F.3d 63 (2d. Cir. 1999)...............................................................10

Vermont Microsystems, Inc. v. Autodesk, Inc.,
    88 F.3d 142 (2d Cir. 1996)...............................................................14

Statutes

Rule 65, Federal Rules of Civil Procedure ...............................................1, 16

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X

DANIEL EISNER,

                Plaintiff,

      -against-

WALLEYE TRADING ADVISORS, LLC

                Defendant.

--------------------------------------------------------------- X

                        07 CIV 7837 (AKH)

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

      Defendant, Walleye Trading, LLC ("Walleye Trading"), respectfully submits this memorandum of law in opposition to the motion by Plaintiff, Daniel Eisner ("Eisner"), for a preliminary injunction enjoining Walleye Trading "from attempting to enforce the non-competition agreement signed by Eisner in a manner that prevents Eisner from working for D. E. Shaw & Co., L.P. as a Systems Analyst," pursuant to Rule 65, Fed. R. Civ. P.[1]

### PRELIMINARY STATEMENT

      By his pre-discovery motion for a preliminary injunction, Eisner attempts to side-step the non-competition provision of his written employment agreement with Walleye Trading, his former employer, a Minnesota-based company engaged in the highly proprietary business of trading securities using quantitative strategies to execute trades using a specialized computerized

---

[1]   It is difficult to interpret what Eisner means by an injunction enjoining Walleye Trading "from attempting to enforce the non-competition agreement signed by Eisner in a manner that prevents Eisner from working for D. E. Shaw & Co., L.P. as a Systems Analyst."  Walleye Trading will assume, however, that apart from the precise nature of the injunctive relief that Eisner seeks, the pivotal issue for the Court is whether the non-competition agreement is enforceable.  In any event, it would appear that Eisner's motion seeks relief that is the same as, or tantamount to, the ultimate relief requested in the complaint.

trading system.  For over two years, Eisner helped design and build Walleye Trading's complex

IT architecture – "from the ground up," in Eisner's words.[2]  This architecture supports Walleye

Trading's entire trading system and gives the company a competitive advantage in a highly

competitive arena.  Eisner now wants to exploit his extensive knowledge of Walleye Trading's

computer architecture by taking a position with D. E. Shaw & Co., L.P. ("D. E. Shaw"), which is

one of only 18 firms in the securities industry that Walleye Trading considers to be a direct

competitor in this specialized securities industry business.

      Shortly after its inception, in or around June 2005, Walleye Trading hired Eisner

as its dedicated systems person to work on the design and implementation of Walleye Trading's

IT infrastructure.  Then four years out of school, Eisner cut his teeth working at the direction of

Ori Kushnir ("Kushnir"), who, as a founding member of the firm, was responsible for, among

other things, developing and maintaining all technology for Walleye Trading, including IT

infrastructure.[3]

      In his accompanying affidavit, Kushnir describes – at a level of detail appropriate

to the public nature of this proceeding – the nature and extent of the specialized systems

information at the heart of Walleye Trading's business, of which Eisner acquired intimate

knowledge while at Walleye Trading.  Kushnir Aff. ¶¶ 16-20.  Again at an appropriate level of

---

[2]  Affidavit of Daniel Eisner, sworn to October 9, 2007 ("Eisner Aff."), ¶ 16.

[3]  Affidavit of Ori Kushnir, sworn to October 23, 2007 ("Kushnir Aff.") ¶ 9. The Kushnir Aff. dispels the false impression given by the Eisner Aff. that Eisner was the only computer scientist at Walleye Trading, and that he single-handedly designed and built the computer system there from the ground up.  The system is largely the brainchild of Kushnir, who has the equivalent of a bachelor's of science in computer science and physics from Tel Aviv University; was awarded the second highest award in Israel for non-combat contributions to national security for his computer research for the Israeli Ministry of Defense, researching and developing large-scale data communications, networking and related technologies; held leading technology positions in several companies; and is the co-inventor of several patents in the field of computer science. Kushnir Aff. ¶ 8.

detail, Kushnir provides concrete examples of the specialized nature of Eisner's work at Walleye Trading, and the large extent to which he learned highly confidential information through a process of trial and error, and in close collaboration with Kushnir and other Walleye Trading personnel.  Kushnir Aff. ¶¶ 16-20.

In short, Eisner grew thoroughly familiar with all of the most confidential details of the design of Walleye Trading's highly specialized and proprietary computer system, which gives Walleye Trading an edge in high-volume quantitative trading, where nanoseconds matter and a system crash can mean the loss of millions.  Kushnir Aff. ¶¶ 10-18.

Eisner now seeks to cash in on the extensive knowledge and experience he gained under Kushnir at Walleye Trading.  To do so, he mischaracterizes the nature and extent of the work he did at Walleye Trading, and misrepresents, or simply fails to elaborate on, the nature and extent of the work he will do at D. E. Shaw.  Eisner also chooses not to disclose what his compensation package would be at D. E. Shaw.  But, barely six years out of school, Eisner does admit that D. E. Shaw has offered him a salary "substantially higher than [his] salary at Walleye."  Eisner Aff. ¶ 42.  Indeed, in seeking employment with D. E. Shaw, Eisner appears prepared to forego $240,000 over the next two years, as the non-compete provision is operative for two years only if Walleye Trading continues to pay Eisner his base salary of $120,000 per year, which Walleye Trading has been doing, without protest from Eisner, since he resigned, in July 2007.  The likely fact that D. E. Shaw is footing the bill for Eisner's prosecution of this action, moreover, tends to confirm the suspicion that D. E. Shaw is hiring Eisner at least in part for his specialized knowledge of Walleye Trading's highly confidential computer system.[4]

---

[4]  There is often a question in the context of pre-discovery motions for preliminary injunctive relief, and a serious question here, as to whether the plaintiff has chosen to make the motion to obtain relief expeditiously despite the benefit of discovery disclosure, or in feigned urgency to

The Court should therefore deny Eisner's motion because the non-compete agreement is reasonable and appropriate, there is ample (indeed, on-going) consideration paid for the restriction, and the provision is fair and will not prejudice Eisner in the least. Indeed, as L. Michael Levinson ("Levinson"), a recruiter with 20 years experience of placing IT professionals, testifies in his accompanying affidavit, Eisner can deploy his skills by working for any of the hundreds of firms in the securities industry at which Eisner's employment as a systems professional will not pose a competitive threat to Walleye Trading. Affidavit of L. Michael Levinson, sworn to October 23, 2007 ("Levinson Aff."). In contrast to the hundreds of firms that Levinson identifies, Kushnir provides a list of only 18 firms that Walleye Trading considers off limits to Eisner. Kushnir Aff. ¶ 30. D. E. Shaw happens to be one of the most prominent firms on that short list.

Eisner's claim of "career" prejudice, moreover, is inherently incredible. On the one hand, he argues that he will be rendered a virtual dinosaur in the industry if he cannot immediately start working for D. E. Shaw, due to the rapid pace of change within his field. Eisner Aff. ¶ 39; see also Reiss Aff. ¶ 11. On the other hand, Messrs. Pavlicic and Reiss (D. E. Shaw's witnesses) claim that D. E. Shaw has no or little interest in the work that Eisner did at Walleye Trading over the past two-plus years; they are interested only in the work that Eisner did for the SIAC in 2005 and before. Pavlicic Aff ¶ 7 and Reiss Aff. ¶ 6.

Through Messrs. Pavlicic and Reiss, moreover, D. E. Shaw further advocates for hiring Eisner because they were poised to interview and presumably hire him in 2005, based on his pre-Walleye Trading resume. But Eisner knowingly rejected that prospect in 2005 and

avoid such disclosure.

instead accepted employment at Walleye Trading. As stated, there has been no discovery,[5] but one begins to surmise from these allegations that in 2005, with little or no systems experience at a quantitative trading firm, Eisner figured he could make more money at Walleye Trading than at D. E. Shaw. Now that Eisner has designed Walleye Trading's computer system from soup to nuts, D. E. Shaw is prepared to pay him a "substantially higher" amount than what Walleye Trading was paying, for reasons that for now can only be inferred.[6]

A preliminary injunction is an extraordinary remedy and requires the movant to meet heightened requirements of proof. Where, as here, the motion seeks relief that is equivalent to the ultimate relief requested by the plaintiff in the plenary action, the thresholds are higher still. In spite of this, Eisner makes his motion, on the basis of self-contradictory and conclusory assertions, and without having participated in any discovery. Walleye Trading, in contrast, lays bare substantial evidence showing that it has a valid and enforceable non-compete agreement supported by more-than-adequate consideration, that Eisner is in possession of confidential and proprietary information and that Walleye Trading has a legitimate, real concern with guarding against its use by a competitor. Eisner may pursue any number of employment opportunities that do not run afoul of his non-compete. The Court should deny Eisner's motion in its entirety.

## FACTS

All the relevant facts in opposition to Eisner's motion are set forth in detail in the accompanying Kushnir and Levinson Affs. In sum, Kushnir shows that Walleye Trading's unique computerized trading system is highly proprietary and confidential and that Eisner knows

---

[5] See accompanying Declaration of Harry W. Lipman, Esq. dated October 23, 2007, attaching Walleye Trading's First Request for Production and Notice of Deposition, and explaining that there has been no discovery in this action..

[6] Even D. E. Shaw's witness Peter Riess cannot help but admit that in 2007 he "found Eisner's experience overseeing the infrastructure at Walleye ... relevant." Reiss Aff. ¶ 6.

the system intimately through working at Kushnir's direction for over two years. Kushnir Aff. ¶¶ 14-20. Kushnir further substantiates that Walleye Trading is legitimately concerned with Eisner working at a competitor, and is prepared to pay $120,000 per year under the restrictive covenant to hold Eisner to his agreement. Kushnir Aff. ¶¶ 34-37. Kushnir also reveals that there are only 18 firms in the entire securities industry that Walleye Trading considers its competitors. Kushnir Aff. ¶ 30.

Levinson, who is unaffiliated with Walleye Trading, flatly disagrees with Mr. Eisner's statement that "Walleye's acts are preventing me from working in my chosen field as an IT professional for two years." Levinson Aff. ¶ 21 (quoting Eisner Aff. ¶ 39). Levinson similarly disputes that Eisner will likely suffer any financial losses or injury as the result of the non-compete agreement, concluding that:

> [F]ar from being 'irreparably injured' by enforcement of his non-compete covenant, Mr. Eisner will likely benefit from it if he gets a job at a non-competitor of Walleye Trading with a pay level similar to that at Walleye Trading; and, given Mr. Eisner's experience and the number of potential employers in the securities industry, I think this is reasonable.

Levinson Aff. ¶ 23.

The employment agreement at issue, entitled "Confidential Employment, Non-Competition, Non-Solicitation, and Non-Disclosure Agreement (the "Employment Agreement"), contains a non-competition provision that restricts Eisner from working for any of Walleye Trading's competitors for a period of two years, but only if Walleye Trading continues to pay Eisner during that term. Eisner Aff. Ex. 1, ¶ 13 ("the provisions of this Paragraph shall only apply to Employee for as long as Employer continues to pay Employee his or her base salary (subject to all applicable withholding taxes) at Employee's last prevailing rate (excluding any bonuses, benefits or any other compensation) during the Noncompete Term.").

As Kushnir concludes, it is vital to Walleye Trading that Eisner abide by the terms of his Employment Agreement and refrain from working for D. E. Shaw. Eisner gained substantial cutting-edge knowledge and experience while employed by Walleye Trading. He was intimately involved with the development and implementation of Walleye Trading's sophisticated computerized trading system, which provides Walleye Trading a significant competitive advantage in this extremely competitive field. Further, D. E. Shaw is a direct competitor of Walleye Trading's in the field of quantitative securities trading. Finally, Eisner will not be prejudiced by observing the terms of his Employment Agreement but will, instead, enjoy a financial windfall over the next two years.

ARGUMENT

A.    <u>Standards for Issuance of a Preliminary Injunction</u>[7]

A preliminary injunction "is an extraordinary remedy and should not be routinely granted." <u>Patton v. Dole</u>, 806 F.2d 24, 28 (2d Cir.1986) (citations omitted). A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." <u>Hanson Trust PLC v. ML SCM Acquisition, Inc.</u>, 781 F.2d 264, 273 (2d Cir.1986) (quoting <u>Med. Soc'y of New York v. Toia</u>, 560 F.2d 535, 537 (2d Cir.1977)).

To obtain a preliminary injunction, the moving party must establish (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions

---

[7] The procedural question of whether Plaintiff is entitled to a preliminary injunction is governed by Rule 65 of the Federal Rules of Civil Procedure. *See* <u>Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.</u>, 830 F.2d 13, 15 (2d Cir.1987) (in diversity actions, the question of whether a preliminary injunction should be granted is generally one of federal law). The Employment Agreement contains a choice of Minnesota law. Eisner suggests that public policy requires that New York law should govern the enforceability of the restrictive covenant, but acknowledges that the court need not address the choice of law question because there is no actual conflict between the laws of New York and Minnesota. <u>See</u> Eisner Memorandum of Law at footnote 3.

going to the merits to make them a fair ground for litigation and "a balance of hardships tipping

decidedly toward the party requesting the preliminary relief." Hanson Trust, 781 F.2d at 273.

Moreover, where, such as here, granting a preliminary injunction would

effectively grant the ultimate relief sought in the action, the moving party must make a "clear" or

"substantial" showing of likelihood of success on the merits in order to qualify for such relief.

New York Magazine v. Metropolitan Trans. Auth., 136 F.3d 123, 127 (2d Cir. 1998), cert.

denied, 525 U.S. 824, 119 S.Ct. 68 (1998); Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996).

Here, Plaintiff has not established that he will suffer any irreparable harm resulting from denial

of the injunction nor that he has a likelihood of success on the merits, and his motion should be

denied.

B.    Plaintiff Cannot Establish Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary

injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable

harm before a decision on the merits can be rendered." Bell & Howell v. Masel Supply Co., 719

F.2d 42, 45 (2d Cir.1983) (citations omitted). The harm must be "actual and imminent" and "not

remote or speculative." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.

1979) (citations omitted). Further, "irreparable injury means injury for which a monetary award

cannot be adequate compensation." Jackson Dairy, 596 F.2d at 72. "[W]here money damages are

adequate compensation, a preliminary injunction will not issue since equity should not intervene

where there is an adequate remedy at law." Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d

914, 918 (2d Cir. 1986) (citation omitted).

Plaintiff cannot show that the denial of the preliminary injunction will cause him

harm for the simple reason that Walleye Trading will continue to pay him his annual salary of

$120,000 without aid of the injunction.  Further, Eisner is free to supplement that income through employment with any of the hundreds of employers that hire highly skilled IT professionals in lucrative positions but who do not compete directly with Walleye Trading in the small field of quantitative securities trading.   Levinson Aff. ¶ 17-18.  Plaintiff is poised to enjoy a virtual bonus of $120,000 per annum without the aid of a preliminary injunction, so it is difficult to imagine a situation in which the risk of irreparable harm would be more remote.

Further, if Walleye Trading has impermissibly damaged Eisner by seeking to enforce the Employment Agreement (which it has not), Eisner can easily quantify his alleged damages.  Monetary damages could readily be calculated, for a one-year period, as the difference between the amount that D.E. Shaw would have paid Eisner for that year minus (a) the $120,000 that Walleye Trading would have paid together and (b) the income Eisner could have earned from non-infringing employment.  Because Eisner's damages are not irreparable, Eisner's request for a preliminary injunction should be denied.

Moreover, the balance of hardships favors Walleye Trading in this case.  Even if Eisner chooses not to obtain a non-infringing job, the hardship imposed on Eisner during a well-paid vacation is much less than the potential irreparable harm caused to Walleye Trading by having its former Chief Technologist perform identical or nearly identical functions for a direct competitor.  Both Minnesota and New York law recognize that improper disclosure of confidential information is presumed to cause irreparable harm.[8]  "A threat of irreparable harm

---

[8]      In addition, Eisner specifically agreed in Section 15 of the Employment Agreement that all of the restrictive covenants in the Agreement (including the non-competition provision) are "reasonable and necessary in order to protect and maintain the legitimate business interests of [Walleye Trading], and that their enforcement would not prevent [Eisner] from earning a livelihood, especially given that [Eisner] is skilled in other areas and would only be skilled in the areas protected by this Agreement as a result of the training and know-how provided by [Walleye Trading]." Employment Agreement, § 15.  Moreover, Eisner agreed and admitted that

- 9 -

can be inferred from the breach of a valid and enforceable restrictive covenant." Medtronic, Inc.
v. Gibbons, 527 F. Supp. 1085, 1090-91 (D. Minn. 1981); Eutectic Welding Alloys Corp. v.
West, 160 N.W.2d 566, 569 n. 4. (Minn. 1968); Thermorama, Inc. v. Buckwold, 125 N.W.2d
844, 845 (Minn. 1964); Innoviant Pharmacy, Inc. v. Morganstern, 390 F.Supp.2d 179 (N.D.N.Y
2005) ("irreparable harm is presumed where a trade secret has been misappropriated")
(collecting cases); L-3 Communications Corp. v. Kelly, 10 Misc.3d 1055 (Suffolk Co. 2005)
("New York law recognizes that irreparable harm is presumed when trade secrets have been
misappropriated").

Walleye Trading's continued payment of Eisner's salary militates strongly against
any finding of irreparable harm. In Medtronic Inc v. Gibbons, 527 F. Supp. at 1094, the district
court granted a preliminary injunction prohibiting an employee from violating a restrictive
covenant. The potential harm to the employee was "relatively minor" because "Pacesetter
[plaintiff] has agreed to pay [defendant] Gibbons a stipend of approximately $4,000 a month if
he is enjoined from contacting his former Medtronic customers." Payment of the "stipend"
"virtually guarantees that Gibbons will not suffer serious deprivation of income during the term
of an injunction." Id.

In Bradford v. New York Times Co., 501 F.2d 51, 58 (2d Cir. 1974), the
employer agreed to provide the employee with annual installments of stock following his
retirement or severance, so long as plaintiff refrained from competing. The Court determined
that the ongoing consideration for plaintiff's agreement not to compete weighed heavily in favor

---

Walleye Trading would suffer irreparable injury if he breached the Agreement, and that Walleye
Trading's remedy at law for damages would be inadequate, thus entitling the firm to an
injunction to restrain any breaches. Id. This provision can be viewed "as an admission by [the
employee] that [the company] will suffer irreparable harm were [the employee] to breach the
contract's non-compete agreement." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d. Cir.
1999).

of the reasonableness and enforceability of the restraint on competition. The Court stated:

> He [plaintiff] was to receive annual installments of stock for a ten-year period so long as he abided by his promise not to compete. . . . While this was a restraint upon his liberty, it can hardly be described as unreasonable. . . . We think, therefore, that the case has an element not present in the prior employee cases in which there was no consideration for the post-employment covenant against competition, and that this factor cannot be overlooked in determining the reasonableness of the restraint presented here.

*Id.* at 58.  Similarly, in <u>Maltby v. Harlow Meyer Savage, Inc.</u>, 166 Misc.2d 481, 486 (N.Y. Co. 1995) the Court enforced a restrictive covenant, concluding "[t]he restrictive covenants are reasonable in that each protects the employer from severe economic injury while – at the same time – it protects the employee's livelihood <u>by requiring that he be paid his base salary</u>" (emphasis added).

Eisner also cannot establish that he will suffer irreparable "career" harm if he is unable immediately to work for D.E. Shaw.  As set forth in the Kushnir and Levinson Affs., Eisner's educational and career experience enable him to obtain employment among any of the hundreds of other firms both within the securities industry and in other industries that hire teams of skilled IT professionals to perform cutting-edge and highly lucrative systems work, but who do not compete against Walleye Trading in the niche field of quantitative securities trading.  <u>See</u> Kushnir Aff. ¶ 41; Levinson Aff. ¶ 18.

The fact that Eisner voluntarily left Walleye Trading for D.E. Shaw while fully aware that such employment encroached on his non-compete agreement, further militates against a finding that he will be irreparably harmed by abiding by the terms of the non-compete.  In <u>Medtronic, Inc. v. Advanced Bionics Corporation</u>, the Minnesota Court of Appeals rejected an employee's claim of irreparable harm in part because the employee had knowingly assumed the risk that the restrictive covenant might be enforced:

> Stultz contends that if the restriction is enforced and he "was
> unable to work, earn a living, and actively maintain [his] business
> relationships and involvement in the neurostimulation/pain
> management field for over two years," his career would be
> irreparably harmed.  But Stultz voluntarily left Medtronic's
> employ, knowing that future employment may be subject to the
> noncompete agreement, thus creating the current situation.

630 N.W.2d 438, 453 (Minn. Ct. App. 2001).

Consequently, in the present case, as in <u>Medtronic</u>, <u>Bradford</u> and <u>Maltby</u>, the real

risk of irreparable harm is to the former employer.

C.     <u>Plaintiff is Unlikely to Prevail on the Merits of His Claim</u>

Similar to New York law, Minnesota law permits enforcement of a restrictive

covenant when the covenant is "for a just and honest purpose, for the protection of a legitimate

interest of the party in whose favor it is imposed, reasonable as between the parties, and not

injurious to the public." <u>Bennett v. Storz Broad. Co.</u>, 134 N.W.2d 892, 898 (Minn. 1965);

<u>Kallok v. Medtronic, Inc.</u>, 573 N.W.2d 356, 361 (Minn. 1998) ("non-compete agreements are

enforceable if they serve a legitimate employer interest and are not broader than necessary to

protect this interest"). A company's business, good will, trade secrets, and confidential

information are legitimate interests that may be protected. <u>Medtronic, Inc. v. Advanced Bionic</u>

<u>Corp.</u>, 630 N.W.2d 438, 456 (Minn. Ct. App. 2001); <u>Reed, Roberts Associats, Inc. v. Strauman</u>,

40 N.Y.2d 303, 353 N.E.2d 590 (1976) ("restrictive covenants will be enforceable to the extent

necessary to prevent the disclosure or use of trade secrets or confidential information").

To constitute a protectible interest under a covenant not to compete, confidential

information need not rise to the level of a trade secret. <u>Modern Controls, Inc. v. Andreadakis</u>,

578 F.2d 1264, 1268 (8th  Cir. 1978) ("the Minnesota Supreme Court has held that confidential

business information which does not rise to the level of a trade secret can be protected by a

properly drawn covenant not to compete"). "An employer need only show that an employee had access to confidential information and a court will then determine the overall reasonableness of the covenant in light of the interest sought to be protected." *Id.*

Walleye Trading's computerized securities trading system is highly confidential and is the type of proprietary business system entitled to protection by a restrictive covenant. Eisner and other Walleye Trading employees spent a significant amount of time and resources to develop this system. The system consists of non-standardized configurations of software, servers, networks, and other hardware that have been uniquely researched and combined (geographically and technologically) to attain a low cost, high speed, low-latency, replicated and distributed data center architecture (the "Architecture"). The Architecture provides Walleye Trading with a significant competitive advantage in the form of robust trading capacity for a fraction of the trading and other costs incurred by other securities firms. Walleye Trading has systematically sought to protect this confidential information through the use of security measures and restrictive covenants. Walleye Trading has a legitimate business interest in protecting this information. Kushnir Aff. ¶¶ 18; 15.

Importantly, Eisner became intimately familiar with Walleye Trading's computer system while working for Walleye Trading. Eisner did not know how to design an optimized trading system like Walleye Trading's upon joining the firm, in 2005. Working closely with other Walleye Trading employees, particularly Kushnir, and with consultants and vendors, Eisner worked around many design problems and came up with customized solutions to create a highly specialized computerized trading system, which Walleye Trading legitimately considers highly confidential. Kushnir Aff. ¶¶ 16-20.

Customized business systems similar to Walleye Trading's computer system are

proprietary and are afforded protection by restrictive covenants. There is no basis for Eisner's

argument that because the individual hardware and software components of Walleye Trading's

computer system are publicly available, the overall system is not proprietary or confidential.

A protected trade secret or proprietary system "can consist of a combination of

characteristics and components, each of which, by itself, is in the public domain, but the unified

process, design and operation of which, in unique combination, affords a competitive advantage

and is a protectible secret." Linkco, Inc. v. Fujitso Ltc., 2002 WL 237838 (S.D.N.Y. 2002).

Protection of proprietary business systems is particularly appropriate, where, as here, the system

involves combinations of sophisticated technological components. In Integrated Cash

Management Services, Inc. v. Digital Transactions, Inc., 920 F.2d 171 (2d Cir. 1990), the Second

Circuit enjoined plaintiff's former employers from working on similar computer systems for

plaintiff's competitor. The Court reasoned:

> The architecture of ICM's product, or the way in which ICM's
> various components fit together as building blocks in order to form
> the unique whole, was secret. The particular combination of
> procedures used in plaintiff's computer system, and the particular
> features within the system are neither obvious nor easily
> duplicated.

Id. at 174. Similarly, in Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 148 (2d

Cir. 1996), the Court held that plaintiff's graphics application constituted proprietary information

despite that it was developed from components available in the public domain.

The time and territory restrictions in the non-compete are reasonably necessary to

protect Walleye Trading's legitimate business interest in protecting its proprietary computer

Architecture. Two-year restrictive covenants are reasonable under Minnesota law. Medtronic,

Inc. v. Advanced Bionics Corp., 630 N.W.2d 438, 453 (Minn. Ct. App. 2001) (enforcing two-

year non-compete); Overholt Crop Ins. Serv. Co., Inc.. v. Bredeson, 437 N.W.2d 698, 703

(Minn. Ct. App. 1989) (two-year restriction held reasonable); <u>Dean Van Horn Consulting Assoc.</u>
<u>v. Wold</u>, 367 N.W.2d 556 (Minn. Ct. App. 1985) (three-year covenant held reasonable); <u>Cherne</u>
<u>Indus. Inc. v. Grounds & Assoc. Inc.</u>, 278 N.W.2d 81 (Minn. 1979) (enforcing two-year
covenant); <u>Alside, Inc. v. Larson</u>, 220 N.W.2d 274 (1974) (enforcing three-year covenant).  A
longer time period is reasonable where, as here, post-employment payments are involved.  <u>Roth</u>
<u>v. Gamble-Skogmo, Inc.</u>, 582 F. Supp. 1029 (D. Minn. 1982).

      Given the scope of Walleye Trading's business and trading, and that of its
competitors, an unlimited geographic scope is also reasonable.  Walleye Trading or any business
like it could be located practically anywhere.  Regardless of any potential unreasonableness,
however, Walleye Trading is seeking to enforce the Employment Agreement in the same city in
which Eisner worked for Walleye Trading, so the geographic overbreadth argument is misplaced.
<u>Dynamic Air, Inc. v. Bloch</u>, 502 N.W.2d 796, 800 (Minn. Ct. App. 1993) ("[W]e hold that a
restrictive covenant on employment, lacking a territorial limitation, is not *per se* unenforceable");
*accord*, <u>Natsource, LLC v. Paribello</u>, 151 F.Supp.2d 465, 471-72 (S.D.N.Y. 2001) (considering a
non-compete extending throughout the United States).  If a non-compete clause is overbroad, a
court can enforce it to the extent that it is reasonable. <u>Davies & Davies Agency, Inc. v. Davies</u>,
298 N.W.2d 127, 131 n.1 (Minn. 1980) ("in employment cases, a court should be permitted to
make changes . . . rather than be compelled to strike down the entire agreement as
unreasonable").  Here, it is certainly reasonable to apply the non-compete to the state of New
York.

      Consequently, Eisner cannot establish a likelihood of success on the merits.
Eisner clearly obtained proprietary information concerning Walleye Trading's computer system
while employed by Walleye Trading and he now seeks to obtain virtually identical employment

at D.E. Shaw in violation of the clear terms of his Employment Agreement.

D.    Plaintiff Has Raised Issues of Fact That Should be
      Considered at an Evidentiary Hearing

Eisner's failure to establish irreparable harm or a likelihood of success on the merits warrants denial of his motion without a hearing. LaRouche v. Webster, 566 F. Supp. 415, 419 n. 5 (S.D.N.Y. 1983) ("there is no doubt that a preliminary injunction may be denied without a hearing . . . when the written evidence shows the lack of a right so clearly that receiving further evidence would be manifestly pointless"). Here, Eisner's motion fails on its face, thus justifying denial of the motion.

At most, Plaintiff may have raised issues of fact concerning his entitlement to a preliminary injunction. If the Court is not inclined to deny Eisner's application on the papers, Walleye Trading requests the opportunity to offer evidence at a hearing concerning the proprietary nature of its computer system and D.E. Shaw's status as a competitor, among other issues. "It is settled law in this Circuit that motions for preliminary injunctions should not be decided on the basis of affidavits when disputed issues of fact exist . . . the existence of factual disputes necessitates an evidentiary hearing . . . before a motion for a preliminary injunction may be decided." Commodity Futures Trade Comm'n v. Incomco, Inc., 649 F.2d 128, 131 (2d. Cir. 1981).

## CONCLUSION

For the foregoing reasons, defendant, Walleye Trading, respectfully requests that

the Court deny Eisner's Motion for a Preliminary Injunction in its entirety.

Dated:  New York, New York
       October 23, 2007

ROTTENBERG LIPMAN RICH, P.C.

By: _____
      Harry W. Lipman (HL 4207)
      Thomas E. Chase (TC 8266)
369 Lexington Avenue, 16th Floor
New York, NY 10017
(212) 661-3080
Attorneys for Defendant, Walleye Trading
Advisors, LLC